

Pro-Se Litigant
Dr. Aparna Vashisht-Rota
12396 Dormouse Road,
San Diego, CA 92129
USA
Email: aps.rota@gmail.com
Telephone: 858-348-7068

**FILED**

Feb 19 2020

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY        s/ vanessac        DEPUTY

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APARNA VASHISHT-ROTA, an individual,<br><br>        Plaintiff,<br><br>v.<br><br>HOWELL MANAGEMENT SERVICES, a Utah limited liability company; and CHRIS HOWELL, an individual<br><br>        Defendants. | Case No. **'20CV0321 MMA KSC**<br><br>**COMPLAINT FOR:**<br><br>**(1) UNLAWFUL AND UNFAIR BUSINESS PRACTICES**<br>**(2) UNFAIR COMPETITION**<br>**(3) FRAUD**<br>**(4) FALSE PROMISES**<br>**(5) UNPAID WAGES AND EXPENSES ORDER ENFORCEMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Dr. Aparna Vashisht-Rota ("Plaintiff") alleges as follows:

### JURISDICTION AND VENUE

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1), because the amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different States.

2.    Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the claims asserted herein occurred or had

effects in this District and those arose out of the business dealings between the parties in San Diego, California.

3.    This Court has personal jurisdiction over both Defendants because Defendants have minimum contacts with the State of California by virtue of their continuous and systematic activity in the California's forum.

## PARTIES

4.    Plaintiff Aparna Vashisht-Rota ("Plaintiff") is, and at all times mentioned was, a resident of San Diego, California, and a citizen of the State of California. At all times mentioned in this complaint Defendant Howell Management Services, LLC, employed Plaintiff.

5.    Plaintiff is informed and believes Defendant Howell Management Services, LLC ("HMS") is, and at all times mentioned was, a Utah limited liability company and existing under and by virtue of the laws of the State of Utah with its principle place of business in Smithfield, Cache County in the State of Utah. All Defendants' members are Utah residents.

6.    Plaintiff is informed and believes Defendant Chris Howell ("Howell") is an individual, and at all times mentioned herein, residing in the State of Utah. Plaintiff further alleges that Howell is the owner, manager, and/or president of HMS.

7.    From time to time, HMS and Howell shall be collectively referred to as "Defendants."

## FACTUAL BACKGROUND

8.    Plaintiff and Defendant Howell met in San Diego CA in May 2015 for international student recruitment. Defendants employed Plaintiff for new business development to acquire universities, university referring agents to deliver exclusive and direct partnerships for the Defendants. Plaintiff introduced her business contact Mr. Hernandez ("Hernandez") to Defendants in October 2015 that resulted in Lindenwood ("LU") and Ottawa University ("OU") for Defendants. Hernandez and

2

Plaintiff entered into a referral contract that pays Plaintiff on per student recruited and placed by Defendants on June 6, 2016, ("Hernandez Contract") (Exhibit A). On May 3rd, 2016, Plaintiff had entered into a similar referral agreement ("WestCliff Contract") (Exhibit B) with WestCliff University ("WU") for referring Defendants to "WU". Defendants directed Plaintiff that both Defendants and respective third parties such as "WU" and "Hernandez" should pay Plaintiff as they both benefitted from the Plaintiff's introduction.

9.    Plaintiff and Defendants had 3 employment contracts[1] dated December 17, 2015, August 3rd, 2016, and dated April 24th, 2017. (First, Second, and Third[2] respectively). The contracts covered the compensation for introducing Defendants to Hernandez that resulted in ("LU") and ("OU"), introducing Defendants to "WU", and new business development that benefits all Defendants current or future university partners. During negotiations of the Third Agreement (Exhibit C), Plaintiff faced sexual harassment[3] by Defendant Howell and (Spencer, an IC at HMS) and rescinded her signature from the Utah employment agreements on May 6th, 2017. Defendants acknowledged this rescission on May 8th, 2017 reverting the parties back to the Second Agreement (Exhibit D and Da[4]). The contracts are summarized in (Exhibit E).

10.    Plaintiff spent most of her time under the First and Second Agreements in her employment with Defendants acquiring ("LU"), Ottawa University ("OU") and then developing those two universities by adding channels such as agents, staffing, immigration, and other digital forums. Defendants assigned each task to Plaintiff and they are 1) University addition assigned in October 2015 with an introduction to Hernandez and with a database of 700+ universities as per Defendants' precise

---

[1] There are 5 agreements, one contract was formed on November 30th, 2015 but the Defendants don't concede that fact, as Plaintiff did not inform the Defendants that she signed that agreement that already had Defendant Howell's signature. In contrast, the Defendants sued Plaintiff based on contracts that it did not tell Plaintiff that it had signed even after Plaintiff rescinded stating that Defendants do not need to inform Plaintiff.
[2] The Utah court ruled that the Fourth Agreement was not formed and it differs from the Third in only missing 1.3.4.
[3] Discrimination and harassment matter pending before the Court in California.
[4] Typed Second Agreement for legibility.

specifications that was delivered from Plaintiff to Defendants in February 2016; 2) Agents development task assigned on March 23, 2016 in addition to the universities leading up to the second agreement that was delivered from Plaintiff to Defendants of a vast agent database with 2,000+ agents in October 2016; 3) Staffing and Immigration task assigned in October 2016 leading up to the alleged Third Agreement that was delivered from Plaintiff to Defendants in March and May 2017 comprising of proprietary databases with over 10,000 companies and 5,000 lawyers. The Second Agreement is a 'requirements'[5] contract for Plaintiff to deliver pipelines of international students for exclusive university partners that have 8,000/year seat capacity at the rate of $10,000-$12,000/student at LU and OU respectively ($80 million to $96 million/year). Exclusives are rare.

11. In each instance, Defendants assigned the task and misappropriated and hid the value of Plaintiff's work. As the terms of the Utah contract were confusing and unclear, Plaintiff rescinded from that agreement prior to receiving countersigned copies. Obtaining countersigned copies was a required procedure to close agreements. Further, Defendants failed to follow the process for modifications stipulated in section 4.4[6] of the alleged Third Agreement leading Plaintiff to believe that there was no agreement because Defendants did not follow the contract. Plaintiff did not agree with the compensation amount in the agreement, tore a check and notified Defendants that acknowledged both. Plaintiff did not believe that agreement was formed or binding. Plaintiff felt coerced to sign these agreements as she felt that if she did not sign, she'd lose all her work and not receive compensation. Defendants followed its own established process for modifications with Hernandez, which contains the same

---

[5] See, e.g., Laclede Gas Co. v. Amoco Oil Co., 522 F.2d 33, 40 (8th Cir. 1975); Eastern Air Lines, Inc. v. Gulf Oil Corp., 415 F. Supp. 429, 442-43 (S.D. Fla. 1975); cf. U.C.C. 2-716 (Comment 2) (requirements contracts considered "unique goods").

[6] 4.4 Modifications. This agreement may not be modified or amended except by a written agreement that refers to this agreement and is signed both parties hereto.

1  terms for such a modification. The Third Agreement was to offer higher
2  compensation to Plaintiff.

3      12.    In parallel, around November 2016, Hernandez and Plaintiff began
4  discussing terms of a new agreement with higher compensation and were supposed to
5  enter new agreements in March 2017 but due to the sexual harassment Plaintiff
6  suffered, Plaintiff panicked and released him from the new contract that was all but
7  pending signatures on March 28th, 2017. The old contract between Hernandez and
8  Plaintiff dated June 6th, 2016 ("Hernandez Contract") was partially enforced in
9  arbitration between Hernandez and Plaintiff in October 2019 because the 'release'
10 ended up being applicable to the June 6th, 2016 contract. During those proceedings,
11 Plaintiff became aware of the defamatory statements that the Defendants were making
12 to university partners. Plaintiff learned that Defendants paid Hernandez $72,000 for 6
13 months of work *with* lifetime royalties with no other work obligations. In contrast,
14 Plaintiff had performed 4 tasks with no compensation whatsoever. Hernandez further
15 noted that he had 'blocked' Plaintiff after the 'release' on March 28th, 2017 and
16 encouraged the Defendants to do the same. The Defendants wrote approximately 75
17 days later to obtain a 'release' of liability.

18     13.    Plaintiff rescinded on May 6th, 2017, from the alleged UT agreement due
19 to unconscionable and confusing compensation terms. Plaintiff thought that the
20 Second Agreement was the last operative agreement between the parties. However,
21 Defendants surprised her first with a check for $500 under the new agreements in
22 early June 2017 and further surprised her with the fully executed Utah Agreements on
23 June 11, 2017 stating that it had signed both the Utah agreements. The Defendants did
24 not fully perform on these agreements either as payments via clauses 1.3.3 (c) and (d)
25 were due. When Plaintiff redirected to be paid $400 under the CA based Second
26 Agreement, Defendants threatened Plaintiff that either Plaintiff accepts the new
27 agreements or provide a 'release' and then reframed the redirection as a refusal.

28     14.    On or around July 10, 2017, Plaintiff helped a student pursuant to

paragraph 1 of First and Second Agreement by taking a phone call to help with an admissions related matter and reported that call to Defendants for transparency. Defendants 'prohibited' Plaintiff from working with its universities via email to a vendor US Admissions ("USA"). Plaintiff brought "USA" to Defendants. Plaintiff's contact brought those universities. Defendants maliciously singled her out to ruin her business as "USA" can place students but Plaintiff is prohibited. Plaintiff submitted a grievance to Defendants about discrimination around this time. Defendants then terminated the alleged UT Agreements effective July 21, 2017.

15.    Plaintiff commenced arbitration proceedings based on the partially superseded Second Agreement but that was closed as in June 2018 the Utah courts ruled that the Third Agreement, agreement dated April 24th, 2017 was the governing contract between the parties. It contains unenforceable provisions that are not a part of the post contractual obligations as per paragraph 3.3 upon termination. Defendants filed an anti-SLAPP suit based on a section in the contract that is unenforceable[7] in California to chill Plaintiff's business interests and freedom to select employment opportunities.

---

2.    **Non-Solicitation and Non-Competition**.

2.1    Non-Solicitation of Clients/Customers. For the duration of this agreement and for twelve (12) months thereafter, irrespective of whether this agreement is terminated voluntarily or involuntarily, for any reason or no reason, Representative agrees not to, directly or indirectly, solicit, accept business from, or perform services for any HMS customer or client, encourage any customer or client of HMS to cease doing business with HMS or to engage in business with any entity or individual competitive with HMS, or otherwise interfere with any of HMS's client and customer relationships. HMS customers and clients include both individuals seeking placement at universities or colleges in the U.S.A. as well as HMS' college and university partners.

2.2    Non-Solicitation of Vendors and Employees. For the duration of this agreement and for twelve (12) months thereafter, irrespective of whether this agreement is terminated voluntarily or involuntarily, for any reason or no reason, Representative agrees not to solicit, divert or induce, directly or indirectly, any of HMS' contractors, vendors, or employees to terminate any relationship with HMS.

2.3    Restrictions Reasonable. Representative and HMS agree that the restrictive covenants provided herein are reasonable and necessary for the protection of HMS' business, goodwill, confidential and proprietary information. If any of the provisions of this Section 2 are held to be unenforceable, the remaining provisions shall nevertheless remain enforceable, and the court making such determination shall modify, among other things, the scope, duration, or geographic area of this Section to preserve the enforceability hereof to the maximum extent permitted by law.

16.    Plaintiff agreed to litigate in Utah in good faith and did not appeal the order, even though the Second Agreement wasn't and is not fully superseded, thinking that once there was ruling on the agreements Defendants would pay in their chosen jurisdiction and as per their own coerced agreement, as that is what was left. Not so. In their moving papers in the Utah litigation near trial, Defendants categorically deny all of Plaintiff's work and efforts under that agreement. Plaintiff learnt recently that Defendants had conceded the UT agreements with respect to jurisdiction only allowing it to escape substantial California liabilities. The Defendants' sole purpose is to kill Plaintiff's business, silence her harassment complaint, coerce waiver of forum, and prolong litigation as long as possible to run out the clock in California. In the Utah action, they have refused discovery for damages, rushed all the deadlines and denied all stay requests such that Plaintiff could not add her California causes of action to that litigation. Defendants then filed to preclude damages that are not known as they refuse to disclose.

17.    Utah contracts may be putative and unenforceable due to unconscionability. It is a fact issue whether Defendants actually signed the Utah agreements on the said date(s). The evidence produced is a declaration and a signed contract produced months later. Defendants have a lot to gain with Utah jurisdiction with evidence so easy to produce.

18.    The Second Agreement states "Expiration or termination of this agreement for *any reason* does not relieve HMS of its obligation to compensate Representative for the development of educational partnerships, new business opportunities and agent relationships. Sections 8 & 9 of this agreement *shall remain in effect* in the event this agreement expires or is terminated." In addition, the Second Agreement notes that the arbitration clause "The foregoing notwithstanding, should either party require that a breach of the agreement requires the enforcement of the agreement by specific performance or other equitable relief not requiring damages, the arbitration provision above shall not be impediment or bar to the pursuit of the

parties equitable remedies. Upon conclusion of the arbitration or litigation...."

Furthermore, the Second Agreement states in paragraph 4 that "Representative agrees not to solicit, divert, accept business from, perform business for or otherwise take away or interfere with any client or customer of HMS; nor solicit, divert or induce any HMS' other contractors or employees to leave HMS' employ at anytime during or after termination of this agreement irrespective of the circumstances or reason for such termination. *This is not applicable in certain instances where Representative develops new business opportunities and/or educational partnerships on behalf of HMS* (emphasis added).

19.    Under the choice-of-law doctrines, and the preponderance of the parties' work, the court ruling that classified Plaintiff as an employee in California, the Plaintiff seeks to bifurcate the case as Plaintiff is entitled to California laws application to all claims arising out of the work and events in California. Plaintiff does not waive forum to get employment related benefits. Plaintiff humbly requests to bifurcate the matter based on dates as it has damages (Exhibit F).

## FIRST CAUSE OF ACTION

**(Unlawful and Unfair Business Practices Business and Professions Code, §§17200)**

**(By Plaintiff against Defendants)**

20.    Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

21.    Defendants constantly changed parameters of her compensation like moving targets and gratuitously sabotaged her efforts to deny value.

22.    Defendants' conduct is against industry norms, in addition to being immoral, unethical, and oppressive as Defendants intentionally hid the true value of Plaintiff's work to gravely harm Plaintiff.

23.    Defendants did the least possible to cause the most harm to Plaintiff's business and livelihood. Plaintiff is a new entrant. Defendants made it impossible for Plaintiff to gain fair money.

24.    Defendants offered unclear agreements to Plaintiff with nonsensical terms. Defendants tricked Plaintiff to her severe detriment and public humiliation.

25.    Defendants maliciously denigrated the quality of her work to the trade contacts, high value agents, and partners she brought to Defendants.

26.    Defendants violated her privacy and confidential grievance.

## **SECOND CAUSE OF ACTION**

### **(Unfair Competition)**

### **(By Plaintiff against Defendants)**

27.    Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

28.    Defendants conspired[8] with Hernandez and other third parties to restrict Plaintiff's trade and commerce.

29.    Plaintiff had prior contracts and contacts with LU and OU. Plaintiff has the right to her own contracts for the properties she developed.

30.    Defendants know that Plaintiff had the right to pursue the universities her own business interests as clearly noted in paragraph 4 of First and Second Agreement encompassing 98% of the employment in California.

---

[8] Forming a trust is a violation of §16720 and §16721 of the California code on Business and Professions code. Trusts are defined in Section 16720 as any "combination" of capital, skill or acts by two or more persons to, *inter alia*, carry out restrictions in commerce, prevent competition, or fix prices. Section 16720 applies to a wide variety of anticompetitive conduct, but applies only where there is proof of a "combination of resources of two or more independent entities for the purpose of restraining competition and preventing market competition." G.H.I.I. v. MTS, Inc., 147 Cal. App. 3d 256, 266 (1983); see also Chavez v. Whirlpool Corp. 93 Cal. App. 4th 363 (2001).

31. Defendants were aware that Plaintiff had other business segments that she wanted to pursue. Defendants acted with focused malice to withhold fair compensation to destroy competition.

32. Defendants' acts of unlawful, unfair, and fraudulent competition have caused harm to Plaintiff, prospective students, and channel partners.

## THIRD CAUSE OF ACTION

### (Fraud)

### (By Plaintiff against Defendants)

33. Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

34. Defendants willfully and intentionally engaged in fraud[9] and deceit throughout the transaction as defined by California Civil Code § 1709-1710.

35. Defendants took possession of her contacts by deception and had no intention of either tagging her work or paying her for the work.

36. Defendants obtained consent based on undue influence. Defendants intentionally suppressed material facts to Plaintiff's severe detriment.

37. Defendants offered Plaintiff unconscionable terms. Defendants' contracts are tainted by procedural unconscionability as Plaintiff could only either sign the UT contract or reject it. Plaintiff was denied all reasonable negotiations and

[9] "The consent of the parties to a contract must be: 1. Free; 2. Mutual; and, 3. Communicated by each to the other." (Civ. Code§ 1565.) "An apparent consent is not real or free when obtained through: 1. Duress; 2. Menace; 3. Fraud; 4. Undue influence; or, 5. Mistake." (Civ. Code§ 1567.) Section 1572 of the Civil Code, which echoes Section 1710, defines "actual fraud" as: ... any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract: 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true; 2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true; 3. The suppression of that which is true, by one having knowledge or belief of the fact; 4. A promise made without any intention of performing it; or, 5. Any other act fitted to deceive. (Cal. Civ. Code§ 1572; see also Rest. Contracts, § 471; Pearson v. Norton (1964) 230 Cal.App.2d 1 "A single fraudulent misrepresentation is sufficient to void execution of a contract." (Ramos v. Pacheco (1944) 64 Cal.App.2d 304, 310.) 84

compensation for 18 months such that Defendants could coerce her consent or Plaintiff loses all her money and work. All the contracts between the parties are one-sided and offer terms shockingly low, oppressive, and harsh. They are substantively unconscionable.

38.    Plaintiff was in duress with family hospitalization and did not read contract fully and rescinded with a legal notice. Plaintiff suddenly became the sole breadwinner and a recipient of harassment and non-payment after 18 months of false promises in a lucrative industry.

39.    Plaintiff could not understand and still does not understand the contradictory and confusing terms and that is directly due to Defendants' own contracts. Defendants denied that Plaintiffs could be confused as Plaintiff is so educated and qualified that no one would believe her. However, based on expert reports, those UT contracts are in fact confusing.

40.    Defendants drew Plaintiff in by false representations and maintained the fraud through the relationship and used deception to obtain Plaintiff's work for free. Defendants changed the compensation success terms after obtaining the work.

## **FOURTH CAUSE OF ACTION**

### **(False Promises)**

### **(By Plaintiff against Defendants)**

41.    Plaintiff incorporates by reference each and every allegation contained in each paragraph above and below as though the same were set forth in full herein.

42.    Defendants made false promises of 'won't have to do anything', 'very rich and fair compensation, and 'a lot of money' 'under what circumstances would Plaintiff be more comfortable' but Plaintiff did all of the work such as acquire universities, agents, channels, marketing work for 18 months for free and not only did

1  she not make any money, she got saddled with litigation to coerce silence as soon as
2  she expressed discomfort and for asking for money.

3      43.    Defendants promised Plaintiff that they would pay her for her students
4  but did not.

5      44.    Defendants promised they'd pay for her travel but did not.

6      45.    Defendants promised a job once the universities were established but did
7  not.

8      46.    Defendants directed Plaintiff to be honest and then sued her for *ad*
9  *hominems ad nauseam* in private emails that were filtered to an IT guy. Defendants
10 sued based on privileged and protected activity that Plaintiff reported to Defendants
11 first in good faith.

12     47.    Defendants promised that they would take over the contract between
13 Hernandez and Plaintiff ("Hernandez contract") but never did.

14     48.    Plaintiff reasonably relied on these false promises and worked in the
15 hope that she'd be compensated. Plaintiff gave up other deals and business
16 opportunities based on those false promises that the Defendants had no intention of
17 performing.

18

19              **FIFTH CAUSE OF ACTION**
20      **(Unpaid wages and expenses Order enforcement)**
21          **(By Plaintiff against Defendants)**

22

23     49.    Plaintiff incorporates by reference each and every allegation contained in
24 each paragraph above and below as though the same were set forth in full herein.

25     50.    Plaintiff was ruled as an employee by Court Order on January 28, 2019
26 [Case No: 18-cv-2010-L-AGS] (Exhibit G). The Order stated that the wages had to be
27 added in Utah and the amounts were unclear. Plaintiff filed to appeal this Order in
28 October 2019 and was going to file but did not for three reasons. First reason, around

1  the time for the appeal, in parallel, in the Utah litigation, the Defendants added an
2  'expert' witness. Plaintiff had to bring rebuttal expert witnesses that published their
3  reports on December 20th, 2019. Plaintiff is a new entrant so Plaintiff waited for the
4  reports (Exhibit H) and (Exhibit I) to provide the court genuine amounts based on
5  international education norms.

6      51.   The second reason is that Plaintiff determined that rather than appeal the
7  favorable order; she should attempt to enforce it first. Plaintiff tried to enforce the
8  Court's order on February 14, 2020 (Exhibit J). Lastly, Plaintiff is unable to add those
9  wages and expenses in Utah litigation due to statute of limitations and UT trial stage.
10  Plaintiff filed a stay in UT for California's wages decision but was denied and
11  opposed vehemently by Defendants. The wages complaint was dismissed so kindly
12  without prejudice, thus, Plaintiff incorporates the additional data on the amount
13  herein. The Courts are permitted to look for external valuations to determine true
14  value of a service. Exhibit J has fair market estimates for the services performed as an
15  employee in the lucrative field of international recruitment. The compensation terms
16  are base plus bonus in a sales role in international education. Bonus terms are in the
17  various contracts.

18      52.   Defendants are in contempt of both Utah and California court orders
19  because UT order states they understood the agreements when they 'signed' the UT
20  agreement, however they refuse to follow the order and fulfill its (post) contractual
21  obligations as of June 2018. Defendants are in contempt of California order that ruled
22  Plaintiff as an employee and failed to pay her fair market wages.

23      53.   Defendants coerced Plaintiff into an unfavorable agreement (Exhibit K)
24  based on which Defendants filed an anti-SLAPP lawsuit subject to C.C.P. § 425.16.

25      54.   Defendants willfully, intentionally, and maliciously destroyed Plaintiff's
26  business by refusing to pay and using her pain filled privileged communications to
27  further demolish her work. Plaintiff's work and money is stuck. Plaintiff has not been
28  paid for 5 years.

55.     Defendants engaged in unfair business dealings, non-payment harassment, and grave misconduct of soliciting a subordinate for sexual favors such that either she consents or loses all her money. Defendants suffered no harm whatsoever. Plaintiff got robbed of a job that she liked. Plaintiff is well within its rights to raise all its defenses and valid claims.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for a judgment against Defendants, and each of them, as follows:

1.     For declaratory relief of a bifurcation of the case and California as a venue for all claims arising out of work and events in California until March 31st, 2017 based on choice-of-law doctrine.

2.     For equitable relief of specific performance of the entire Second Agreement to its term until August 2, 2021[10] as it is a requirements contract causing a modification of the employment terms and a superseding contract "Fifth Agreement" effective February 16, 2020[11]. All contract disputes to be remanded to arbitration while harassment, wages, and California business code violations to remain in this Court, as arbitration is not a bar to Plaintiff's equitable remedies such as litigation to raise all its defenses and claims. In the *alternative*, the Utah matter can be transferred to California combined under this litigation to forego arbitration to preserve evidence ready for trial. Defendants have California counsel and it is a simple breach of contract dispute. Defendants' UT causes of action would be stricken in CA due to C.C.P. § 425.16 alone.

---

[10] 8(c) is due until August 2, 2021 for "LU" and "OU" as known currently. 9 (d) is due in perpetuity.

[11] Pursuant to AB 51, Plaintiff seeks California forums and procedures as Plaintiff has a pending FEHA action. Plaintiff cannot be coerced to waive forum or procedure based on this modification. Plaintiff was a job applicant for a new role when the harassment occurred (Exhibit L).

3.    For losses due to unfair business practices on a per day basis as maximum allowed by law ($6,000/day) for intentional violations of California laws since October 2015. For losses due to unfair competition in the amount of at least $30 million since May 2017. For losses due to denigration for at least $3,020,833 since May 2017.

4.    For losses due to interference with Hernandez's contract in the amount of the harm caused by the interference since March 28, 2017.

5.    For disgorgement of all profits earned by the Defendants since July 2017 for unfair competition.

6.    For losses due to fraud in the amount of all of attorneys' fees that Plaintiff had to spend to obtain fair compensation from Defendants of at least $500,000.

7.    For costs of suit incurred herein, including expert costs and for an award of pre-judgment and post-judgment interest as allowed by law;

8.    For losses due to false promises in the amount of the losses and damages due to those false promises since 2015 in the amount of at least $3.6 million/year in lost student placements and referral revenue.

9.    For a modification and subsequent enforcement of the Order on wages till March 31, 2017 in the average amount of $424,348 plus all attorneys' fees to obtain fair compensation.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED: February 16, 2020


I, Aparna Vashisht-Rota, hereby attest and affirm that the facts set forth herein are true and accurate to the best of my ability.



/s/ Aparna Vashisht-Rota

```
Court Name: USDC California Southern
Division: 3
Receipt Number: CAS119392
Cashier ID: asepulve
Transaction Date: 02/19/2020
Payer Name: APARNA VASHISHT-ROTA
------------------------------------
CIVIL FILING FEE
 For: APARNA VASHISHT-ROTA
 Case/Party: D-CAS-3-20-CV-000321-MMA
 Amount:        $400.00
------------------------------------
CHECK
 Check/Money Order Num: 734
 Amt Tendered:  $400.00
------------------------------------
Total Due:       $400.00
Total Tendered:  $400.00
Change Amt:      $0.00


There will be a fee of $53.00
charged for any returned check.
```