DR. APARNA VASHISHT-ROTA
12396 Dormouse Road
San Diego, CA 92129
aps.rota@gmail.com
Telephone: 858-348-7068

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| APARNA VASHISHT ROTA | Case No. 3:20-00321-AGS-KSC |
| Plaintiff, | **REQUEST FOR JUDICIAL NOTICE TWO** |
| v. | |
| CHRIS HOWELL AND HOWELL MANAGEMENT SERVICES | Judge: Hon. Schopler<br>Date: June 14, 2024<br>Time: 2:30 p.m.<br>Courtroom: 5C (Schwartz Courthouse) |
| Defendants. | |

**1. Applications Under the Agreements** (Exhibit 1)

**2. Standing Phone Order (Exhibit 2)**

**3. Mediator Noted AAA Agreement Revert:** Exhibit 3 Forced Mediation

**4. SCOTUS Letter:** Exhibit 4—note that Rota has filed a petition for rehearing for SCOTUS.

**CONCLUSION**

Since October 2015, Rota is owed money at the rate of $6,360/hour or $480,663,360 under §1927. She is owed $728,000 as of July 2018 under the third agreement 1.3.3 c and d.

DATED: May 22, 2024

By: _____

DR. APARNA VASHISHT-ROTA

1

EXHIBIT 1

| RESPONSE | SUPPLEMENTAL RESPONSE<br><br>(Changes in Red) |
|---|---|
| RESPONSES TO REQUESTS FOR ADMISSION ||
| **Response to Request for Admission No. 2:**<br>Defendants object to Request No. 2 because the phrases "express advance written consent" and "pursue opportunities" are vague and ambiguous such that a meaningful response cannot be made. Further, the so-called Third Agreement was not in effect when the parties first evaluated, pursued, and/or developed opportunities with Lindenwood University. The Third Agreement took effect, if at all, upon complete execution by the parties sometime in 2017, and may not retroactively govern prior compensable events. Without waiving the foregoing objections, admit. | SUPPLEMENTAL RESPONSE: Without waiving any objections, deny. Defendants object to Request No. 2 because the phrases "express advance written consent" and "pursue opportunities" are vague and ambiguous such that a meaningful response cannot be made or would likely be misconstrued, misleading, and/or incomplete. Notwithstanding, Defendants state that they had prior approval by text message (See ROTA002580) to promote the 'CPT Model'. Mr. Hernandez learned of the 'CPT' Model because of AEG (See AEG000916-918; AEG000941-942). The 'CPT Model' was subsequently deployed at Lindenwood University. The contract between Hernandez has been established (See Rota 8th Supplemental Disclosures and ROTA003175-75). |
| **Response to Request for Admission No. 3:**<br>Defendants object to Request No. 2 because the phrases "express advance written consent" and "pursue opportunities" are vague and ambiguous such that a meaningful response cannot be made. Further, the Request assumes potentially incorrect facts in that the so-called Third Agreement was not in effect when the parties first evaluated, pursued, and/or developed opportunities with Ottawa University. The Third Agreement took effect, if at all, upon complete execution by the parties sometime in 2017, and may not retroactively govern prior compensable events. Without waiving the foregoing objections, admit. | SUPPLEMENTAL RESPONSE: Without waiving any objections, deny. Notwithstanding, Defendants state that they had prior approval by text message (See ROTA002580) to promote the 'CPT Model'. Mr. Hernandez learned of the 'CPT' Model because of AEG (See AEG000916-918; AEG000941-942). The contract between Hernandez has been established (See Rota 8th Supplemental Disclosures and ROTA003175-75). The 'CPT Model' was subsequently deployed at Ottawa University. Defendants had prior access to Ottawa University through WellSpring; the company at which Mr. Hernandez worked (ROTA002543). |
| **Response to Request for Admission No. 5:**<br>Defendants object to Request No. 5 because the phrases "express advance written consent" and "Agent opportunities" is vague and ambiguous such that the Request is not susceptible to a meaningful response. Without waiving these objections, deny. | SUPPLEMENTAL RESPONSE: See Responses to Requests for Admission Nos. 2 and 3, supra. Without waiving any objections, deny. Notwithstanding any objections, Defendants state that they had prior approval by text message (See ROTA002580) to pursue opportunities through third party agents for university referring agents (various referring agents) such as Michael Hernandez pursuant to 1.3.3. AEG in that text had the express advance written consent to promote the 'CPT Model' to any source that could find an institution. Mr. Hernandez is a university-referring agent. Mr. Hernandez is also a student-referring agent (See ROTA003021-22; ROTA003024-25). Under the Third Agreement 1.3.3(d), Hernandez is a non-compensable agent as he refers students to HMS but does not have a student referral agreement to get compensated for the students (ROTA003025, line 15-20). The Second Agreement for referring agents does not stipulate an advance written consent of HMS to pursue agent opportunities (see Second Agreement, paragraph 9). He was pre-approved as of June 6, 2016 (see Request for Admission No. 7). The agent addition task was assigned to Defendants on March 21, 2016 |

| | |
|---|---|
| | (HMS_PROD03822). Hernandez is an AEG agent that refers universities and students. |
| **Response to Request for Admission No. 6:**<br>Defendants object to Request No. 6 because it is compound, overbroad, seeks information not yet fully developed at this stage of litigation, calls for legal conclusions, assumes potentially incorrect facts, and inappropriately seeks information regarding legal and factual issues not relevant or material to this litigation. Without waiving the foregoing objections, deny. | **SUPPLEMENTAL RESPONSE**: Without waiving any objections, deny. Notwithstanding any objections, Defendants state that Defendant Rota has been classified as an employee in California. (See, Case 3:18-cv-02010-L-AGS Document 21 Filed 01/28/19 PageID.473, lines 23-27) "From October 2015 to March 2017, Plaintiff was employed by Defendants Howell Management Services, LLC and Chris Howell ("HMS" or "Defendants"). See ECF No. 1-2." |
| **Response to Request for Admission No. 8:**<br>Defendants object to Request No. 8 because it is compound, assumes potentially incorrect facts, and seeks information not fully developed at this stage of the litigation. Without waiving the foregoing objections, deny. | **SUPPLEMENTAL RESPONSE**: Without waiving any objections, deny. Notwithstanding any objections, Defendants state that Defendants expected to be paid 10% of the first semester's tuition pursuant to the Third Agreement, paragraph 1.3.2(a), for Lindenwood and Ottawa University from HMS. Defendants expected to be paid as per the contract between Hernandez and AEG noted in Request For Admission No. 7. |
| **Response to Request for Admission No. 10:**<br>Defendants object to Request No. 10 because it is vague and ambiguous such that a meaningful response cannot be formulated. Without waiving these objections, deny. | **SUPPLEMENTAL RESPONSE**: Without waiving any objections, deny. Notwithstanding any objections, Defendants state that Defendants expected to be paid 10% of the first semester's tuition pursuant to the Third Agreement, paragraph 1.3.2(a), for Lindenwood and Ottawa University from HMS. Defendants expected to be paid as per the contract between Hernandez and AEG noted in "Request For Admission No. 7" above. |
| **Response to Request for Admission No. 11:**<br>Defendants object to Request No. 11 because it is compound and seeks information not fully developed at this stage of the litigation and/or not in the possession or knowledge of Defendants. Further, the Request assumes potentially incorrect facts, in that the so-called Third Agreement may not have been in effect when the parties first evaluated, pursued, and/or developed opportunities with U.S. Admissions or Abacus. The Third Agreement took effect, if at all, upon complete execution by the parties sometime in 2017, and may not retroactively govern prior compensable events. Without waiving the foregoing objections, deny for lack of information or belief. | **SUPPLEMENTAL RESPONSE:** Defendants add that Hernandez is a university agent and a student-referring agent under the Third Agreement, Section 1.3.3. |
| **Response to Request for Admission No. 12:**<br>Defendants object to Request No. 12 because it is compound and seeks information not fully developed at this stage of the litigation and/or not in the possession or knowledge of Defendants. Further, the Request assumes potentially incorrect facts, in that the so- called Third Agreement may not have been in effect when the parties first evaluated, pursued, and/or developed opportunities with Westcliff University or other educational partnerships. The Third Agreement took effect, if at all, upon complete execution by the parties sometime in 2017, and may not retroactively govern prior compensable events. Without waiving the foregoing objections, deny for lack of information or belief. | **SUPPLEMENTAL RESPONSE:** Without waiving any objections, deny. Notwithstanding any objections, Defendants state that Defendants acquired WestCliff, OU, and LU. Defendants developed HUST, LU, and OU by adding agents and channel partners that benefit current and future HMS' partners. Third Agreement paragraph 1.3.3(f) and Second Agreement paragraph 9(d) provide that "Royalties will be paid to Representative as long as the AEG agent maintains an agreement with HMS and recruits students for any present or future HMS partner college or university." |
| **Response to Request for Admission No. 13:**<br>Defendants object to Request No. 13 because it is compound and seeks information that is not fully developed at this stage of | **SUPPLEMENTAL RESPONSE**: Without waiving any objections, deny. Notwithstanding any objections, Defendants state that Defendants had prior approval by |

| | |
|---|---|
| the litigation. Further, the Request assumes potentially incorrect facts regarding the nature of Defendants' role in formation of any such business relationships as well as the agreements between the parties to this action or third parties. Without waiving these objections, deny. | text message (See ROTA002580) to promote the 'CPT Model'. See responses to Requests for Admission Nos. 2, 3, and 5. |
| **Response to Request for Admission No. 14:** Admit that Defendants refused a check from HMS for $500 on or about June 6, 2017. Otherwise deny. | **SUPPLEMENTAL RESPONSE**: Admit that Defendants refused a check from HMS for $500 on or about June 6, 2017 and redirected to be paid $400 as per the Second Agreement. Otherwise deny. |
| **Response to Request for Admission No. 15**: Defendants object to Request No. 15 because it is overbroad, compound, and seeks information that is irrelevant, immaterial, or otherwise not calculated to lead to the discovery of admissible information. Without waiving these objections, Defendants admit that they (1) had access to a generic agent contract produced by HMS; (2) had limited knowledge of certain non-exclusive, India-based agents associated with HMS, at least insofar as those agency relationships were described to Aparna Vashisht Rota by Chris Howell; and (3) have certain student names provided by Michael Hernandez, possibly having nothing to do with HMS. Defendants deny the remainder of the Request, and specifically deny having possession of any intellectual property of HMS. | **SUPPLEMENTAL RESPONSE**: Without waiving any objections, generally deny except as previously admitted. |
| **Response to Request for Admission No. 18:** Defendants object to Request No. 18 because it assumes potentially incorrect facts, in that the so-called Third Agreement was not in effect when the parties first evaluated, pursued, and/or developed opportunities with Michael Hernandez. The Third Agreement took effect, if at all, upon complete execution by the parties sometime in 2017, and may not retroactively govern prior compensable events. Without waiving the foregoing objections, deny. | **SUPPLEMENTAL RESPONSE:** Without waving the foregoing objections, deny. See responses to Requests for Admission Nos, 2, 3, and 5. Notwithstanding any objections, |
| **Response to Request for Admission No. 19:** Defendants object to Request No. 19 because the phrases "express written (email) advance consent" and "pursuing opportunities" are vague and ambiguous such that a meaningful response cannot be made. Further, certain of the agreements between the parties may not have been in effect when the parties first evaluated, pursued, and/or developed opportunities with Lindenwood University. Without waiving the foregoing objections, deny. Furthermore, HMS and/or its representatives provided advanced permission via written and telephone communications to pursue business opportunities with Michael Hernandez, the agent who brought Lindenwood University into HMS's orbit. | **SUPPLEMENTAL RESPONSE:** Without waiving any objections, deny. Notwithstanding any objections, Defendants state that Defendants had prior approval by Text (See ROTA002580) to promote the 'CPT Model'. Mr. Hernandez learned of the 'CPT' Model because of AEG (See AEG000916-918; AEG000941-942). The 'CPT Model' was subsequently deployed at Lindenwood University. The contract between Hernandez has been established (See Rota 8th Supplemental Disclosures and ROTA003175-75). On May 29, 2015, Defendants obtained written approval to promote the 'CPT' model (ROTA002580). The 'CPT Model' was subsequently deployed at Lindenwood University and Ottawa University. Defendants had prior access to Ottawa University through WellSpring-- the company at which Mr. Hernandez worked (ROTA002543). Any future universities through Hernandez that use the 'CPT' model that Hernandez learned from AEG is a compensable event for AEG. |
| **Response to Request for Admission No. 20:** Defendants object to Request No. 20 because the phrases "express written (email) advance consent" and "pursuing opportunities" are vague and ambiguous such that a meaningful response cannot be made. Further, certain of the agreements | **SUPPLEMENTAL RESPONSE:** See responses to Requests for Admission No. 19 incorporated herein by reference. |

| | |
|---|---|
| between the parties were not in effect when the parties first evaluated, pursued, and/or developed opportunities with Ottawa University. Without waiving the foregoing objections, deny. Furthermore, HMS and/or its representatives provided advanced permission via writing and telephone communications to pursue business opportunities with Michael Hernandez, the agent who brought Ottawa University into HMS's orbit. | |

| RESPONSES TO INTERROGATORIES | |
|---|---|
| **Response to Interrogatory No. 3:** Defendants object to Interrogatory No. 3 because it is overbroad, compound, vague, ambiguous, and seeks information not fully developed at this stage of the litigation, not available to Defendants at this time, and/or otherwise outside of Defendants' knowledge or control. Moreover, Interrogatory No. 3 seeks information regarding a separate action that is irrelevant and immaterial to the instant lawsuit and therefore seeks information not reasonably calculated to lead to the discovery of admissible evidence. Without waiving these objections, Defendants state that the fact that they, or any of them, are entitled to compensation from Mr. Hernandez under a separate agreement does not in any way foreclose a claim for compensation from HMS under the agreements at issue in this lawsuit, under a theory of unjust enrichment, or another legal theory. Both Mr. Hernandez and HMS benefitted from Defendants' role in their introduction, as well as Defendants' continued management and facilitation of their business relationship.<br><br>Defendants further represent that they, and each of them, performed the following services, without limitation, entitling them to compensation under agreements with Michael Hernandez:<br>1.    Introduced Mr. Hernandez to HMS and their business model; facilitated his business relationship with HMS; and helped him to make proper university and agent connections that would make him a valuable asset to HMS.<br>2.    Added agents and other "channel partners" for Mr. Hernandez to use in fulfilling obligations to educational partners or to advance other business opportunities.<br>3.    Marketed on behalf of Mr. Hernandez in the international marketplace, creating more business opportunities for him, including, but not limited to, new educational partners, agents, and student placements.<br>4.    Performed various business development activities, including vendor selection, the preparation of business models and proposals, as well as messaging and strategy for recruitment and marketing.<br>Defendants further represent that they, and each of them, performed the following services on behalf of HMS, without limitation, potentially entitling them to payment and/or compensation under the agreements between the parties:<br>1. AEG, through Defendant Rota, upon information and belief, referred specific students to HMS, either directly or through agents, who have enrolled in HMS partner colleges and universities, including, but not limited to:<br>a.    Ravi Gupta | **SUPPLEMENTAL RESPONSE**: See responses to Requests for Admission Nos. 2, 3, and 5, incorporated herein by reference, and provide the following supplement:<br>2. AEG, through Defendant Rota, introduced various agents, colleges and universities to HMS, including, but not limited to:<br>a.    Michael Hernandez<br>b.    Abacus<br>c.    U.S. Admissions<br>d.    Artesia Soft, LLC<br>e.    International Doorway to Education and Athletics (IDEA)<br>f.    Educhannel<br>g.    TASA Asia<br>h.    Westcliff University<br>i.    Alliant International University (AEG000208) introduced on May 19, 2015<br>j.    Defendants sent a list of universities from 25 states based on HMS' requirements and that list had Lindenwood (HMS_PROD06019, HMS_PROD06020, HMS_PROD06021).<br>k.    ROTA002543 shows the list of universities through Hernandez. |

Case 3:20-cv-00321-AGS-KSC    Document 352    Filed 05/22/24    PageID.25019    Page 7 of 153
Case: 19-55748, 09/05/2020, ID: 11814620, DktEntry: 65, Page 90 of 108

Page 85 of 103

b.      Prince Antigha
c.      Ashok Kumar Mutyala
d.      Naga Prameela Rani Sripathi
e.      Alzayer Salam Faahimi
f.      Raghunandan Kandrakota
g.      George Denzil Vayalil
h.      Padala Prahlada
i.      Vijay Kumar
j.      Jayadeep [Unknown Surname]

2. AEG, through Defendant Rota, introduced various agents,
colleges and universities to
HMS, including, but not limited to:
a.      Michael Hernandez
b.      Abacus
c.      U.S. Admissions
d.      Artesia Soft, LLC
e.      International Doorway to Education and Athletics
(IDEA)
f.      Educhannel
g.      TASA Asia
h.      Westcliff University
i.      College of Charleston
j.      California Miramar University
k.      Colorado Heights University
l.      Fair Future
m.      Apex Consultants
3.      AEG, through Defendant Rota, introduced Michael
Hernandez to HMS for the purpose of linking his university
and college relationships with HMS. Under the various
agreements between the parties, Defendant Rota's introduction
of Mr. Hernandez to HMS entitles her to compensation for any
student recruited by Mr. Hernandez to HMS's partner colleges
or universities and to any college or university partners Mr.
Hernandez brought to HMS, including, but not limited to,
Lindenwood, Ottawa, and NGS. Because the information
detailing HMS and Mr. Hernandez's business dealings are in
the possession of HMS and Mr. Hernandez, Defendants are
unable to provide a description of the specific compensable
events related to Mr. Hernandez's introduction.
4.      AEG, through Defendant Rota, referred certain
unclassified recruits resulting from AEG and Defendant Rota's
extensive marketing, staffing, and outreach efforts on behalf of
HMS. Because this information is in the possession of HMS,
Defendants are unable to provide a description of specific
compensable events related to these recruits.
5.      AEG, through Defendant Rota, also provided
substantial recruitment resources to HMS, including a database
of 2,000–5,000 potential agents for recruitment of students, a
database of staffing companies and immigration attorneys,
marketing and outreach
messaging, and a questionnaire for agent recruitment that, upon
information and belief, are still in use by HMS. Upon
information and belief, much, if not all, of the staffing and
immigration attorney outreach performed by Defendants was at

the specific request of HMS after Mr. Hernandez's efforts failed to yield desirable results.

**Response to Interrogatory No. 4:**
On or about May 29, 2015, Defendant Rota was introduced to Mr. Hernandez, an international education consulting agent based out of Kansas City, Missouri. Mr. Hernandez possessed both established university relationships and experience with the recruitment and placement of international students. Among Mr. Hernandez's established university relationships were National Graduate School of Quality Management (NGS), Lindenwood University, and Park University.
Around this same time, Defendant Rota had begun forming a relationship with HMS principals Chris Howell and Justin Spencer. At some point toward the end of October 2015, Defendant Rota pitched Mr. Hernandez's university relationships as a possible opportunity for HMS. In a chain of emails, dated October 27, 2015, Defendant Rota and Mr. Hernandez discussed HMS's CPT approach. (See Def.'s Initial Disc. at AEG000041–AEG000042). Defendant Rota indicated to Mr. Hernandez that she had "already reached out to them" and that she was negotiating a business relationship between AEG, HMS, and Mr. Hernandez. (Id.). Later that day, Defendant Rota wrote to Mr. Hernandez to inform him of the following:
The CPT guys are in. They just wrote me and want to meet with NGS to discuss next steps. . . . We need to make sure that we are both covered on the cohort side before we bring these deals to the table. I'd do the CPT first, then UAE, and then Gujarat. I'd do one company per state and then only offer the good ones cohort agreements.
(Id. at AEG000042). The following day, Defendant Rota arranged and participated in a conference call between HMS representatives and Mr. Hernandez. According to Defendant Rota's notes on that call, HMS, Mr. Hernandez, and Defendant Rota discussed the CPT program, including the timing and nature of associated academic courses, visa requirements, and potential university partners and areas of recruitment. (See AEG000135-AEG000139). The parties also discussed NGS, including calculations of tuition payments and other issues. (Id.).
By December 30, 2015, Defendant Rota was still coordinating meetings between Mr. Hernandez and HMS representatives. On that date, Frank Trocki wrote to Defendant Rota to request a conversation with Mr. Hernandez, commenting: "If we want to start recruiting we need the agreement signed." (Def.'s Initial Disc. at AEG000097). Thirteen days prior, Defendants and HMS entered into the so-called First Agreement,1 which provided for compensation based on pursuit and development of "educational partnerships and new business opportunities." (See Counterclaim, Ex. B, ¶ 8). The First Agreement further provides that AEG is to be paid "a royalty of 10% of the first semester tuition paid by each student placed at institutions referred by [AEG] to HMS." (Id. ¶ 8(a)). The terms "educational partnerships," "new business opportunities," and "refer[ral]" are not defined in the Agreement. Moreover, Chris

**SUPPLEMENTAL RESPONSE:** See responses to Requests for Admission Nos. 2, 3, and 5, incorporated herein by reference, and supplement:
On or about May 29, 2015, Defendant Rota was introduced to Mr. Hernandez, an international education-consulting agent based out of Kansas City, Missouri. Mr. Hernandez possessed both established university relationships and experience with the recruitment and placement of international students. Among Mr. Hernandez's established university relationships were National Graduate School of Quality Management (NGS), Lindenwood University, Ottawa, Rochester, Mercyhurst, Ohio Valley University, Young Harris, Culver Stockton, Franklin, St. Michaels, William Jewell, Southwestern College, and Park University. ROTA002543 shows the list of universities through Hernandez.

Case 3:20-cv-00321-AGS-KSC   Document 352   Filed 05/22/24   PageID.25021   Page 9 of 153
Case: 19-55748, 09/05/2020, ID: 11814620, DktEntry: 9-5, Page 72 of 108

Page 87 of 103

| | |
|---|---|
| Howell, a principal of HMS, represented to Defendant Rota during contract negotiations that the universities brought into 1 Additionally, Defendants previously signed an additional agreement, provided for signature by HMS, with identical terms on or about November 30, 2015. (See Counterclaim, Ex. A, at p. 2).<br><br>HMS's orbit by the introduction of Mr. Hernandez would be captured by and compensable under the terms of the parties' agreement. Mr. Howell further represented that Defendants' role was to simply introduce the parties, due to the alleged proprietary nature of HMS's business model. Based upon this evidence, as well as upon information and belief, Defendants were essential to the formation of a business relationship between Mr. Hernandez and HMS. By extension, Defendants were also responsible for the introduction of Lindenwood University, Ottawa University, Park University, NGS, and, upon information and belief, other universities and colleges to HMS through Mr. Hernandez. Indeed, Defendants cultivated a relationship Mr. Hernandez, in part, for the purpose of joining his university resources with those of HMS. | |
| **Response to Interrogatory No. 15**: Defendants object to Interrogatory No. 15 because it seeks information not fully developed at this stage of the litigation, not available to Defendants at this time, and/or otherwise outside of Defendants' knowledge or control. Without waiving these objections, Defendants respond that, on or about May 29, 2015, Defendant Rota was introduced to Mr. Hernandez, an international education consulting agent based out of Kansas City, Missouri. Mr. Hernandez possessed both established university relationships and experience with the recruitment and placement of international students. Among Mr. Hernandez's established university relationships were National Graduate School of Quality Management (NGS), Lindenwood University, and Park University.<br>Around this same time, Defendant Rota began forming a relationship with HMS principals Chris Howell and Justin Spencer. At some point toward the end of October 2015, Defendant Rota pitched Mr. Hernandez's university relationships as a possible opportunity for HMS. In a chain of emails, dated October 27, 2015, Defendant Rota and Mr. Hernandez discussed HMS's CPT approach. (See Def.'s Initial Disc. at AEG000041– AEG000042). Defendant Rota indicated to Mr. Hernandez that she had "already reached out to them" and that she was negotiating a business relationship between AEG, HMS, and Mr. Hernandez. (Id.). Later that day, Defendant Rota wrote to Mr. Hernandez to inform him of the following:<br>The CPT guys are in. They just wrote me and want to meet with NGS to discuss next steps. . . . We need to make sure that we are both covered on the cohort side before we bring these deals to the table. I'd do the CPT first, then UAE, and then Gujarat. I'd do one company per state and then only offer the good ones cohort agreements.<br>(Id. at AEG000042). The following day, Defendant Rota arranged and participated in a conference call between HMS | **SUPPLEMENTAL RESPONSE**: See responses to Requests for Admission Nos. 2, 3, and 5, incorporated herein by reference. |

Case 3:20-cv-00321-AGS-KSC   Document 352   Filed 05/22/24   PageID.25022   Page 10 of 153
Case: 19-55748, 09/05/2020, ID: 11814620, DktEntry: 65, Page 33 of 108

Page 88 of 103

| | |
|---|---|
| representatives and Mr. Hernandez. According to Defendant Rota's notes on that call, HMS, Mr. Hernandez, and Defendant Rota discussed the CPT program, including the timing and nature of associated academic courses, visa requirements, and potential university partners and areas of recruitment. (See AEG000135-AEG000139). The parties also discussed NGS, including calculations of tuition payments and other issues. (Id.).<br><br>By December 30, 2015, Defendant Rota was still coordinating meetings between Mr. Hernandez and HMS representatives. On that date, Frank Trocki wrote to Defendant Rota to request a conversation with Mr. Hernandez, commenting: "If we want to start recruiting we need the agreement signed." (Def.'s Initial Disc. at AEG000097). Thirteen days prior, Defendants and HMS entered into the so-called First Agreement,2 which provided for compensation based on pursuit and development of "educational partnerships and new business opportunities." (See Counterclaim, Ex. B, ¶ 8). The First Agreement further provides that AEG is to be paid "a royalty<br><br>2 Additionally, Defendants previously signed another agreement, provided for signature by HMS with identical terms, on or about November 30, 2015. (See Counterclaim, Ex. A, at p. 2).<br><br>of 10% of the first semester tuition paid by each student placed at institutions referred by [AEG] to HMS." (Id. ¶ 8(a) (emphasis added)). The terms "educational partnerships," "new business opportunities," and "refer[ral]" are not defined in the Agreement. Moreover, Chris Howell, a principal of HMS, represented to Defendant Rota during contract negotiations and at other times that the universities brought into HMS's orbit by the introduction of Mr. Hernandez would be captured by and compensable under the terms of the parties' agreement. Based upon this evidence, as well as upon information and belief, Defendants were essential to the formation of a business relationship between Mr. Hernandez and HMS. By extension, Defendants were also responsible for the introduction of Lindenwood University, Ottawa University, Park University, NGS, and, upon information and belief, other universities and colleges to HMS through Mr. Hernandez. Indeed, Defendants cultivated a relationship Mr. Hernandez, in part, for the purpose of joining his university resources with those of HMS. | |
| **Response to Interrogatory No. 16:** Defendants object to Interrogatory No. 16 because it is compound and because the phrases "express written (email) advance consent" and "pursuing opportunities" are<br><br>4<br><br>vague and ambiguous such that a meaningful response cannot be made. Further, certain of the agreements between the parties were not in effect when the parties first evaluated, pursued, and/or developed opportunities with Michael Hernandez. Defendants also object on the basis that Interrogatory No. 16 potentially assumes incorrect facts regarding the scope of the contractual provisions at issue by suggesting that any agreement between the parties required authorization to pursue | **SUPPLEMENTAL RESPONSE:** See responses to Requests for Admission No. 19 incorporated herein by reference. |

# Page 89 of 103

specific university partners through an agent, rather than authorization to pursue the agent who would thereafter yield university partners and/or other business opportunities. Without waiving the foregoing objections, Defendants respond that they received prior written approval from HMS or its representatives before introducing Mr. Hernandez to HMS. On October 7, 2015, Defendant Rota pitched Mr. Hernandez's university relationships as a possible opportunity for HMS, stating: "NGS is my first school and I have 2 more coming up." (See AEG000211). After explaining that HMS would not work as a "sub-agent" to AEG, Chris Howell indicated that he would like to "collaborate with [Defendant Rota] by contracting directly with the university[.]" (See id.). On October 26, 2015, Defendant Rota wrote to Chris Howell offering to set up a meeting with Mr. Hernandez and further describing opportunities for HMS. (See AEG000212). Chris Howell responded that he had assigned his partner, Frank Trocki, to work directly with Defendant Rota and Mr. Hernandez moving forward. (Id.).

In a contemporary chain of emails, dated October 27, 2015, Defendant Rota and Mr. Hernandez discussed HMS's CPT approach. (See Def.'s Initial Disc. at AEG000041–AEG000042). Defendant Rota indicated to Mr. Hernandez that she had "already reached out to them" and that she was negotiating a business relationship between AEG, HMS, and Mr.Hernandez. (Id.). Later that day, Defendant Rota wrote to Mr. Hernandez to inform him of the following:

The CPT guys are in. They just wrote me and want to meet with NGS to discuss next steps. . . . We need to make sure that we are both covered on the cohort side before we bring these deals to the table. I'd do the CPT first, then UAE, and then Gujarat. I'd do one company per state and then only offer the good ones cohort agreements.

(Id. at AEG000042).

The following day, Defendant Rota arranged and participated in the conference call between HMS representatives (including Frank Trocki) and Mr. Hernandez. According to Defendant Rota's notes on that call, HMS, Mr. Hernandez, and Defendant Rota discussed the CPT program, including the timing and nature of associated academic courses, visa requirements, as well as potential university partners and areas of recruitment. (See AEG000135-AEG000139). The parties also discussed NGS specifically, including calculations of tuition payments and other issues. (Id.).

By December 30, 2015, Defendant Rota was still coordinating meetings between Mr. Hernandez and HMS representatives. On that date, Frank Trocki wrote to Defendant Rota to request a conversation with Mr. Hernandez, commenting: "If we want to start recruiting we need the agreement signed." (Def.'s Initial Disc. at AEG000097). Thirteen days prior, Defendants and HMS entered into the so-called First Agreement,1 which provided for compensation based on pursuit and development of "educational partnerships and new business opportunities." (See Counterclaim, Ex. B, ¶ 8). The First Agreement further provides that AEG is to be paid "a royalty

1 Additionally, Defendants previously signed an additional agreement, provided for signature by HMS, with identical terms on or about November 30, 2015. (See Counterclaim, Ex. A, at p. 2).

of 10% of the first semester tuition paid by each student placed at institutions referred by [AEG] to HMS." (Id. ¶ 8(a)). The terms "educational partnerships," "new business opportunities," and "refer[ral]" are not defined in the Agreement. Moreover, Chris Howell, a principal of HMS, represented to Defendant Rota during contract negotiations that the universities brought into HMS's orbit by the introduction of Mr. Hernandez would be captured by and compensable under the terms of the parties' agreement. Mr. Howell further represented that Defendants' role was to simply introduce the parties, due to the alleged proprietary nature of HMS's business model. Based upon this evidence, as well as upon information and belief, Defendants were essential to the formation of a business relationship between Mr. Hernandez and HMS. By extension, Defendants were also responsible for the introduction of Lindenwood University, Ottawa University, Park University, NGS, and, upon information and belief, other universities and colleges to HMS through Mr. Hernandez. Thus, the cultivation and introduction of Mr. Hernandez to HMS by Defendants provided HMS with avenues for new university partners, student recruits, and/or agents, including, but not limited to, Lindenwood University, Ottawa University, and NGS.

Beyond the documents specifically cited in this answer and otherwise previously disclosed to Plaintiff, Defendants are now searching those documents and materials in their possession that may further demonstrate that HMS provided advanced written permission for Defendants to pursue a relationship with Mr. Hernandez. These responses will be supplemented accordingly.

| | |
|---|---|
| **Response to Interrogatory No. 17:** Defendants object to Interrogatory No. 17 because it is compound and because the phrases "express written (email) advance consent" and "pursuing opportunities" are vague and ambiguous such that a meaningful response cannot be made. Further, certain of the agreements between the parties were not in effect when the parties first evaluated, pursued, and/or developed opportunities with Michael Hernandez. Defendants also object on the basis that Interrogatory No. 17 potentially assumes incorrect facts regarding the scope of the contractual provisions at issue by suggesting that any agreement between the parties required authorization to pursue specific university partners through an agent, rather than authorization to pursue the agent who would thereafter yield university partners and/or other business opportunities. <br><br> Without waiving the foregoing objections, Defendants respond that they received prior written approval from HMS or its representatives before introducing Mr. Hernandez to HMS, who, upon information and belief, brought other universities, other educational partners, and/or business opportunities to HMS. In support, Defendants refer Plaintiff to the factual | **SUPPLEMENTAL RESPONSE:** See responses to Requests for Admission No. 19 incorporated herein by reference. |

| | |
|---|---|
| assertions and documents cited above in response to Interrogatory No. 16.<br>Beyond the documents specifically cited in this answer and otherwise previously disclosed to Plaintiff, Defendants are now searching those documents and materials in their possession that<br>may further demonstrate that HMS provided advanced written permission for Defendants to pursue a relationship with Mr. Hernandez. These responses will be supplemented accordingly. | |
| **Response to Interrogatory No. 18:** Defendants object to Interrogatory No. 18 because it is compound and because the phrases "express written (email) advance consent" and "pursuing opportunities" are vague and ambiguous such that a meaningful response cannot be made. Further, certain of the agreements between the parties were not in effect when the parties first evaluated, pursued, and/or developed opportunities with Michael Hernandez. Defendants also object on the basis that Interrogatory No. 18 potentially assumes incorrect facts regarding the scope of the contractual provisions at issue by suggesting that any agreement between the parties required authorization to pursue specific university partners through an agent, rather than authorization to pursue a specific agent who would thereafter yield university partners and/or other business opportunities.<br>Without waiving the foregoing objections, Defendants respond that they received prior written approval from HMS or its representatives before introducing Mr. Hernandez to HMS, who, upon information and belief, brought Lindenwood University and Ottawa University into HMS's orbit. In support, Defendants refer Plaintiff to the factual assertions and documents cited above in response to Interrogatory No. 16.<br>Beyond the documents specifically cited in this answer and otherwise previously disclosed to Plaintiff, Defendants are now searching those documents and materials in their possession that may further demonstrate that HMS provided advanced written permission for Defendants to pursue a relationship with Mr. Hernandez. These responses will be supplemented accordingly. | **SUPPLEMENTAL RESPONSE**: See responses to Requests for Admission No. 19 incorporated herein by reference. |
| **RESPONSES TO REQUESTS FOR PRODUCTION** ||
| **Response to Request for Production No. 18:** Defendants object to Request for Production No. 18 because the phrases "express written (email) advance consent" and "pursue opportunities" are vague and ambiguous such that a meaningful response cannot be made. Further, certain of the agreements between the parties were not in effect when the parties first evaluated, pursued, and/or developed opportunities with Michael Hernandez and, by extension, Lindenwood University. Defendants also object on the basis that Request for Production No. 18 potentially assumes incorrect facts regarding the scope of the contractual provisions at issue by suggesting that any agreement between the parties required authorization to pursue specific university partners through an agent, rather than authorization to pursue a specific agent who would thereafter yield university partners and/or other business opportunities.<br>Beyond the documents specifically cited in this document and | **SUPPLEMENTAL RESPONSE**: See responses to Requests for Admission No. 19 incorporated herein by reference. |

| | |
|---|---|
| otherwise previously disclosed to Plaintiff, Defendants are now searching those documents and materials in their possession that may further demonstrate that HMS provided advanced written permission for Defendants to pursue a relationship with Mr. Hernandez. These responses will be supplemented accordingly. | |
| **Response to Request for Production No. 19**: Defendants object to Request for Production No. 19 because the phrases "express written (email) advance consent" and "pursue opportunities" are vague and ambiguous such that a meaningful response cannot be made. Further, certain of the agreements between the parties were not in effect when the parties first evaluated, pursued, and/or developed opportunities with Michael Hernandez and, by extension, Ottawa University. Defendants also object on the basis that Request for Production No. 19 potentially assumes incorrect facts regarding the scope of the contractual provisions at issue by suggesting that any agreement between the parties required authorization to pursue specific university partners through an agent, rather than authorization to pursue a specific agent who would thereafter yield university partners and/or other business opportunities. Beyond the documents specifically cited in this document and otherwise previously disclosed to Plaintiff, Defendants are now searching those documents and materials in their possession that may further demonstrate that HMS provided advanced written permission for Defendants to pursue a relationship with Mr. Hernandez. These responses will be supplemented accordingly. | **SUPPLEMENTAL RESPONSE:** See responses to Requests for Admission No. 19 incorporated herein by reference. |

EXHIBIT 5

## REFERRAL FEE AGREEMENT

This Referral Fee Agreement (hereinafter the "Agreement") is made this June 6, 2016 (the "Effective Date"), by and between Michael B. Hernandez at 3110 NE Vivion Rd, Kansas City, Missouri 64119  (hereinafter referred to as "MBH") and August Education Group at 12396 Dormouse Road, San Diego, California 92129 (hereinafter referred to as "AEG").

WHEREAS, MBH desires to recruit international students for its university contacts and source vendors for recruitment;

WHEREAS, AEG has contacts within the education industry and desires to introduce MBH to vendors;

WHEREAS, AEG has introduced MBH to HMS (Howell Management Services) to recruit international students for universities in a specialized 'CPT' program offered by HMS;

NOW, THEREFORE, the parties agree as follows:

I.  **REFERRAL FEES:**
    a.  MBH shall pay a referral fee of $75 per student for every session/semester a student is enrolled in a 'CPT' program for which MBH gets compensation from HMS.
    b.  The referral fee in clause I. (a) shall be due AEG for each student at each university 'CPT' partner that MBH brings to HMS for international recruitment as long as the contract is active and until the time the contract between HMS and each university partner is completed.
    c.  MBH will notify AEG of any new 'CPT' universities partners signed and those will get added to Exhibit A upon closure of the agreement between HMS and a university partner for each campus location.
    d.  MBH shall provide AEG recruitment reports from HMS to ratify the numbers for every session/semester enrolled.

II.  PAYMENT: MBH will pay AEG within 15 days of receipt of payment from HMS with a brief recruitment report as provided by HMS. The payment shall be made via wire transfer to the following bank account:

> Via Wire
> Bank of America
> Checking Account Number: 3250 6124 3701
> ACH Routing Number: 121000358
> Title on Account: AUGUST EDUCATION GROUP
> 12396 DORMOUSE ROAD SAN DIEGO, CA 92129

III.  TERM: The duration of the agreement is 10 years.

IV.  EXPIRATION: Expiration or termination of this Agreement for any reason shall not relieve MBH of its obligation to pay referral fees to AEG for introducing the HMS 'CPT' program to universities.

V.  NON-CIRCUMVENTION: During the term of this Agreement and for 10 years thereafter, MBH will not attempt to do 'CPT' program business with HMS for the purpose of circumventing AEG, the result of which shall be to prevent AEG from realizing or recognizing a commission or referral fee for new 'CPT' program business. If such circumvention shall occur then AEG shall be entitled to any commissions due pursuant to this Agreement relating to such transactions related to the HMS 'CPT' program and any university partners signed by MBH for HMS to the 'CPT' program.

VI.    FINAL AGREEMENT: This Agreement represents the entire agreement with respect to the subject matter hereof and terminates and supersedes all prior understandings or agreements with respect to such matters. This Agreement may be amended only in writing signed by both parties.

VII.    LEGAL CONSTRUCTION: In the event any one or more of the provisions contained in this Agreement shall for any reason be held invalid, illegal, or unenforceable in any respect, that invalidity, illegality, or unenforceability shall not affect any other provisions. This Agreement shall be construed as if the invalid, illegal, or unenforceable provision had never been contained in it.

VIII.    GOVERNING LAW: The laws of California shall govern this Agreement, without giving effect to principles of conflicts of law.

IX.    ARBITRATION: In the event that a dispute arises between the parties concerning the contract, performance, breach or any other provision that requires dispute resolution, the parties hereby agree to submit the dispute to a three-person arbitration panel for binding arbitration. The terms and obligations of the arbitration shall be in accordance with the standard terms as set forth by the American Arbitration Association for commercial dispute resolution. The foregoing notwithstanding, should either party require that a breach of the agreement requires the enforcement of the agreement by specific performance or other equitable relief not requiring damages, the arbitration provision above shall not be an impediment or bar to the pursuit of the parties equitable remedies. Upon conclusion of the arbitration or litigation, the prevailing party shall be entitled to the recovery of reasonable attorney's fees for every stage including collection and appeals.

X.    CONFIDENTIALITY: MBH and AEG each agree that during the Term and thereafter, all information contained in the agreement will be kept confidential, and will cause its employees, consultants, affiliates and licensees and sub-licensees to keep confidential, all confidential Information of the other Party that is disclosed to it, or to any of its employees, consultants, affiliates and licensees and sub-licensees, pursuant to or in connection with this Agreement, except to the extent that disclosure is required in accordance with the performance of this Agreement. Neither MBH and AEG nor any of their respective employees, Affiliates and licensees and sublicenses shall use Confidential Information of the other Party for any purpose whatsoever except as expressly permitted in this Agreement.

IN WITNESS WHEREOF, the Parties have entered into this Agreement as of the day first set forth above

Mr. Michael B. Hernandez

_____

Michael Hernandez, Self

Date: 6/6/2016

August Education Group

_____

Aparna Vashisht-Rota, CEO

Date: 6/6/2016

**Exhibit A:**

1. Ottawa University
2. Lindenwood University

Scanned by CamScanner

EXHIBIT 6



**S. GRACE ACOSTA**

The Judge Building
Eight East Broadway, Suite 410
Salt Lake City, Utah 84111
(801) 746-6300 (Office)
(801) 746-6301 (Fax)
www.lewishansen.com

gacosta@lewishansen.com

*Via Email*

August 28, 2019

Jeffrey W. Shields
Nathan Thomas
Jones, Waldo, Holbrook & McDonough, P.C.
170 South Main Street, Suite 1500
Salt Lake City, UT 84101

    **Re:** *Howell Management Services, LLC v. August Education Group, LLC (Utah Case) Request to Produce Documents Identified in Deposition and Additional Supplementation*

Dear Mr. Shields:

    In response to your letter dated August 20, 2019 we provide the following information:

| Page(s) and Line(s) of Deposition | Description of Document Identified | *Response* |
|---|---|---|
| 35:6- 37:1 | Complete "replacement" of Responses to Plaintiffs First Set of Discovery Requests as "new updated copies that should have been given to [Plaintiff]". | *No need to update these - I think. I was confused* |
| 40:10-41:9 | Gmail electronic documents to the extent not already produced. | *Produced* |
| 54:2-14 | Notes from the meeting of May 15, 2015 between Justin Spencer, Chris Howell and Ms. Rota at Alliant University. | *ROTA002521* |
| 60:10-17 | Text messages referred to at 60:10 - 11. | *Produced* |
| 62:12-23 | Telephone records from "archives" concerning telephone calls with Mr. Spencer, May or June 2015. | *I changed phone carriers, so I don't have access to old bills. I talked to Mr. Spencer right after meeting Michael and then again in early/mid-June. A text with Justin spencer is what leads me to believe that I talked to him in June.* |
| 115:21-116:15 | Update to "outdated" Responses to Plaintiffs Second Set of Discovery. | *No need to update these - I think. I was confused* |
| 139:5 - 21 | The text messages referred to as "the earlier ones, | *Produced* |

| | all of them, the first one, two - three-" | |
|---|---|---|
| 154:3 - 10 | Emails or text messages between [Ms. Rota] and [Mr. Hernandez] that state at least in that kind of written form what understandings you were operating on?:   "I have text message, an agreement, an email, all of those, back- dating- October 2015" | *Michael texts produced*<br><br>*AEG000115 to AEG000172*<br><br><br>*ROTA002523* |
| 158:12-15 | The "updated agreement [with Michael Hernandez?]" | *Updated agreement AEG000170-AEG000172* |
| 161:23-164:9 | "Emails to the affect that - that lead [Ms. Rota] to believe that both of them were, like, working together to get [Ms. Rota] removed ... " | *See below* |
| 168:4- 169:1 | The "full contract draft" with "expanded terms"; "[Ms. Rota] will produce that to you." | *Updated agreement AEG000170-AEG000172* |
| 175:4- 177:7 | The "one email where Mr. Trocki, Mr. Howell and - who is the third one<br>- Spencer are copied where Frank- it's actually February 2016 where he mentions 'oh, I guess Michael isn't going with us .. ' there's an email to it, I'll, we'll produce it to you, I'll give you the production number." | *HMS_PROD05637* |
| 178:3 - 8 | The documents referred to as "I have texts - I mean, communications to that effect.  We'll produce that to you where I know that they were negotiating to others." | *Produced above.* |
| 208:9 - 209:5 | The "agreements" and the "spreadsheets" to "monitor all the agreements that were in process or various stages of process." | *I don't have it.* |
| 316:11-317:17 | The "evidence of when this or a list like it was sent. .. yes, I have that actually... we will send that to you." | *See below* |
| 333:11-335:18 | The working papers supporting the damages analysis.<br><br>[This is not a comprehensive and full list and the Defendants reserve all rights to supplement this list as and when the SODI motion, TRO, and others are granted for AEG to ratify the damages]. | ROTA002510-ROTA002519<br>ROTA002571-ROTA002572<br>ROTA002573-ROTA002575<br>ROTA002576 -ROTA002578<br>HMS_PROD0559<br>AEG000211<br>AEG000135<br>HMS_PROD08297<br>AEG001838-1839<br>AEG000277-AEG000279<br><br>**Universities:**<br><br>HMS_PROD06019<br>HMS_PROD05590<br>HMS_PROD07789<br>HMS_PROD05855<br>HMS_PROD06020<br>HMS_PROD06021 |

|  |  | HMS_PROD00040<br>HMS_PROD0665<br><br>**Agents:**<br>HMS_PROD03822<br>HMS_PROD01705<br>HMS_PROD05590<br>HMS_PROD5473<br>HMS_PROD07206<br>HMS_PROD07159<br>HMS_PROD08154<br>HMS_PROD07486<br>HMS_PROD07785<br>HMS_PROD7492<br>HMS_PROD05277<br>HMS_PROD07224<br>HMS_PROD07486<br><br>**Staffing:**<br>HMS_PROD08288<br>HMS_PROD07229<br>HMS_PROD07228<br>HMS_PROD07224<br>HMS_PROD07168<br>HMS_PROD07168<br>HMS_PROD05204<br>HMS_PROD00634<br>ROTA002510-ROTA002519<br><br>**Unclassified:**<br>ROTA002510-ROTA002519<br>ROTA002531<br>ROTA002533<br><br>**Compensable/Non-Compensable/Unclassified**<br>ROTA002531<br>ROTA002533<br>**HMS_PROD00634**<br><br>**Increase rates:**<br>1.3.2 d: Increase in share above HMS' base rate of $3,000. The increased rate is in various agreements.<br>ROTA002529.<br><br>**Miscellaneous: Bad Faith:**<br><br>ROTA002521,<br>HMS_PROD05590-91.<br>ROTA002510- ROTA002519, made false promises to get staffing and immigration database to steal it. |
|---|---|---|

Chris promised one thing and meant another. He was promising me more money than he was going to give me: HMS_PROD05717 and HMS_PROD00634.

HMS_PROD08154. That is unfair prices that either I accept or lose my work. Either I do what he says or go through litigation to collect simple wages. That is the trauma I had to endure to get money and to leave a harmful situation. HMS harassed me for 4 plus years to deny my work and value. The compensation offered to me never increased above $500. HMS earned $3,000 prior to my work and after my work, got $12,000.  He did not offer me more than $500/student.

Wages: Salary asks four times, prominent role, but never any compensation. $500/student/university, $150,000-$200,0000/year various times.

HMS_PROD07486. Like the 'idea of me working there' after nearly a year of free work. HMS humiliated me. I lost 5 years worth of my career and earnings for my family.

Unfair competition, prevention of work and ability to make a living HMS_PROD04979. Saying one thing and doing another even for student placements.

On the one hand I can allegedly place my students where I want and on the other hand, HMS expects me to accept $500/student that is sold in the market for $12,000. I could not negotiate or else I lost my work. I had to accept the terms under duress each time.

Chris constantly asked me for money needs and then made fun of me. He degraded and humiliated me. This is the worst professional experience of my life. I felt

| | | harassed instead of being given the compensation and a way to place my students so I can move on.<br><br>HMS_PROD03822 balding Chris harmed me intentionally in some kind of revenge 'lift yourself up' after asking me for sexual favors and degrading me. He is the vilest person I met and I regret deeply with humiliation that my pristine work is stuck with someone like him.<br><br>Harassment: Loss on leads sheet in damages. ($667,000). I lost 2 years of work due to the litigation. Additional damages as may be known in the future from SODI that are hidden by HMS now.<br><br>Michael counts as an introduction, AEG Agent, and unclassified agent recruit.<br><br>Unclassified recruits count as non-compensable AND unclassified. |

## Damages:

1. **MBH referral:** In short, I am the person responsible for getting Michael to HMS. If he went to HMS directly or HUST, that is an unclassified recruitment event that led to two universities so that is still $500/student that was placed at those universities. He is a recruit because he wanted to refer students but referred universities. Just as a student referral agent did all the work for each student application for each university, Michael did the same negotiation and introduction for each university as a referral agent. HMS denied me credit to keep my money. ***This is $500*889 or $444,450***.

2. **Damages from all the business HMS did with LU and OU** via Michael. Michael had offered to increase the amounts and expand to non-CPT programs. HMS did not provide me with an accounting of all the business they got from LU and OU.

   a. *New Business development: Estimated is 889 (LU+OU) and TCOSR or 1,000 *$500 or **$500,000**.*

   b. *Current Unclassified and non-compensable is 416*$2,500 or **$1,040,000**.*

c.  *The estimated future value of unclassified is 5,000 students \*$500 or $2.5 million.*

d.  HMS has refused to fulfill unclassified, compensable, and non-compensable for LU and OU as noted in the agreement and did not when sent the check in June 2017. HMS has hidden all the referrals, compensable, and non-compensable reporting. In a meet and confer, Jeff noted



e.  HMS believes that the list of students produced as 8444-8483 is AEG's "best day"--- this has a list of approximately 416 names. If AEG is entitled to $500 per person— then its "best day" according to HMS is $200k. HMS disputes that all these recruits were caused or brought about by AEG and so, "best day" means that AEG essentially wins everything on this claim. It appears that this is all students to these universities from all sources (this would include Hernandez????).  I am not clear on that point. Now, HMS is essentially refusing to honor its own contracts by disputing the terms of unclassified. If they have no referring source they are unclassified and if HMS did not pay for those 416, they are also non-compensable. HMS is disputing that they came due to my efforts even though they had no one else working on the outreach except for me. [HMS_PROD07492, HMS_PROD05277, HMS_PROD_00634].

Here is what we learned.

HMS believes that the list of students produced as 8444-8483 is AEG's "best day"—this has a list of approximately 416 names. If AEG is entitled to $500 per person— then its "best day" according to HMS is $200k. HMS disputes that all these recruits were caused or brought about by AEG and so, "best day" means that AEG essentially wins everything on this claim. It appears that this is all students to these universities from all sources (this would include Hernandez????). I am not clear on that point.

3. **Chris lied that he has IP.** He does not. It is a gross misrepresentation while he stole mine. I sent agents, universities, staffing, and immigration databases that produce revenue and produced revenue. "Please lift yourself up" (HMS_PROD05257) when Chris stole my properties and my right to place students is unconscionable. He stole my family's wealth and assigned it to himself.

    a. At minimum, HMS made $12,000 multiplied by 889 students or $10 million. I was told that I'd get a looooot of money. Chris stole my money and time. My work was not paltry. Chris' valuation was so he could keep my money. He stole from me.

    b. As I can place 200-300 students/year, that is a loss of $3.6 million per location per year at OU and LU. Chris has blocked me from the properties that were not possible without my work.

    c. Chris stole it so he does not have to pay for it. As per 1.3.2 d, I am entitled to higher amounts per student from LU and OU.

        i. Lowest: $12,000-$3,000 (HMS' standard rate)-$3,000 (MBH—guess) or $6,000. **Damages: $5,334,000**.

        ii. This is calculated as: $12,000- $3,000 (HMS' standard rate) or $9,000 to AEG per student for the introduction to HMS. The potential damages are 889*$9,000 or **$8,001,000** at the highest.

4. **False Data:** Jeff is hiding based on what he thinks I am entitled to. He is racist and thinks an Indian lady would know another Indian lady. The data HMS has produced is false. HMS stated that they get 20 leads per day at Harrisburg. That is 20*365 or 7,300 leads. At 50% conversion, that is roughly 3,000 students per year. That HMS placed only 889 as per report from Michael is fake and not accurate. The only way we know is to get bank deposits is all possible banks that HMS has and it is the same for Michael. Chris is not likely to share the dollar value of business generated from LU and OU. I don't trust Jeff at all. He is likely to

hide information.

5. **New Business Development Universities Tag**: The number of students at The College Of Saint Rose has not been provided for 10% of the first semester for new business development efforts in building a target list for HMS at their request and knowledge in early 2016.

6. **Michael Contract Takeover:** HMS' harassment caused me to lose the contract and additional compensation from Michael Hernandez.  Chris told me that he'd move MBH's contract to HMS and this is one of the deposition exhibits. Chris did not do that. He interfered in my business relationship and ruined it by causing confusion and harassing me. The *value of that contract is $100/student/semester for all HMS programs for 10 years until June 5th, 2026*. But this did not come to fruition due to HMS' predatory behavior.

7. **LU and OU full revenue to be awarded to me:** Chris snatched my work for LU and OU. It is not his work. He should have to give up LU and OU that I developed. It was my goodwill not HMS' that brought business to HMS. Chris stole my work, money, and effort to grab what is not his. He is a con and nothing but a thug. No veteran in international education would treat an international person the way his company treated me. I spent time on HMS that I should have on myself. Chris stole my success. I regret meeting him and have suicidal thoughts daily. Chris should be fired and I should get all the money that he personally earned for 2015-2019 as damages in addition to LU and OU. I lost earnings for that period due to Chris' gross incompetence. Chris harmed me irreparably and intentionally to degrade me. He kept my money hostage to control me and that is abusive. I wish to be rid of this abuse, get all my money in all categories, and get full access to all universities with each university at the same rate as HMS with limited volumes so I can enjoy my success.  **$10 Million or all the money HMS made at LU and OU ITD.**

8. **Wages lost for 5 years:** HMS said they did not pay for marketing and each IC had to do it but they offered me an 'operating capital' which was supposed to be a retainer that I was to spend marketing HMS. They changed the rules all the time to confuse me and to keep my money. Chris has not left my life. I feel like I have a stalker that I can't get rid of.  Chris

Howell abused his power and berated me mercilessly to keep my money or harass me each time I asked for money. He humiliated me by asking for sexual favors. I don't know how to calculate the damages from someone snatching your future and ruining career for 5 years of sustained non-payment harassment to make my family weak and vulnerable. HMS_PROD05257 shows a glimpse of the berating comments I faced to ask for money. Chris humiliated me for money and held my life hostage for 5 years to prevent my business from growing. August could have been a huge name and HMS destroyed it. Chris is a repugnant jerk who should be forced to exit this space as he exploits females. He used and abused my trust to steal my family's money, rights, and future wealth. Chris is a charlatan. I should be restituted with full benefits of my work as though I never met such a person. That is 5 years of trauma, anguish, and sustained nonpayment harassment to coerce me to leave my family. HMS owes me restitution damages for wages for the 5 years that HMS caused harm to me. The damages are $200,000 * 5 years **or $1,000,000 net of taxes.**

9. **Shifting compensation hurdles:** The work terms and compensation rules kept changing. He abused me. He stole my work. Please see email below. On the one hand they promised me that I could run WU in India and on the other hand put me down for placing a student via my own contract. Chris did not let me earn money in peace. They have harassed me as though I owe them something when I never participated in any IP related meetings. The $500 sent to me was possibly a racist dog whistle to remind me of my value. Chris berated and humiliated me for my money. To get money, I had to sue. Otherwise, he was just forcing me into work and keeping all the work and contacts. He put so much pressure on me as though it was my job to get students. It was Chris' job to get the students. First, I was told I had to do nothing, just introduce for the universities and step out. I did that for both Michael and WU and now Chris is saying I had to negotiate the whole contract. First, I had to go build agents and get them aware of HMS. I did that and now HMS is saying I had to have pre-approval. Chris first said I'd not have to spend any time on application processing but now I had to do application processing as well. If the students went to HMS directly, I'd not know. Chris did not even pay me for the students I sent. I'd like to estimate damages from poor contracts at _**5 years lost of income at $200,000/year for 5 years or $1,000,000.**_ HMS demanded that I send all my students to them. However, in Mr. Howell's declaration is that it was not "exclusive" but he expected me to send all my students to HMS at the rate of $500. The market rate of these students is $5,000 minimum. Damages on 385 CPT leads that **AEG incurred is $1,920,000.**

a. No.2 in HMS_PROD04979 shows that HMS expected AEG to place all its students with HMS or be exclusive but then deny that AEG was not expected to be exclusive [Chris' declaration Page 5, Paragraph 20]. They have prevented me from placing students at my own institutions. I was able to place 110 students that are valued at $1.32 million. I made only a fraction of that because HMS blocked me and prohibited me for reporting sexual harassment. I lost money because of that. First HMS says, we are not exclusive [Chris Declaration 20] but then expects me to send all my students to HMS. "Justin Spencer [BATES 34415] on May 10th, 2017 at 12.02 p.m. "You have now admitted to working with WestCliff University outside the agreement with HMS. However, HMS had assigned me that university for management "WestCliff Addendum". [HMS #34631]. But then in Chris' declaration he notes, "Finally, HMS and AEG did not have an exclusive relationship. AEG and Plaintiff were free to perform recruiting services for other entities." I was not free to recruit for other entities. I feel trapped.

> 9.      Finally, on October 2, 2018 at 11:49:19 AM MDT, I received the email attached hereto at Exhibit B from Plaintiff. In that email, Plaintiff states "I am an independent contractor right?" In the same email, she states, "we didn't have anything exclusive…"

b. HMS stole my freedom to choose my work for the past 5 years. I could not do much else either negotiate fruitless contracts with HMS that they dishonored or litigation to get out of the agreements I did not make to be coerced into a settlement that I don't want. Chris is forcing me.

**From:** Justin Spencer
**Sent:** Wednesday, May 10, 2017 12:02 PM
**To:** Aparna Vashisht Rota
**CC:** Chris Howell
**Subject:** Contract

Dear Aparna,

Once again we find ourselves confused and astounded at your dishonest and unprofessional behavior. Continually agreeing to terms only to "quit" days later is not ethical or considerate. A few housekeeping items need to be addressed as we permanently end our working relationship:

1. The most important issue for which you must comply and follow are the non-solicitation and non-competition clauses in our agreement. Your termination and breach of the agreement does not leave you unencumbered from these items. We fully expect you will comply with the agreement and no legal action will be required by HMS.

2. You have now admitted to working with Westcliff University outside of the agreement with HMS. At this point we do not see the need to explore this deception further, however it is disappointing that you did not disclose this previously and demonstrates unethical behavior.

3. Even after all you've done to belittle us, hurl false and ridiculous accusations at us (all in writing), you "begged" to work with HMS and we reluctantly gave you a final chance. Needles to say, this is it. We are not negotiating. Our dealings with you will remain confidential to HMS. Meaning, we will not discuss our feelings about working with you to anyone outside of HMS. We, of course, expect your confidence in this matter as well. Not only is it ethical and right, it is a legal obligation.

4. You clearly have ulterior motives and have been seeking to use our expertise and intellectual property to build your own company. Notwithstanding your questionable activities, we trust you will stay compliant with the terms of our agreement.

5. Michael Hernandez. We did not direct or advise Michael on his decision to pay you or how much to pay you. He disclosed to us that you two had come to an agreement and that is all. That matter is between you and Michael. We don't know the terms or details as it's not our business or agreement.

Respectfully,

**Justin Spencer**
Partner

HOWELL MANAGEMENT SERVICES
Direct: +1 (801) 440-2699
justin.spencer@howellmgmt.com

10. I continued to work in 2017 and 2018 to send students to HMS and I did. I honored my contract but HMS did not pay me. HMS prohibited me in July 2017 so I could not place more students at the property that I developed. I sent agent progress reports, leads list, and other work in good faith. HMS neither referred to that work nor produced it as they'd have to pay for it. HMS did not present the full picture and my helpful reports they took from me. It is also fairly raw for me so hard to go back and look at all the reports I sent.

    i.    On July 6th, 2017: Ravi Gupta [July 10th, HMS 'prohibited me'.] (Referred to HMS LU)

    ii.    March 22, 2018: Tiffany Vuong (referred to HMS OU)

    iii.    May 12, 2018: Prince Antigha (referred to HMS LU)

    iv.    June 8th, 2018: Ujjwal Bhateja (referred to HUST)

    v.    Through 2017-2019, I sent my leads begging HMS to let me place students. I asked for help but HMS did not respond and used my distress to build a case against me to deny me my rights to my properties. I have other students that I sent as it was the right location but HMS now is denying me any money even through unclassified.

vi.   What I did for HMS is IP because I devised a new marketing and business development from scratch. Chris stole all my work and has kept my life hostage for years. To have to deal with a person as low is Chris is devastating beyond what I can express. All that is left is payment and that is the reason I am in this mess. Chris refuses to pay me for my work and yet says it is no value because he is hiding it. He humiliated my family for basic compensation. Adding channels of revenue is everything and Chris kept me without food to force me into prostitution[1] so I get so desperate for money that I sleep with anything that moves for $500. He is sick and a pervert. I long to forget that this episode happened and I don't know how to calculate the damages from my mental distress and agony.

11. Here is a list of my work and all the promises I was made. I lost 5 years because of Chris.

   a.   **Wages & Expenses:** I was made 4 distinct promises for salary and the new law updated in April 2018 allowing me to pursue my wages under those. Chris told me that I'd have a base+ Bonus. The base was to be the wages once the universities settled and then I'd have bonuses. The wages are for the base amounts. Chris never paid me for my time.

---

1.   [1] The full definition set out in Article 3(a) of the Trafficking in Persons Protocol reads as follows: "Trafficking in persons" shall mean the recruitment, transportation, transfer, harbouring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation. Exploitation shall include, at a minimum, the exploitation of the prostitution of others or other forms of sexual exploitation, forced labour or services, slavery or practices similar to slavery, servitude or the removal of organs".



      i. May 2015: $500/student/university to help HMS with new universities.

      ii. Salary amounts in the range of $150,000-$200,000/year or $500/student/university for each university that settled.

      iii. Expenses. Mr. Howell told me that he'd cover my travel expenses.

b. **Bonuses:** These are all the independent contractor agreements that are performance based.

      i. These were as follows as I thought and understood:

      ii. 10% of first semester tuition for each university acquired through any source. The ability to get a higher rate if higher commission is negotiated.

      iii. $500/student through various referring agents.

      iv. $500/student through staffing/immigration and $1,250 or $1,750 through non-compensable sources.

      v. $500/student for unclassified.

c. **Sexual Harassment:**

      i. I lost 5 years of work. Salary, bonuses, additional student referrals, my universities that I worked on for 17 months.

      ii. I lost $500,000 proposal because of the harassment.

      iii. I lost my properties that I developed.

12. As an example of confusing contracts, Mr. Hernandez who is an unclassified recruit, an AEG Agent that refers universities to HMS. He was introduced to HMS by AEG on October 28th, 2015 and ultimately formed a relationship with HMS on or around March 13th, 2016 for Ottawa University. He stated in his testimony to which I was witness that he referred students to Lindenwood, Ottawa, and HUST [Page 118 line 22, 23, 24]. Mr. Howell provided him with a standard agent contract to circulate to his contacts [BATES 32928]. As he does not have a 'student referral' agreement [Page 119, line 17], he is a non-compensable agent for AEG for student referrals as he is referring students to HMS without compensation or Mr. Hernandez is a 'non-compensable' agent. HMS should pay all AEG's attorney's fees. It is not my job to decode these agreements. [Invoices to be submitted].

```
19    then I might sign the contract with Harrisburg.
20        Q.   Did you ever refer any students to Harrisburg
21    through HMS?
22        A.   Not in the beginning.  But later, through an
23    agent that I was known to with HMS, so he wanted -- he
24    needed something besides Ottawa and Lindenwood.
25        Q.   When you say later, about when are we talking

                U.S. Legal Support | www.uslegalsupport.com          118
```

Michael Hernandez
April 24, 2019

```
1    about?
2        A.   Maybe less than a year ago.
3        Q.   So today's April.
4        A.   Yeah.  So maybe last April or so.  Somewhere in
5    between --
6        Q.   So April 2018, about?
7        A.   Yeah.
8        Q.   That's when you first referred students to
9    Harrisburg?
10       A.   Yep.
11       Q.   Is that correct?
12       A.   Yep.
13       Q.   How many?
14       A.   I don't recall.
```



**Agreements Dispute Damages over and above Attorney's Fees.**

13. HMS clearly asks for agreements pending signatures. The April 24th, 2017 was still pending signature. I was trying to see how I could save my staffing and immigration work that I had begun in October 2016. Chris has snatched my staffing, immigration and agent contacts. They also had all the messaging for each channel but Chris did not pay me.



14. I lost money because of HMS' fake dispute and non-payment. Had I been paid, I'd have moved on and build my own company. Chris Howell harassed me for my money to keep stalking my life and engage in a fishing expedition even though they have found no evidence of any wrongdoing but have blocked all my discovery that will show Chris insulted and berated me.



Other damage categories not yet known:

1. Defamation [Estimate $10 million = loss of business to AEG]

2. Damages associated with defamation and denial of proper credit for AEG's work. [Unknown]

3. Interference with prospective economic relations [$3.6 million damages/year/location as AEG can place 200-300/location/year.}

4. Fraud/ Constructive Fraud

   a. If all you had to do is claim an agreement (s) or two that didn't happen to create confusion and then ultimately be ok if the agreement didn't work out. This is because then you have now brought your opponent to the promise of greater money that they may not get because the agreement would possibly be determined as non-contract. It is not likely that they will fight again to go back to the older agreement dispute resolution.

   b. This also buys non-compete by denying all and any money due till the litigation is ongoing.

   c. HMS knows how much money is owed. They reckon it is best to prolong it to deny the money owed. As they sued me, I have to defend myself knowing fully well that HMS will deny that any money is owed due to termination but termination has responsibilities for HMS that it has refused to fulfill. AEG has to fulfill all its obligations in the hope of getting paid at all.

   d. HMS is therefore holding my money hostage to silence me and to prevent me for reporting wages, harassment, and lodge all and any complaints as I have a right to pursue all avenues of earnings and justice.

   e. HMS is unique in its space. They cater to a niche market. By harassing me for my money that is due, they are still harassing me for favors because if I don't acquiesce, or stay silent, I could lose all the work I did to build a presence in this market. This is tremendous abuse of power. I don't wish to leave my husband and provide happy endings just to have rightful access to the universities that I developed. I don't have that because I refused HMS. I refused to work for free after 17 months of promises of money.

   f. Chris lured me into false promises and tried to get me to prostitute myself. This is the gist of my experience with HMS. I believe myself.

   g. HMS had a lot to gain by claiming UT agreements. They avoided CA wages

claims because of jurisdiction. Wages are $390,000 plus attorneys' fees. We sought additional amounts for income lost 2 years in dispute.

h. HMS will likely beat the statute of limitations and get the sexual harassment claims shot down because of jurisdiction. This caused AEG a loss of $500,000 in marketing funds and opportunity to grow the company.

i. HMS chose the best court for itself. This multi state dispute cost my family.

j. HMS cheated AEG of fair claims and resolution.

k. No matter what the penalty, HMS will lose nothing, as it is the larger company. By engaging my small company in this unfair and unjust fight caused AEG a lot of trauma and this was possibly intentional to obtain a release and payments.

l. HMS has disputed every single claim that AEG brought. It is beyond bad faith to imagine that HMS is right in all categories and that AEG deserves no money whatsoever. Even the ones that are automatically triggered by the agreement. The only reason AEG is in this position is due to HMS' intentional non-payment harassment and forcing a non-compete by denial of rights to speak up and get help.

m. It is in HMS' best interest to prolong this fight as long as possible to coerce AEG to accept bad terms under duress or to deny money due for the work without which HMS would not have the new universities or agents.

n. HMS has only bad will. All the growth HMS experienced was due to AEG's goodwill. HMS destroyed AEG's reputation and work. HMS degraded AEG by denying basic wages. Chris Howell is a terrible manager and a pimp. He stole my hard work and even this litigation is to gain ideas without paying for it. I had to share all my documents and HMS has shared none. HMS is the one that went on a fishing expedition. Rather than address the serious issues, HMS chose to suppress my voice. My working conditions were so bad that I had to sue HMS to get paid. Now I am in a lawsuit because of HMS' charlatan behavior.

5. Anti-SLAPP motion (Paper Attached) [Attorney's fees, SH damages, loss of business, wages, and bonuses, and HMS to address and resolve its violations.]

6. Loss of 5 years of career damages. Had I spent time on other ventures, such as my own work, I'd have been farther ahead. $3.6 million*5 years or approximately $20M in damages. HMS' prohibition cost me.

7. Attorney fees

8. Targeted and sustained harassment.

9. Threats, bullying, and coercion to force an agreement that was better for HMS primarily for avoiding CA laws that were significantly stronger.

10. Second Agreement also better for AEG due to rights to contact the business it developed.

11. Pimp, solicitation and pandering (Paper Attached) [total removal of HMS from AEG"s future life. AEG will not accept any agreements with HMS and wants direct contracts with each university as an exception to end up neutral with AEG.]

Article 3 of the United Nations Protocol to Prevent, Suppress and Punish Trafficking in Persons, especially Women and Children, supplementing the United Nations Convention against Transnational Organized Crime (Trafficking in Persons Protocol) defines trafficking in persons as constituting three elements: (i) an "action", being recruitment, transportation, transfer, harbouring or receipt of persons; (ii) a "means" by which that action is achieved (threat or use of force or other forms of coercion, abduction, fraud, deception, abuse of power or a position of vulnerability, and the giving or receiving of payments or benefits to achieve consent of a person having control over another person); and (ii) a "purpose" (of the intended action/means): namely, exploitation. 1 All three elements must be present to constitute "trafficking in persons" in international law. The only exception is when the victim is a child; in such cases it is not necessary to prove that one of the acts was accomplished through the use of any of the listed "means".[2]

1. They were forcing me into labor that is harmful for me.

2. Chris is a highly skilled pimp and an abusive male.

3. Mr. Ravi Lothumalla, one of the other agents also called him a 'pimp'. He has not been sued.

---

[2] https://www.unodc.org/documents/human-trafficking/2012/UNODC_2012_Issue_Paper_-_Abuse_of_a_Position_of_Vulnerability.pdf

4. News media is abundant and saturated with these types of articles[3],[4],[5],[6],[7],[8] which made me fearful for my safety. It is 4 years and HMS has not left.

5. HMS_PROD05257: He has my entire money hostage and now complains that I am dissenting against the terms of forced labor and reporting harassment to HMS.

6. Sexual Harassment: California Laws:

---

[3] https://twitter.com/pdacosta/status/1088178300114165760
 "In particularly egregious cases, traffickers register under unrelated industries such as religious organizations or educational institutions, making them eligible for tax breaks."

[4] https://www.glamour.com/gallery/post-weinstein-these-are-the-powerful-men-facing-sexual-harassment-allegations

[5] **Adam Serwer of the Atlantic wrote a searing essay** titled "The Cruelty Is the Point," in which he argued that Trump's "only real, authentic pleasure is in cruelty" and that for his followers, cruelty — towards immigrants, *towards people of color, towards women,* towards LGBT people, towards survivors of school shootings — "makes them feel good, it makes them feel proud, it makes them feel happy, it makes them feel united."
https://www.theatlantic.com/ideas/archive/2018/10/the-cruelty-is-the-point/572104/

[6] As Lili Loofbourow wrote in *Slate*, adolescent male cruelty toward women is a bonding mechanism, a vehicle for intimacy through contempt. "toxic homosociality" that "involves males wooing other males **over the comedy of being cruel to women**." "as if the male desire for sex overrides pedestrian concerns like consent."

[7] https://www.latimes.com/entertainment/la-et-mn-emma-thompson-john-lasseter-skydance-20190226-story.html
- *Much has been said about giving John Lasseter a "second chance." But he is presumably being paid millions of dollars to receive that second chance. How much money are the employees at Skydance being paid to GIVE him that second chance?*
- *If John Lasseter started his own company, then every employee would have been given the opportunity to choose whether or not to give him a second chance. But any Skydance employees who don't want to give him a second chance have to stay and be uncomfortable or lose their jobs. Shouldn't it be John Lasseter who has to lose HIS job if the employees don't want to give him a second chance?*
- *Skydance has revealed that no women received settlements from Pixar or Disney as a result of being harassed by John Lasseter. But given all the abuse that's been heaped on women who have come forward to make accusations against powerful men, do we really think that no settlements means that there was no harassment or no hostile work environment? Are we supposed to feel comforted that women who feel that their careers were derailed by working for Lasseter DIDN'T receive money?*
*I hope these queries make the level of my discomfort understandable. I regret having to step away because I love Alessandro so much and think he is an incredibly creative director. But I can only do what feels right during these difficult times of transition and collective consciousness raising.*

[8]
As the Eliot Spitzer case from 2008 showed, there are plenty of gorgeous young women who offer consensual experiences and charge a few thousand dollars a night for the privilege — a price that, for the billionaire class, is less than the cost of a McDonald's hamburger to the rest of us.
https://www.nytimes.com/2008/03/10/nyregion/10cnd-spitzer.html
https://www.telegraph.co.uk/news/worldnews/1581627/Eliot-Spitzer-prostitute-was-22-year-old-singer.html

The bill, with certain exceptions, would prohibit an employer, in exchange for a raise or bonus, or as a condition of employment of continued employment, from requiring the execution of a release of a claim or right under FEHA or from requiring an employee to sign a nondisparagement agreement or other document that purports to deny the employee the right to disclose information about unlawful acts in the workplace, including, but not limited to, sexual harassment. The bill would provide that an agreement or document in violation of either of those prohibitions is contrary to public policy and unenforceable.

- HMS asked me to release him from payments AEG000252 [email screenshot below]
- The new contracts were a 'raise'.
- It is my duty as a victim to report and have the freedom to choose the words to report without worrying about how it makes HMS looks.

distribution, or the taking of any action in reliance upon this communication is strictly prohibited. Moreover, any such disclosure shall not compromise or waive the client-consultant or any other privileges as to this communication or otherwise. If you have received this communication in error, please contact me at the above email address. Thank you.

On Tue, Jun 6, 2017 at 6:20 PM, Chris Howell <chris.howell@howellmgmt.com> wrote:

Aparna,

I agree that we don't currently have an agreement, you terminated it on May 6th. Despite the fact, I am still obligated to honor section 3.3 "Obligations Upon Termination" of our last agreement that was signed and executed by August and HMS on May 5, 2017 (attached). If you don't want to accept the payment I sent you or any future payments that might be due to you, then that's fine with me. If this is the case, please draft and sign a release of liability releasing HMS of it's obligation to fulfill section 3.3 of the latest agreement.

Thanks,

Chris

AEG000252

FEHA provides that an employer may be responsible for the acts of nonemployees, with respect to sexual harassment of employees, applicants, unpaid interns or volunteers, or persons providing services pursuant to a contract in the workplace, if the employer, or its agents or supervisors, knows or should have known of the conduct and fails to take immediate and appropriate corrective action.
This bill would instead make the above provision apply with respect to any type of harassment prohibited under FEHA of employees, applicants, unpaid interns or volunteers, or persons providing services pursuant to a contract in the workplace.

(a) The purpose of these laws is to provide all Californians with an equal opportunity to succeed in the workplace and should be applied accordingly by the courts. The Legislature hereby declares that harassment creates a hostile, offensive, oppressive, or intimidating work environment and deprives victims

of their statutory right to work in a place free of discrimination when the harassing conduct sufficiently offends, humiliates, distresses, or intrudes upon its victim, so as to disrupt the victim's emotional tranquility in the workplace, affect the victim's ability to perform the job as usual, or otherwise interfere with and undermine the victim's personal sense of well-being. In this regard, the Legislature affirms its approval of the standard set forth by Justice Ruth Bader Ginsburg in her concurrence in Harris v. Forklift Systems (1993) 510 U.S. 17 that in a workplace harassment suit "the plaintiff need not prove that his or her tangible productivity has declined as a result of the harassment. It suffices to prove that a reasonable person subjected to the discriminatory conduct would find, as the plaintiff did, that the harassment so altered working conditions as to make it more difficult to do the job." (Id. at 26).

(b) A single incident of harassing conduct is sufficient to create a triable issue regarding the existence of a hostile work environment if the harassing conduct has unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive working environment. In that regard, the Legislature hereby declares its rejection of the United States Court of Appeals for the 9th Circuit's opinion in Brooks v. City of San Mateo (2000) 229 F.3d 917 and states that the opinion shall not be used in determining what kind of conduct is sufficiently severe or pervasive to constitute a violation of the California Fair Employment and Housing Act.

(c) The existence of a hostile work environment depends upon the totality of the circumstances and a discriminatory remark, even if not made directly in the context of an employment decision or uttered by a nondecisionmaker, may be relevant, circumstantial evidence of discrimination. In that regard, the Legislature affirms the decision in Reid v. Google, Inc. (2010) 50 Cal.4th 512 in its rejection of the "stray remarks doctrine."

[1] https://www.unodc.org/documents/human-trafficking/2012/UNODC_2012_Issue_Paper_-_Abuse_of_a_Position_of_Vulnerability.pdf

161:23-164:9 **RESPONSE**

Sent: Wed May 20 2015 08:39:57 GMT-0700 (PDT)

Hi, will a school on the east coast work for what you seek

Sent: Fri May 29 2015 12:59:10 GMT-0700 (PDT)

Yes! I'm in a meeting for a few hours..are you able to chat later?

Received: Fri May 29 2015 13:00:00 GMT-0700 (PDT)

Yes, I'll need to do some more ground work but wanted to ask you first.
Give me till next week?

Sent: Fri May 29 2015 13:00:44 GMT-0700 (PDT)

Perfect! Ping me when you're ready to discuss next week

Received: Fri May 29 2015 13:02:10 GMT-0700 (PDT)

You got it.

Sent: Fri May 29 2015 13:03:12 GMT-0700 (PDT)

Here's what I have. You need a weekend program in an accredited
institution on the coast. The program should be structured in such a
way that the students can work. Second, the tuition needs to be
$6,000/semester.

161:23-164:9 **RESPONSE**:

Mr. Hernandez's deposition where he states that he told HMS to block me. They had conversations about me
that have not been reported by HMS. They have blocked the SODI with this precise request.

Block her: See Picture below. My compensation was due as of January 2017. HMS and MBH collaborated to
make it harder for me to collect my money and move on. They have worked jointly together to harass me.

```
10        Q.    Did you and Chris come up with a plan on how to
11   deal with Aparna during your conversation?
12        A.    No.  No.  Chris just agreed he would have the
13   conversation -- a conversation with Aparna.
14        Q.    Now, you referred to "conversations" before.  I
15   know you said "I've only had one" about the content of
16   Exhibit 26.  What other conversations, after March 28,
17   did you have about Aparna?
18        A.    That was the one.
19        Q.    You never had another conversation after
20   March 28, 2017, about Aparna, with Chris?
21        A.    You mean after everything blew up?
22        Q.    I'm saying anytime after March 28, 2017, did you
23   have another --
24        A.    I'm sure --
25        Q.    -- conversation --
```

```
 1        A.    -- I had a number of conversations about Aparna.
 2        Q.    Okay.
 3        A.    But mostly because I stopped -- I blocked
 4   Aparna's e-mails.  I blocked her phone calls.  And I told
 5   them they should do the same thing.  But they were
 6   willing to, for whatever reason, continue to receive her
 7   stuff.
 8        Q.    Okay.  About when did you block her phone calls?
 9        A.    After the release of -- she released me from my
10   agreement.  So she sent that e-mail.  She sent a
11   follow-up the next day that said even though I was
12   released, I still was obligated.  And then there may be
13   one more e-mail, and then I just stopped.
14        Q.    Okay.  Is that when you blocked her e-mails and
15   phone, is that what you're talking about, both?
16        A.    Yeah.
17        Q.    At the same time?
18        A.    Everything.
19        Q.    Okay.  All right.  I mean, I'm not trying to be
20   weird on this one.
```

a.  She's back…..(this is around October 2017). At this point, it seems that HMS and MBH worked together to defraud me of money due. They also followed the same pattern to force me

out. Both HMS and MBH began discussing updated agreement around the same time promising me more money.  Michael around November 2016 and Chris began asking me heavily for my full time compensation. Chris Howell repeatedly asked me for my full time compensation and then laughed at me. September 2016 and January 2017.

HMS owes me a lot of money. They have motive to harass me into leaving my compensation behind.

b.  Early 2017,  HMS agreed to move MBH agreement to HMS (this is one of the deposition exhibits) to create confusion on the agreements. Sexual harassment occurred. I was terrified. Then in exasperation, I released MBH from agreement around March 28th, 2017 from the new agreement with higher amounts. I lost money due to HMS. AEG000160-162.

c.  I left HMS and in my mind, rescinded back to the Second Agreement. We did not agree to the $36K. I tore the check. He did not follow 4.4. I removed the retainer, shred the check, and then sent a new version that I rescinded the next day on May 6th, 2017. On May 8th, Chris acknowledged the rescission with an "Alright, thank you'.

d.  Out of the blue, early June 2016, Chris sent me $500 for 2 students that had come through my agent. He did not send me any money under the 1.3.3 c unclassified, non-compensable, or compensable. I refused and honestly reminded him that we had retreated back to the Second Agreement and that he owes me $400 after checking in the Second Agreement.

e.  On June 6th, 2017, Chris Howell sent me an email to my honest refusal to accept money under the alleged new agreements, he asked me to sign a release of liability if I did not want any money under the new agreements. HMS asked me for a release stating that if I did not want the money under the new agreement, then I need to draft an agreement to release them from liability for future payments.

> distribution, or the taking of any action in reliance upon this communication is strictly prohibited. Moreover, any such disclosure shall not compromise or waive the client-consultant or any other privileges as to this communication or otherwise. If you have received this communication in error, please contact me at the above email address. Thank you.
>
> On Tue, Jun 6, 2017 at 6:20 PM, Chris Howell <chris.howell@howellmgmt.com> wrote:
>> Aparna,
>>
>> I agree that we don't currently have an agreement, you terminated it on May 6th. Despite the fact, I am still obligated to honor section 3.3 "Obligations Upon Termination" of our last agreement that was signed and executed by August and HMS on May 5, 2017 (attached). If you don't want to accept the payment I sent you or any future payments that might be due to you, then that's fine with me. If this is the case, please draft and sign a release of liability releasing HMS of it's obligation to fulfill section 3.3 of the latest agreement.
>>
>> Thanks,
>>
>> Chris

f.  So my choice was either I accept the new agreements or sign a release of liability. Michael had also obtained a 'release' from me by promising me more money. HMS did the same thing and sent me money under the non-agreements to further make it harder for me to gain compensation.

g.  HMS joined forces with Michael in a joint defense agreement. Both filed motions to demonize me to catch me make errors that are inadvertent to deny compensation and my value. But when I asked HMS to help me get my money from MBH, Chris told me to do that on my own. They told Michael to pay me too.

h.  HMS followed the same pattern as MBH in the negotiation process. They both are ganging up on me to deny me compensation and make it harder for me to move on to intentionally harm me.

i.  HMS knew that for any modifications to the new were to be done as per 4.4. They did that with Michael, not me. They paid Michael and not me. Chris stole my wages, career and humiliated me in front of my own contact that I brought for HMS.

j.  Michael was assigned the staffing work that was my idea. It is one of the reasons I was very upset in March 2017. I realized that Chris was stealing my work and efforts and not telling me my value and insulting me every chance he got. [ROTA002511]. He stole my ideas, wages, and value. He worked with Michael to get me to release the money rather than just honor his own words, pay and let me move on.

k.  Chris let me believe that I could have a job and work for nearly 17 months and stole all of it. [ROTA002511-2516]. Both Michael and HMS jointly humiliated me by promising me money

but never sending me any. Chris is the worst person I met. There is no price to the peace and joy he stole from our lives by not paying me. Chris treated me worse than a slave and disrespected my family and career.

l.   Had I not done the initial work, HMS would not have had the universities. If MBH knew of HMS, why did he wait 25 years to get to them? He had no idea. Chris lied that he did not know it was my Michael to deny me compensation and humiliate me in front of other males who did nothing to get Michael.

See Michael's deposition—Michael Fernandez. Justin thought it was Michael Fernandez. It suggests they talked about me and what to do about me 'situation' in our face.

```
        Q.   Okay.

        A.   The situation was right there in our faces.  So
there was nothing to --

        Q.   Did you know if Justin Spencer talked to Aparna
about this during the NAFSA?

        A.   I think later he mentioned that they had met and
she had asked about -- if he knew Michael, he thought
Fernandez, with an F.  That's what I was told.  And so he
said no.  That's what I was told.
```

Michael had never heard of HMS before me. Had I not been in the picture, HMS would not have had the work. Both of them humiliated me. Had I worked anywhere else, I'd have been paid. They harmed me in concert.

1   Q.   Yeah.

2   A.   Yeah.  No.

3   Q.   Okay.  Then when she said, "The CPT guys are

4   in," was that good news for you?

5   A.   Well, it was good that we were going to have a

6   conversation about the CPT program.

7   Q.   Okay.

8   A.   I mean, at this point, there was -- it was all a

9   speculative process.  Since I'd never talked to them.

10   Q.   Okay.  Do you remember how soon after this

11   e-mail on October 27 that you actually had a conversation

12   with the CPT guys?

13   A.   Well, I think it's a couple of days, if I

14   remember the timing.  Something like October 29th.

15   Q.   So did you have a teleconference with Frank

16   Trocki and Aparna about the CPT program?

17   A.   Yes.

18   Q.   What was the purpose of that?

19   A.   To be introduced to Dr. Trocki and the concept

20   of the program.  And for me to talk about how my work at

21   NGS and -- so that was our introductory meeting.

22   Q.   Okay.  Before that introductory meeting, had you

23   met anyone at HMS?

24   A.   No.

25   Q.   Had you heard of HMS?

1   A.   No.  Other than the vending company at the

2   airports.

3       MS. VASHISHT-ROTA:  Yes.  Yes.

4   BY MR. HEINRICHS:

Getting exclusives is a rarity: Due to my work, MBH was able to deliver what HMS wanted. This was a rare opportunity for me and HMS had tremendous power to deny compensation, demand favors, and harass me if I don't do what they said. Chris ruined my opportunity. He humiliated my work and value.

```
11   what --
12         A.    It says -- well, it says, "I have a draft here
13   for your review," so it looks like consulting contract.
14   Because it says "Consulting_Mike Hernandez."
15         Q.    Okay.  And then I want to direct your attention
16   to the next e-mail, October 26, 2015, 5:51 a.m.  And
17   you're responding to Aparna; correct?
18         A.    Yes.
19         Q.    And you say, "Looks good"; right?
20         A.    Well, it's not my tone.
21         Q.    All right.
22         A.    "Looks good, but I will remove the references to
23   'exclusive'."
24         Q.    So did you remove the references to exclusive in
25   the document?
```

```
1          A.    I don't recall.  I mentioned that I did, but I
2    don't have this.
3          Q.    Okay.  I'm just wondering if you remember.
4          A.    Only because of this (indicating).
5          Q.    Does it jog your memory that you now know that
6    you've removed -- I mean, I'm asking if you remember
7    that.
8                MR. WILLIAMS:  Objection.  Asked and answered.
9                THE WITNESS:  I would have removed the term
10   "exclusive" on any document.
11   BY MR. HEINRICHS:
```

14      Q.   And when you say it's not possible, why isn't it

15   possible?

16      A.   Because in working with schools and becoming an

17   agent, that is a rarity, to get the exclusive.

18      Q.   Okay.  Now, HMS has exclusives; correct?

19      A.   Uh-huh.  It's a rarity.

20      Q.   Is that a "yes"?

21      A.   Yes.  Did I say "yes"?

22           THE REPORTER:  No.

23   BY MR. HEINRICHS:

24      Q.   You nodded your head.

25      A.   Oh, sorry.

---

1       Q.   So let me ask you again.  HMS has exclusives;

2   correct?

3       A.   Yes.

4            MR. WILLIAMS:  Objection.  Vague.

5    BY MR. HEINRICHS:

6       Q.   And when you say yes, they have exclusives, what

7    do you mean?

8       A.   What do I mean?

9       Q.   Yeah.

10      A.   They have exclusive on their CPT program with

11   the schools that they work with.

12      Q.   Okay.

13      A.   So nobody else can come in and do the same CPT

14   program at that school, once they sign their exclusive

15   contract.

**316:11-317:17: Entire timeline of work assigned, lists delivered.**

| | | | |
|---|---|---|---|
| Where are you working at these days? | Oct 7, 2015 | AEG000211 | First official ask for work. |
| MBH and HMS intro | Oct-28-15 | AEG000135 | University task |
| HMS sends first agreement | 11-16-15 | | University task for MBH and WU. |
| Only introduce and step out, not required to be in meetings | Nov-19-2015 | HMS_PROD08297 | MBH and WU already introduced. |
| First time AEG brought up staffing connections | 11/23/2015 | HMS_PROD08288 | Staffing idea |
| Yes, boss I will report back | Dec-8-2015 | HMS_PROD05857 | AEG thought this was to be a job as partners told AEG that there would be upside at new universities. |
| Agreement | Dec-17-15 | First Agreement | covered MBH intro and WU. |
| University task build out commencement, requested baseline. | 1/7/16 | HMS_PROD05855 HMS_PROD06020 HMS_PROD06021 | Baseline of current universities requested. |
| Continued discussion on university targets. | 1/19/2016 | HMS_PROD07789 | 'Blacklisted universities discussion' no university or contact excluded at this time. |
| Complete database delivered as per specifications. No universities, agents, or Michael excluded. | 2/23/16 | HMS_PROD06019 | University database delivered. |
| Agent task assigned | Mar-16 | HMS_PROD03822 | MBH not excluded as a university referring agent of contact. |
| WestCliff Signed | May 2016 | AEG001838-39 | HMS asked AEG to get a contract from WU as both HMS and WU benefitted. |
| I will trust you and Justin | June 2, 2016 | HMS_PROD01705 | HMS sent me to NAFSA to get agents for LU and OU but did not tell me that MBH |

| | | | had reached out to them. |
|---|---|---|---|
| | | HMS_PROD05590 | HMS thanks AEG for efforts for bringing MBH. As both HMS and MBH benefitted, and as MBH was my contact, that was a compensable event for AEG. |
| MBH Ratified | June 2016 | | |
| MBH AEG Contract | June 6, 2016 | AEG000158 | May all our dreams come true now! |
| Agreement with agents | Aug-16 | Contract | 6 months later. No WU, LU or OU added at this time. HMS assured me that everyone knew that MBH was my contact. |
| First wave of agencies | August 16, 2016 | HMS_PROD5473 | HMS email created for agent outreach. |
| Agent questionnaire | September/23/2016 | HMS_PROD07206 | LU, OU, HUST and future HMS' partners new business development |
| Agent database delivered | October 2016 | HMS_PROD07159 | LU, OU, HUST and future HMS' partners new business development |
| Agents—help on a temporary basis | October 2016 | HMS_PROD07492 | You don't have to do any application processing. It won't take up much of your time. This is what he had said for universities as well. I had been working for HMS for nearly a year without any compensation whatsoever. |
| Staffing & Immigration Assigned | October-16 | HMS_PROD07575 | Oct-March Staffing and immigration work. 3/14 meeting in CA for staffing. Chetan Tanna in SD for immigration attorney. |
| Staffing Aestenos | 2/13/2017 | HMS_PROD07229 | Agent portal information provided to agents. |
| Staffing meeting | 3/8/17 | HMS_PROD07228 | Staffing work follow up |
| Send standard agreement to Artesia or anyone else | 3/13/17 | HMS_PROD07224 | Staffing work ongoing for 6 months now. |
| Staffing messaging | 3/24/17 | HMS_PROD07168 | "I work for HMS". |
| Staffing database delivered with | 3/20/17 | HMS_PROD05717 AEG0001810 | I put my thesis on the backburner to help Chris. He |

| proposal | | | HMS_PROD00634 | extracted this proposal from me by promising me $500,000 but sending a contract for $36,000 with nebulous money. He did not pay any of those amounts and stole from me. |
|---|---|---|---|---|
| Agreement with staffing | | Mar-27-17 | HMS_PROD05209 | 7 months later. |

In view of the information obtained in the deposition, we also write to request supplementation of responses to certain prior requests for production of documents in our First set of written discovery to Defendants.

### First Request for Production of Documents

Request for Production of Documents No. 1 asks for:

All emails, letters, notes of phone calls or other records of communications between Defendants, or each of them, and Michael Hernandez concerning or related to the discussions and negotiations leading up to the execution of the contract between Defendants and Michael Hernandez attached as Exhibit B [to the first set of discovery].

RESPONSE: AEG000115 to AEG000172 has been produced.

### Likewise, Request for Production of Documents No. 2 of the First Set of Discovery Requests asks for:

All emails, letters, notes of phone calls or other communications of any kind between Defendants, and each of them, and Michael Hernandez concerning or related to the agreement attached hereto as Exhibit B [to the First Requests] after the date of its execution.

RESPONSE: The entire phone calls, texts that I have with MBH and the record has been produced as noted in the pages they sent over.

Request for Production No. 9 of the First Set of Discovery Requests asks for:

All documents evidencing communications between Defendants, or each of them, with or to any party or entity since January 1, 2015 concerning or in any way related to HMS and/or Christopher Howell.

**Request for Production of Documents No. 10 of the First Set of Discovery Requests asks for:**

> All documents evidencing communications between Defendants, or each of them, with or to any party or entity since January 1, 2015 concerning or in any way related to Justin Spencer.

> **RESPONSE:** I have produced all the communications with Justin Spencer.

From a detailed review from our document database containing all documents produced by the Defendants in this case, we did not see the production of any text messages, SMS, WhatsApp, Messenger, or any similar com1mication platform in response to these requests although Ms. Rota testified, they exist.

The First Set of Discovery Requests define the term "communication" as follows:

The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) by any means, including but not limited to any meeting, conversation, discussion, conference, correspondence, message, or other written or oral transmission, exchange, or transfer of information in any form between two or more persons including in person or by telephone, facsimile, telegraph, telex, email, or other medium.

In addition, the definitions and instructions of the First Set of Discovery Requests define the term "document" as follows:

The term "document" shall have the broadest meaning permitted by Utah. R. Civ. P. 34(a) and includes without limitation all originals, copies (if the originals are not available), non-identical copies (whether different from the original because of underlining, editing marks, notes made on or attached to such copy, or otherwise) ,md drafts of the following items, whether printed or recorded (through a sound, video or other electronic, magnetic or digital recording system) or reproduced by hand, including but not limited to letters, correspondence, telegrams, telexes, memoranda, records, summaries of personal conversations or interviews, minutes or records or notes of meetings or conferences, note pads, notebooks, postcards, "Post-It" notes, stenographic notes, notes, notebooks, opinions or rep01is of financial advisors or consultants, opinions or reports of experts, projections, financial or statistical statements or compilations, contracts, agreements, appraisals, analyses, purchase orders, confirmations, publications, articles, books, pamphlets, circulars, microfilm, microfiche, reports, studies, logs, surveys, diaries, calendars, appointment books, maps, charts, graphs, bulletins, photostats, speeches, data sheets, pictures, photographs, illustrations, blueprints, films, drawings, plans, tape recordings, videotapes, disks, diskettes, data tapes or readable computer-produced interpretations or transcriptions thereof, electronically transmitted messages ("E-mail"), voice mail messages, interoffice communications, advertising, packaging and promotional materials, and any other writings, papers and tangible things of whatever description whatsoever, including but not limited to any information

contained in any computer, server, mainframe, or other storage device (including (i) information on or in computer memory, (ii) information on or in computer or network backup files, and (iii) information that has been "deleted" or "erased" but is recoverable) whetl1er located on-site or at an off-site facility, within your possession, custody, or control.

Consequently, these types of messages were well within the definition of "communication" and "document", respectively, as used in the First Set of Discovery Requests.

In addition, one of the documents that we produced in this case (and that was produced back to us by Ms. Rota) was an email to Eric Darr of Harrisburg University dated February 12, 2019 in which Ms. Rota sends him multiple pages of computer-maintained notes of some kind. From our production, it is document HMS_PROD09085 - 9169. A copy of the document is enclosed for your convenience. Beginning on Bates page 9148 of that document is a list of phone calls and phone records by name of counterparty and includes Chris Howell, Michael Hernandez and possibly Justin Spencer. Ms. Rota lists several specific incoming and outgoing text messages in this material and presumably has them. However, she did not produce the actual text messages in the document as listed at least when the document was sent to us by Eric Darr. We would ask that those messages, which are very specifically listed and disclosed by Ms. Rota, be produced.

*RESPONSE*: I do not have the actual text messages. It was an old phone bills that I went through to capture these events. I did not keep them as I changed my phone number prior to the litigation.

Very truly yours,

**LEWIS HANSEN**

*/s/ S. Grace Acosta*
S. Grace Acosta

SGA/lm
cc:  Liz Butler
      Jeffrey W. Shields
      Nate Thomas

EXHIBIT 7

7/15/2018                                    August Network Mail - Fwd: Artesia

                                    **Aparna Vashisht Rota <avrota@augustnetwork.com>**

___

## Fwd: Artesia
5 messages

___

**israel rapuri** <irapuri@yahoo.com>                                    Fri, Nov 17, 2017 at 9:30 AM
To: "avrota@augustnetwork.com" <avrota@augustnetwork.com>

Sent from my iPhone

Begin forwarded message:

> **From:** Israel Rapuri <irapuri@gmail.com>
> **Date:** November 17, 2017 at 9:28:34 AM PST
> **To:** "IRAPURI@YAHOO.COM" <IRAPURI@YAHOO.COM>
> **Subject: Fwd: Artesia**

Sent from my iPhone

Begin forwarded message:

> **From:** Aparna Rota <aparna.rota@howellmgmt.com>
> **Date:** March 10, 2017 at 5:46:26 PM PST
> **To:** Israel Rapuri <irapuri@gmail.com>
> **Cc:** Chris Howell <chris.howell@howellmgmt.com>
> **Subject: Re: Artesia**

Hi Israel:

We are coming to meet you on the 15th. Chris is my partner and he wants to meet you in person, if possible. Let me know if you are here on 15th morning and we can meet around Chennai Tiffins or anywhere else that is close to you.

As discussed:

1.) HMS will pay you as our representative and you can recruit students in India. Since you already have a staffing company with QA, SAP, Oracle training, one idea would be to pre-train the students in India and then they apply for their F-1 at one of our schools.

Once they are here, you can place them at your contracts as they would be allowed to pursue technical jobs as a part of their CPT. The tuition at most of our schools is right around $4,000-$5,000 per semester. If students have good GPAs, we also give scholarships.

Second is that let's suppose you have someone on H1-B that is expired or you have applied for their H1-B or those whose OPT has run out as well,then they can pursue the school option.

Thanks and let us know about the 15th morning.

Best,
Aparna

7/15/2018                                    August Network Mail - Fwd: Artesia

On Wed, Mar 8, 2017 at 11:37 AM, Israel Rapuri <irapuri@gmail.com> wrote:
Hi Aparna this is Israel Rapuri
Pl send me the details of the financial gains for our company and also agentship .
Thnx
Israel Rapuri

On Tue, Mar 7, 2017 at 11:58 AM, Aparna Rota <aparna.rota@howellmgmt.com> wrote:
Hi Ira:

We met yesterday at Chennai Tiffins and spoke briefly about working together. I am so
glad that you see the possibilities as I do.

I have your contract details as follows:

Israel Puri
Artesia Soft LLC
18528 Pioneer Boulevard #204
Artesia, CA 90703

Phone: 562-745-5369

Chris:

I wanted to introduce you to Ira. He is interested in working with us. He trains students
and professionals on SAP, QA, and Oracle and has been doing this for the past 8 years.
The synergies between us are good and we can help each other.

Ira's contract's details are noted able so if you could please get him a contract, it would
be awesome.

Thank you,

Aparna

---

**Aparna Vashisht Rota** <avrota@augustnetwork.com>                    Fri, Nov 17, 2017 at 9:31 AM
To: israel rapuri <irapuri@yahoo.com>

Thank you!
[Quoted text hidden]

---

**Aparna Vashisht Rota** <avrota@augustnetwork.com>                    Wed, Nov 22, 2017 at 2:53 PM
To: Ward Heinrichs <swheinrichs@gmail.com>

[Quoted text hidden]

---

**Aparna Vashisht Rota** <avrota@augustnetwork.com>                    Fri, Jan 19, 2018 at 9:09 AM
To: kcall@scmlaw.com, Alr@scmlaw.com

I don't have access to the "aparna.rota@howellmgmt.com" email any longer.


---------- Forwarded message ----------
From: **israel rapuri** <irapuri@yahoo.com>
Date: Fri, Nov 17, 2017 at 9:30 AM
Subject: Fwd: Artesia
To: "avrota@augustnetwork.com" <avrota@augustnetwork.com>

[Quoted text hidden]

--
Best regards,

Aparna Vashisht-Rota
President & CEO
Skype: Apsrota
Phone: 858-280-5019

PRIVILEGED AND CONFIDENTIAL
This communication and any accompanying documents are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon this communication is strictly prohibited.  You are not to use the e-mail, or the information in it, in any way.

---

**Aparna Vashisht Rota** <avrota@augustnetwork.com>                     Sun, Jul 15, 2018 at 12:30 PM
To: kcall@scmlaw.com

You will need this. I am sending you others as well in a similar manner. Once you see my document, it will make sense.

A

---------- Forwarded message ----------
From: **israel rapuri** <irapuri@yahoo.com>
Date: Fri, Nov 17, 2017 at 9:30 AM
Subject: Fwd: Artesia
To: "avrota@augustnetwork.com" <avrota@augustnetwork.com>

[Quoted text hidden]

--
Best regards,

Aparna Vashisht-Rota
President & CEO
+1-858-209-9541

**PRIVILEGED AND CONFIDENTIAL**
This communication and any accompanying documents are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon this communication is strictly prohibited.  You are not to use the e-mail, or the information in it, in any way.

EXHIBIT 8

 **Aparna Vashisht Rota <avrota@augusteducationgroup.com>**

## Ottawa MBA IT
5 messages

**Aparna Vashisht Rota** <avrota@augusteducationgroup.com>

Thu, Apr 20, 2017 at 7:30 PM

To: tirthesh1991 <tirthesh1991@gmail.com>, Justin Howell <justin.howell@howellmgmt.com>

Dear Tirthesh:

Attached are the application documents needed for Ottawa. Justin is the application processing manager and will guide you through it. I have also attached the merit scholarship application for you. Since you have a master's from SDSU, I don't think a WES evaluation or TOEFL will be needed.

1.) Transcripts from India (If you have a 3.6 GPA here, it would help)
2.) Transcripts from SDSU
3.) Passport copy
4.) Bank statements
5.) Personal statement
6.) Letters of recommendations

Dear Justin,

Tirthesh copied here is interested in Ottawa's MBA IT program. I think I have all the documents he needs but do correct me and add others that I might have missed.

Best regards,

Aparna

--
Aparna Vashisht-Rota
President & CEO
Skype: Apsrota

PRIVILEGED AND CONFIDENTIAL
This communication and any accompanying documents are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon this communication is strictly prohibited. Moreover, any such disclosure shall not compromise or waive the client-consultant or any other privileges as to this communication or otherwise. If you have received this communication in error, please contact me at the above email address. Thank you.

**2 attachments**

 **Ottawa Application.pdf**
1420K

 **Merit Scholarship Ottawa.pdf**
119K

---

**Aparna Vashisht Rota** <avrota@augusteducationgroup.com>                    Thu, Apr 20, 2017 at 7:31 PM
To: tirthesh1991 <tirthesh1991@gmail.com>

Hi there,

FYI. This is for Ottawa. I will need the same documents for your WestCliff application too and will set up time next week for both of us to go there. Wednesday in the morning will work well for me. We can be there at 11 if we leave San Diego at 10.

Best regards,

Aparna
[Quoted text hidden]

---

**2 attachments**

 **Ottawa Application.pdf**
1420K

 **Merit Scholarship Ottawa.pdf**
119K

---

**Justin Howell** <justin.howell@howellmgmt.com>                    Fri, Apr 21, 2017 at 4:02 PM
To: Aparna Vashisht Rota <avrota@augusteducationgroup.com>
Cc: tirthesh1991 <tirthesh1991@gmail.com>

Tirthesh

Ottawa University offers a unique, executive weekend MBA program at its Phoenix, AZ campus. The program is specifically designed with professional, international students in mind. The weekend program only requires students to be on campus one weekend (Friday, Saturday, Sunday) every 8 weeks. The rest of the time, students interact with their professors and classmates online using the Blackboard learning management system. They also participate in CPT from day 1 which allows them to apply what they are learning in the classroom to real-world, professional training.

Here are the details of the program. Please note that there are 3 concentrations available.

**Ottawa University - www.howellmgmt.com/ottawa**

- Campus in Phoenix, AZ
- Available Degree:
    - MBA-IT (STEM)
    - MBA-Operational Effectiveness
    - MBA-Health Care Management
- Executive Weekend Format (One weekend (Friday, Saturday, Sunday) every 8 weeks) with CPT from day 1
- 2-year, 6-semester program; 42 credits (36 coursework, 6 CPT)
- Semester cost: $4,860; Total cost: $29,160
- Available Scholarships:

   - International Student Merit Scholarship - $4000 to students who maintain a 3.6 GPA in the program. Available after first semester.

For your convenience, I have attached the application form for this program. You can submit your complete application packet directly to me in PDF format. Because you have already studied in the US, you do not need to submit proof of English proficiency. There is no application fee. **The next start date is June 23.**

Here is a checklist of required documents:

1. Application
2. Statement of Purpose
3. Copies of degree certificates and transcripts
4. 3 letters of recommendation
5. Copy of passport, visa, I-20 and I-94
6. Copy of bank statement showing $28,000 USD in available funds. This can be a personal statement, family account statement, or a combination of statements to equal $28,000

Please reach out to me at 435-994-9786 with any questions.

Best regards

Justin Howell
[Quoted text hidden]
--


 **HMS International Graduate App_OU.pdf**
1420K

---

**Aparna Vashisht Rota** <avrota@augusteducationgroup.com>
To: "Law Offices of Chetan P. Tanna" <greencard@usa.net>

Fri, Apr 21, 2017 at 4:17 PM

Hi there,

Update.

Tirthesh will apply to both Ottawa and WestCliff. He will get both. I am going to try to get both tuitions to be equal and then he can choose. He is going with me to WestCliff next week. I agree with you that WC is the better choice for him but I want him to have options, just in case.

I will also put you in touch with Justin Howell who handles all the application processing. I will be in the loop and ensure all are taken care of, so no worries there. So you will see an email about this.

Aparna
[Quoted text hidden]

---

 **HMS International Graduate App_OU.pdf**
1420K

**Aparna Vashisht Rota** <avrota@augusteducationgroup.com>          Wed, May 15, 2019 at 5:43 PM
To: Ward Heinrichs <swheinrichs@gmail.com>

This was a referral from Chetan.

---------- Forwarded message ---------
From: **Aparna Vashisht Rota** <avrota@augusteducationgroup.com>
Date: Thu, Apr 20, 2017 at 7:30 PM
Subject: Ottawa MBA IT
To: tirthesh1991 <tirthesh1991@gmail.com>, Justin Howell <justin.howell@howellmgmt.com>

[Quoted text hidden]

---

**2 attachments**

 **Ottawa Application.pdf**
1420K

 **Merit Scholarship Ottawa.pdf**
119K

EXHIBIT 9



Source: HMS_PROD05717

1. This is the full calculation for the non-compensable and unclassified. As you can see in 5, that is $1,250+$500 or $1,750[1]. In 7, he also offers me additional $500 for unclassified students, which brings this to $2,250 as all non-compensable are also unclassified because the source is unknown as there is no underlying agreement.

2. Note that I said the maximum that I could get is $2,250 and that is wrong because once the number of students increase, 416 as in this case, the per student compensation is higher. At 416 unclassified, it would be $1,783+$500 or $2,283. Adding $500 from unclassified at 7, that makes it $2,783.

| Annual Enrollments | Option A | Per Student | Option B | Per Student | Current Option | Per Student |
|---|---|---|---|---|---|---|
| 100 | $ 150,000.00 | $ 1,500.00 | $ 111,750.00 | $ 1,117.50 | $ 125,000.00 | $ 1,250.00 |
| 200 | $ 300,000.00 | $ 1,500.00 | $ 262,250.00 | $ 1,311.25 | $ 350,000.00 | $ 1,750.00 |
| 300 | $ 450,000.00 | $ 1,500.00 | $ 462,750.00 | $ 1,542.50 | $ 525,000.00 | $ 1,750.00 |
| 400 | $ 600,000.00 | $ 1,500.00 | $ 713,250.00 | $ 1,783.13 | $ 700,000.00 | $ 1,750.00 |
| 500 | $ 750,000.00 | $ 1,500.00 | $1,013,750.00 | $ 2,027.50 | $ 875,000.00 | $ 1,750.00 |
| 600 | $ 900,000.00 | $ 1,500.00 | $1,363,750.00 | $ 2,272.92 | $1,050,000.00 | $ 1,750.00 |
| 700 | $1,050,000.00 | $ 1,500.00 | $1,713,750.00 | $ 2,448.21 | $1,225,000.00 | $ 1,750.00 |

Source: AEG0001810

---

[1] $429,750 is not equal to $458,012 and nor is $167,000 $223,000.

3.  Note that HMS has paid as much as $2,500/student for Lindenwood so the most I could get at trial arguably is $2,500+$500+$500 or $3,500 because now we can debate which non-compensable agent the one that HMS paid $1,250 or $2,500?

Look at the below. In one, he is suggesting one sum but in an email to me, he is offering more money that what he got 'approved' so to speak.



**Source:** HMS_PROD00634

This is the email where I tried to clarify if the student goes to HMS directly from a lawyer. HMS knows that is possible and there is no underlying agreement with the lawyer, thus the student is both a non-compensable and unclassified.



From: Chris Howell
To: Aparna Rota <aparna.rota@howellmgmt.com>
Cc: Justin Howell <justin.howell@howellmgmt.com>
Sent: 5/4/2017 9:31:22 AM
Subject: Re: Agent Trainings


Aparna,

That's a good question about the lawyers. I suspect that the lawyers will simply refer their clients to HMS, they won't actually assist them with the application process. If this is the case, I wonder if it would be helpful for us to create a summary document explaining the programs that could be emailed to them which they could share with their clients. What do you think?

Chris

Sent from my iPhone

On May 4, 2017, at 8:45 AM, Aparna Rota <aparna.rota@howellmgmt.com> wrote:

I assume that he has connected with you on whatsapp.

I think I sent one person the portal information yesterday with whom we don't have an agreement.

EXHIBIT 10

11/17/2017                                     August Network Mail - FW: Deposit Receipt



**Aparna Vashisht Rota <avrota@augustnetwork.com>**

---

## FW: Deposit Receipt
1 message

---

**Gupta, Ravi** <rgupta@itwprobrands.com>                                    Thu, Jul 6, 2017 at 2:36 PM
To: Aparna Vashisht Rota <avrota@augusteducationgroup.com>, Justin Howell <justin.howell@howellmgmt.com>

FYI. I have made the payment $1,000 (Enrollment Deposit).

Thanks for your help I really appreciate it.


Thanks,


Regards

Ravi Gupta

816-400-5429

---

**From:** Hajiyev, Emin [mailto:EHajiyev@lindenwood.edu]
**Sent:** Thursday, July 6, 2017 4:21 PM
**To:** Gupta, Ravi <rgupta@itwprobrands.com>
**Subject:** Deposit Receipt


Ravi,


Please see enclosed.

Thank you,



**Emin Hajiyev** / **Director, Office of International Students & Scholars**
**Lindenwood University** / 209 South Kingshighway • St. Charles, MO 63301
636.627.2531 *(o)* / 636.949.4108 *(f)* / **LinkedIn** / **Facebook** / **Twitter** / **lindenwood.edu**

---

 **Gupta receipt.pdf**
20K

Example:

1. UT Austin
2. University of Houston
3. UT Dallas
4. Rice University
5. Washington University in St. Louis (**I visit personally to meet them**).

Ravi Lothumalla is entering into Quality and Top Tier Universities ONLY where students and their families have a Great Impact and Reputation in their life. I get all these students from LOCAL HIGH SCHOOLS in US.

I hope this should clear your thoughts, if not, please call me and I can re-assure you that these "Agent Represented Universities are NOT on my agenda to work with.."
Further, I do not encourage anyone to "Question" my Ethics, Reputation, Integrity and Honesty in any manner, be it University or any Agent/s who work with any universities without Verifiable and Credible information.

Please feel free to reach me on **(917) 670-2021**
Thank you,

**Ravi Lothumalla**
*Educational Consultant and Advisor*
**US** **Admissions** || **1-800-**Interns hips || **Veracitians**
**US:**
"**US** **Admissions**", 12439 Orchid Dr,Frisco, TX 75035. C: (917) 670-2021 || F: 888-712-3843
**INDIA:**
"**US** **Admissions**",
H-No: 6-10/C Plot No. 1, Opp.to Indian Oil Petrol Bunk, Beside Roots Dental Clinic, Zaheer Nagar, Habsiguda Main Road,Hyderabad
Telangana. **INDIA**. Zip Code: 500 007
**Devi:** 91000-87717 || **Madhu:** 96764-52545 || **Swamy:** 94414-35990  || **Office:** 040-6451 6464
**SKYPE: Ravi.Lothumalla**

---

**From:** Chris Howell <chris.howell@howellmgmt.com>
**To:** Ravi Lothumalla <ravilothumalla@yahoo.com>
**Cc:** Justin Spencer <justin.spencer@howellmgmt.com >
**Sent:** Monday, July 10, 2017 6:02 PM
**Subject:** Lindenwood University

Ravi,

A couple of things that need to be addressed:

1. In my email to you on June 11th (below) I mentioned that HMS has not received a signed recruitment agreement from US Admissions. Despite not having a formal agreement, HMS paid you in good faith for the students you recruited. If you would like our relationship to continue, please send a signed agreement to me without further delay.

2. It was brought to my attention that you recently contacted Lindenwood University, specifically Emin regarding an issue pertaining to "employment letters". Ravi, you have worked indirectly with HMS in the past and know very well that this behavior is unacceptable. If there is ever a concern, question, suggestion, etc. please contact HMS not the university. It is never appropriate for you to contact our university partners directly.

3. Not only did you contact Emin, It is my understanding that you also involved Aparna. In my email to you on June 11th (below) I clearly mentioned that questions and/or concerns are to be directed to me, not Aparna. HMS is not associated with Aparna and Aparna is prohibited from associating with our university partners.

If you would like to continue sending students to our universities then you need to send a signed agreement and I will look past these grievous mistakes. If you do not wish to comply and move forward with our association then please let me know.

Thanks,

Chris

On Sun, Jun 11, 2017 at 1:18 PM, Ravi Lothumalla <ravilothumalla@yahoo.com> wrote:
Chris:
We received a check for $2500. Any contracts or communication about general things, Madhavi will be in contact with you.
I am looking for your help in getting contract for Shipping/Courier from Lindenwood University if you can help us.

We have a Courier Service company:
http://24by7courier.com/

Please feel free to reach me on (917) 670-2021
Thank you,

**Ravi Lothumalla**
*Educational Consultant and Advisor*
**US Admissions** || **1-800-Interns hips** || **Veracitians**
**US:**
**"US Admissions",** 12439 Orchid Dr,Frisco, TX 75035. C: (917) 670-2021 || F: 888-712-3843
**INDIA:**
**"US Admissions",**
H-No: 6-10/C Plot No. 1, Opp.to Indian Oil Petrol Bunk, Beside Roots Dental Clinic, Zaheer Nagar, Habsiguda Main Road,Hyderabad

EXHIBIT 10

Telangana. **INDIA**. Zip Code: 500 007
**Devi: 91000-87717 || Madhu: 96764-52545 || Swamy: 94414-35990  || Office: 040-6451 6464**
SKYPE: **Ravi.Lothumalla**

On Sunday, June 11, 2017 11:45 AM, Chris Howell <chris.howell@howellmgmt.com> wrote:

Ravi,

I'm forwarding you the email that I sent to Madhavi on May 17th regarding payment for the two students that started at Lindenwood University. I understand you are concerned with the amount that was sent. Please see below, the remaining amount will follow in semester 2 and semester 3 as originally communicated. Please let me know if you have any questions.

Also, I don't recall receiving a signed copy of the agreement between US Admissions and HMS. Could you please re-send it to me at your convenience. Lastly, if you have any questions or concerns please direct them to me, not Aparna.

Thanks,

Chris

---------- Forwarded message ----------
From: **Chris Howell** <chris.howell@howellmgmt.com>
Date: Wed, May 17, 2017 at 7:26 AM
Subject: Re: LU - ENROLLED STUDENTS
To: Justin Howell <justin.howell@howellmgmt.com>
Cc: madhavi lothumalla <madhavilothumalla@yahoo.com>, Ravi Lothumalla <ravilothumalla@yahoo.com>

Hello Madhavi,

My records indicate the following students from US Admissions enrolled at LU for the summer 2017 term. If you have other information please let me know.

Mutyala, Ashok Kumar
Sripathi, Naga Prameelarani

For these two students you will be paid $1,250 in the first semester then $625 in the second and third semesters these students are enrolled for a total of $2,500 per student. Please list $1,250 per student on your invoice then send a follow up invoice in the 2nd and 3rd semesters for the remaining amount.

Let me know if you have any questions.

Thanks,

Chris

On Wed, May 17, 2017 at 1:18 AM, Justin Howell <justin.howell@howellmgmt.com> wrote:
Madhavi

I am cc'ing Chris Howell on this email so that he can get you a final count of enrollments at Lindenwood from US Admissions for the Summer term.

Regards

Justin

On Tue, May 16, 2017 at 3:09 AM, madhavi lothumalla <madhavilothumalla@yahoo.com> wrote:
Hi Justin,
Can you please provide the list of students enrolled for Lindenwood and how much amount should be raised in the invoice per student.

Thanks,
Madhavi


--


--


EXHIBIT 11

 **Gmail**

**Aparna Vashisht Rota <avrota@augustnetwork.com>**

## Application for MS Analytics (Harrisburg University)
2 messages

**Ujjwal Bhateja** <ubhatej1@jhu.edu>
To: "avrota@augustnetwork.com" <avrota@augustnetwork.com>

Thu, Jun 7, 2018 at 5:30 PM

Hi *Aparna*,

I'm Ujjwal Bhateja and I would like to submit my application for Master of Science (M.S.) in Analytics degree program. Attached are the required documents required for the admission. Currently, I'm on my OPT and would be required first day CPT.

Below are the Details of attached documents

·     HU Grad application (File: International Graduate Application [2])

·     Statement of Purpose (File: SOP_Harrisburg University)

·     Valid passport        (File: Pass-1, pass-2)

·     Visa of F1         (File: visa)

·     Resume         (File: Ujjwal _Bhateja)

·     I20         (File: I 20-issue 3)

·     I94         (File: I94- Official Website)

·     Transcript        (File: transcript of JHU)

·     Undergrad        (File: WES Report Transcript)

·     Financial Document     (File: Certificate Deposit 1, Certificate Deposit 2, Account_Statement_JHU, Bofa statement)

            Certificate Deposit 1 + Certificate Deposit 2= **$16,213**

            Account_Statement_JHU= **$6005**

            Bofa Statement= **$ 16,208**

            **Total = $38,426**

For any additional information, please feel free to reach out.

Cordially,

**Ujjwal Bhateja, CQF**

***Phone: +1(443) 743-5152***

**16 attachments**



**pass-1.jpg**
1792K



**pass-2.JPG**
1748K

📄 **Certificate Deposit-2.pdf**
2074K

📄 **Certificate Deposit- 1.pdf**
3970K

📄 **Ujjwal _ Bhateja.pdf**
106K

📄 **I94 - Official Website.pdf**
196K

📄 **transcript of JHU.pdf**
4643K

📄 **SOP_ Harrisburg University.pdf**
50K

📄 **Account_Statement_JHU.pdf**
89K

📄 **Bofa statement.pdf**
62K

📄 **graduation verification letter.pdf**
146K

📄 **International Graduate Application[2].pdf**
225K

📄 **WES Report Transcript (Undergrad) (1).pdf**
709K

📄 **I 20- issue 3.pdf**
7272K

📄 **visa.pdf**
1568K

📄 **HU_InternationalAffidativeSupport.pdf**
93K

---

**Aparna Vashisht Rota** <avrota@augustnetwork.com>                                      Fri, Jun 8, 2018 at 4:41 PM
To: Eric Darr <edarr@harrisburgu.edu>

Dear Eric,

I hope my email finds you well. I have an application for Harrisburg. If possible, please pass on to the right person for processing. Have a great weekend.

Best regards,
Aparna

PS: It is now a month that my post contractual obligations are complete (on the alleged contract that HMS imposed on me), and I can tell you that the freedom that I feel is great. I am finally able to see the fruits of my labor. I have also gone completely viral and I can see my money and where to invest it unconstrained from HMS. It is great.

[Quoted text hidden]

--
Best regards,

Aparna Vashisht-Rota
President & CEO
+1-858-209-9541

**PRIVILEGED AND CONFIDENTIAL**

This communication and any accompanying documents are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon this communication is strictly prohibited.  You are not to use the e-mail, or the information in it, in any way.

---

**16 attachments**



**pass-1.jpg**
1792K



**pass-2.JPG**
1748K

**Certificate Deposit-2.pdf**
2074K

**Certificate Deposit- 1.pdf**
3970K

**Ujjwal _ Bhateja.pdf**
106K

**I94 - Official Website.pdf**
196K

**transcript of JHU.pdf**
4643K

**SOP_ Harrisburg University.pdf**
50K

**Account_Statement_JHU.pdf**
89K

**Bofa statement.pdf**
62K

**graduation verification letter.pdf**
146K

**International Graduate Application[2].pdf**
225K

**WES Report Transcript (Undergrad) (1).pdf**
709K

**I 20- issue 3.pdf**
7272K

**visa.pdf**
1568K

**HU_InternationalAffidativeSupport.pdf**
93K

**Lindenwood University**
209 South Kingshighway
St. Charles, MO 63301
(636) 949-2000

## Application for Admission

 **Applicant Information**

### Applicant

| | |
|---|---|
| Name | Prince Aniefiok Antigha |
| Applying for Term | SU TRA 18 |
| Previously Applied | No |
| Initial Program | Cyber Security Management (MS)-TRI-MO |

### Demographics

| | |
|---|---|
| Gender | Male |
| Birth Date | 11/15/1994 |
| Birth Place | London Nigeria |
| Native Language | |
| Religious Preference | Don't Know, or refused to disclose |

### Address

| | |
|---|---|
| Home | Farimang Singhateh Street, Bakau New Town Gambia pantigha@gmail.com |
| Local | None Provided |

### Residency Status

| | |
|---|---|
| U.S. Citizen | No |
| Visa Type | F-1 |
| Country of Citizenship | Nigeria |

 **Education Information**

### High School Information

| | |
|---|---|
| High School Name | West African International School |
| Graduated | 3/31/2009 |
| GPA | 2.5 of 4 |

### Transfer Colleges

SOUTHEAST MISSOURI STATE UNIVERSITY

### Standardized Test Scores

| **American College Test (ACT)** | **Scholastic Aptitude Test (SAT)** | **Test of English as a Foreign Language ( TOEFL )** |
|---|---|---|

**American College Test (ACT)**

No test scores entered.

**Scholastic Aptitude Test (SAT)**

No test scores entered.

**Test of English as a Foreign Language ( TOEFL )**

No test score entered.

**International English Language Testing System (IELTS)**

No test score entered.

EXHIBIT 12

170100325

**Record on Appeal.**

https://netorg7015503-
my.sharepoint.com/:f:/g/personal/ken_reichlawgroup_com/EpHPXZt1Ic9KmgHUt6d6
tm0B08iPgnS1YATe2vqfFfcO7Q?e=SyzCcs

**Supplemental Disclosures:**

https://www.dropbox.com/home/AEG%20Rota%20Supplemental%20Initial%20Discl
osures

Kenneth L. Reich (8578)
S. Grace Acosta (9836)
J.D. Lewis (16704)
LEWIS HANSEN PLESHE FLANDERS LLC
8 East Broadway #410
Salt Lake City, Utah 84111
Telephone: (801) 746-6300
Facsimile: (801) 746-6301
klr@lewishansen.com
gacosta@lewishansen.com
jd@lewishansen.com
*Attorneys for Defendants*

### IN THE FIRST JUDICIAL DISTRICT COURT
### CACHE COUNTY, STATE OF UTAH

| | |
|---|---|
| HOWELL MANAGEMENT SERVICES, LLC, a Utah limited liability company,<br><br>                Plaintiff,<br>vs.<br><br>AUGUST EDUCATION GROUP, LLC, a California limited liability company; AND APARNA VASHISHT ROTA, an individual<br><br>                Defendants. | **OPPOSITION TO PLAINTIFF'S MOTION TO PRECLUDE DEFENDANTS FROM OFFERING UNTIMELY DISCLOSED EVIDENCE AND CALCULATION OF DAMAGES AT TRIAL**<br><br>**(ORAL ARGUMENT REQUESTED)**<br><br>Civil No. 170100325<br><br>Judge: Kevin K. Allen |

Defendants August Education Group, LLC ("AEG"), and Aparna Vashisht Rota ("Ms. Rota") (at times collectively referred to as "Defendants") hereby oppose Plaintiff Howell Management Service, Inc.'s ("HMS") Motion to Preclude Defendants from Offering Untimely Disclosed Evidence and Calculation of Damages at Trial (the "Motion").

## RELIEF REQUESTED AND GROUNDS FOR RELIEF

This case is a contract dispute between AEG and HMS. AEG asserts that HMS has failed to pay commissions to AEG as per the various contracts between the parties and breached the contract terms. HMS denied her access to place her students as per the contracts resulting in losses on student placements. One of AEG's contractual claims is for referrals for students placed at Lindenwood (LU) and Ottawa University (OU) (collectively "universities") that an AEG agent, Michael Hernandez ("Hernandez") brought to HMS. As both HMS and Hernandez benefited from the introduction and had an agreement with AEG, both sides had to pay AEG a referral fee per student placed at LU and OU. AEG and Hernandez had a separate referral agreement. Early in 2017, HMS promised AEG that it would take over the contract between AEG and Hernandez. However, at the breakdown of the relationship between HMS and AEG, Hernandez refused to pay AEG and AEG enforced its rights in arbitration, which concluded in October 2019. This is the arbitration which is the venue and subject of the show-cause motion before this Court as HMS claims this is an 'unrelated' matter which is factually inaccurate given that the agreement between AEG and Hernandez is enforced. The enforced agreement establishes AEG's pivotal role in the relationship. Defendants updated the precise damages in the 8th disclosure that revise the damages to HMS' benefit, as they have to pay less. Defendants had noted the entirety of this damage to HMS prior to the deadline and should the Court bar

2

those updated damages; Defendants humbly revert to the unadjusted amounts submitted prior to the deadline.

Finally, AEG asserts that it has unknown damages. *See* Page 1 of Opposition's motion at paragraph 6 and 7, from wages, defamation, harassment, and discrimination that it has estimated for which it seeks either permission to add to this trial or to gain an exemption to pursue its damages in California. Defendants sought a stay from the Court for the various decisions to be ruled but was denied. Therefore, Defendants request the Court to permit Defendants to submit a motion to obtain an exemption instead given new extension of the California statute of limitations for sexual harassment.

1. *Contractual Damages:* AEG asserts contractual damages and for the precise calculation of the contractual damages, HMS is in sole possession of the information that forms the core basis for AEG's damages. HMS, however, has failed and refused to provide this information. And yet, HMS's present motion complains that AEG has failed to "timely disclose a computation of damages" which HMS's refusal to provide discovery has caused. For this reason, HMS's present motion should be denied. HMS is in no position to bar any damages, as it still has not completed fact discovery. This is the subject of a discovery motion pending before the court in the Statement of Discovery Issues Re: Defendants' Third Set of Discovery Requests. As a result of HMS's refusal to provide clearly admissible information regarding its damages, AEG

3

has been left to provide HMS with calculations that are based on the experience, knowledge, and information available. Due solely to HMS's refusal to provide the information, the calculations to this point have been imprecise but generally accurate as far as Defendants can discern. Finally, to add insult to injury, HMS now asserts that because AEG has failed to provide support for its damages, it should be precluded from claiming damages. Such a position would reward HMS for the stonewalling and would be improper and contrary to justice.

*2. Unknown damages: See* Page 1 of Opposition's motion at paragraph 6 and 7: The Defendants do not know the damages from defamation, reputation loss, student placement loss, and loss due to distress and emotional devastation. The Plaintiffs have refused to comply with the discovery request to provide communications between the universities and HMS' staff regarding AEG and Dr. Rota. This is the subject of a discovery motion pending before the court in the Statement of Discovery Issues Re: Defendants' Third Set of Discovery Requests. As a result of HMS's refusal to provide clearly admissible information regarding its damages, AEG seeks permission to either add those known damages that have been disclosed prior to the deadline to this trial or permission to submit a motion to obtain an exemption to pursue those known damages in California based on the California statute of limitations that extends the statute of limitations to report sexual harassment to three years. The new laws also provide stronger protections to August Education Group, LLC and Defendants against defamation and

4

retaliation after reporting harassment if done in good faith. The Defendants submitted the discrimination and harassment complaints directly to and only to HMS in good faith in July and September 2017 respectively but with no resolution. August Education Group, LLC is a California corporation. A majority of the work was performed in California. The Defendants had never been to Utah except for the deposition.

Finally, as is the subject of the motion pending before the court is one of the First and Second Agreement arbitration clauses, the First and Second Agreement, arguably aren't fully superseded. As the harassment events occurred in California under those agreements, it is plausible and equitable to pursue those in California based on the agreement governing the relationship on that date. The Third Agreement as ruled by the court and humbly accepted by the Defendants begins April 24th, 2017 and is not retroactive. As demonstrated, Defendants are awaiting pending decisions to update all its damages.

HMS asserts:

1. *AEG has failed to provide a computation of damages.* Not so. The computation is done by inserting information into a formula set forth by contract. AEG has attempted to fill in the formula with the limited information at its disposal, however, the core information must come from HMS. The formula is in the contracts and AEG

has consistently pointed to the contracts as the basis for its damages. The bulk of the information remains in HMS's hands and is the subject of a pending motion before the Court. When HMS provides the information in discovery, AEG will provide it back to HMS as a disclosure and plug it into the contractual formula.

2. *AEG has failed to timely supplement its disclosures.* Not so. AEG has timely provided HMS the information it has regarding its damages for both the seventh and eighth disclosures. For the seventh disclosure, AEG updated its calculations and loss on students that AEG could not place due to prohibition since July 2017 even though the contracts permitted AEG to work directly with each university it developed. These damages have been disclosed to HMS on numerous occasions and noted below. For the 8th disclosure, as the AAA[1] case was decided in October 2019, the Defendants updated the damages with precision so as not to 'double' dip. These damages were submitted to HMS prior to the deadline.

3. *AEG has failed to disclose damages experts.* AEG has not disclosed a specially retained expert to make the calculations because Dr. Rota herself is qualified and

---

[1] AEG and Mr. Hernandez were parties to arbitration. HMS had offered to take over that contract but then later reneged. Mr. Hernandez also disputed the validity of the contract so the Defendants had to go through litigation to enforce the contract to collect funds due and then seek the remainder in this litigation. These damages have been disclosed to HMS well before the deadline.

capable to provide this information. This is not rocket science and requires no mathematical extrapolation that might require a 'hired gun' to purvey. The contract damages can be estimated by plugging numbers into a contractual formula and the loss on student placements can be estimated by the fair market value of students via AEG's contracts with HMS, which entitled AEG to be on par with HMS' compensation to estimate losses due to denial of student placements at properties developed by AEG. The table below notes all these damages and AEG asserts that it still does not have a complete estimate of its damages as HMS has refused to perform on any of its contracts and provide key data, tag agents, universities, staffing companies, and other channels for AEG to determine its damages.

**FACTUAL BACKGROUND AND
EVIDENCE SUBMITTED TO HMS PRIOR TO DEADLINE**

| *Factual Assertion Plaintiff is Challenging* | *Location in Record Where Fact Was Presented to the Plaintiffs* |
| --- | --- |
| Evidence of damages submitted and ongoing damages; Loss on 300 students/location/year, HMS taking over Mr. Hernandez's contract; Unknown damages. | 1. *See* Plaintiff's Declaration filed February 11, 2019, Exhibit E referring to an email dated March 27, 2018; lines 17-18 "Due to this episode, as I had students, I had to place them elsewhere and got a location in NYC but that is a very local program. We market other programs too." The Defendants further note in |

7

line 22, "I'd like to have the ability to place <u>300 students per year at the same rate as HMS</u>." AEG011619.

2. *See* Defendants Sixth Disclosure filed on September 3rd, 2019 page 2, Net Compensation after all expenses at ROTA002902, which notes the net compensation of <u>$12,000</u> for a CPT student. AEG has damages in the amount of $1,186,000,004.13 noted.

3. *See* Exhibit E of the Plaintiff's Declaration filed February 11, 2019, page 11 (marked page 9 of DFEH Rights to Sue dated March 19th, 2018 and amended March 27th, 2018), line 22 or paragraph 33 "<u>I'd like to accommodated and have fair access to place my students with parity, dignity, and respect.</u>"AEG011632.

4. *See* Exhibit F of the Plaintiff's Declaration filed February 11, 2019, page 1, email dated October 1, 2018; lines 30-31"They never let me meet anyone at OU and at the other university, <u>I got compensated directly and 100% of what HMS got for my own</u>

8

<u>students."</u> HMS_PROD04000.

5. *See* Exhibit H of the Plaintiff's Declaration filed February 11, 2019, page 2, lines 11-14,  "Due to this episode, as I had students. I had to place them elsewhere and got a location in NYC but that is a very local program. We market other programs too. <u>For myself, I'd like to have the ability to place up to 300 students per year at the same rate as HMS.</u> We don't use sub agents and I would prefer if the university paid us directly so I can remove HMS going forward in my dealings so there is no interaction. I can also keep this confidential to not undermine them in any way." AEG015758

6. *See* Exhibit M of the Plaintiff's Declaration filed February 11, 2019. Page 2 lines 1-13 "Post the trip to India, I'd like to renew my request for direct access and payment from OU. I am writing to request that OU open an interim method for us to send applications and be paid for the same. I feel that I am catching the shortest end of the stick in every way just because I complained about the poor

management as well as the harassment. I now have to spend money to get out of a bad situation. I have the students and when I heard the story of the lady in India, I thought I should speak up and request this because id I don't speak up for her in addition to myself, then I let two people down."

"We would not like you to disrupt your main vendor in any way. I feel there is no reason that I can't have access other than the exclusivity and I will write up an amendment that allows the university and I with a way forward such that it does not disrupt anything or anyone. It can be an interim solution till the matter is litigated because while the main vendor has lost nothing (nor do I want them to, I have no malice or ill will towards them at all), <u>I lost nearly 2 years of work and was wrongfully prohibited</u> without the main vendor even checking the facts. I spent money out of my own pocket to develop and add agents and <u>I'd like to be paid on par with the main agent."</u>

7. *See* Exhibit P of the Plaintiff's Declaration filed

10

February 11, 2019, Page 2 and line 8-14. "You are interfering with my prospective economic relationship with Ottawa University as I do have the right to approach the university based on the truthful and honest reporting of the circumstances and my painful experience. Your statements describing me with words such as "nuts, "Whacko" are libel and that is an intentional interference with a prospective economic advantage for AEG. AEG can recruit greater number of students than HMS. My damages are greater"

Line 23-26 "<u>However, I will accept no less than 100% of what you get paid.</u> I want to find the best way that works for you so I can earn a living at a university in which I invested till the matters are being litigated. It is fair. We are going to seek a gag order so you can't defame me with libel in order to hurt my prospective economic chances to recruit for Ottawa."

8. *See* Exhibit P and page 5 of the Plaintiff's Declaration filed February 11, 2019 (marked Page 1) of the "Memorandum of Understanding for an Agency

Relationship Between Ottawa University, August Education Group LLC at 2.3 Student Volumes: AEG is permitted to recruit up to 1,000 students per year per campus."

9. *See* More specifically, page 3 of Exhibit Q of the Plaintiff's Declaration filed February 11, 2019 (marked Page 1) of the Memorandum of Understanding for an Agency Relationship Between Harrisburg University, August Education Group LLC at 2.3 Student Volumes: AEG is permitted to recruit up to 300 students per year per campus per program at HUST.

10. *See* Exhibit S of the Plaintiff's Declaration filed February 11, 2019 dated February 10th, 2019 Page 1, line 16-17 that states "All I seek is an interim way to place my students till the dispute between the parties is resolved."

11. *See* Exhibit S of the Plaintiff's Declaration filed February 11, 2019 dated February 10th, 2019, Page 1, lines 22-24: "Yes, they would not get paid on my

12

|   | students as <u>I seek the same compensation as HMS</u> but they have willingly forfeit that revenue. Respectfully, I seek an interim solution." |
|---|---|
|   | 12. *See* Exhibit S of the Plaintiff's Declaration filed February 11, 2019, page 5, at paragraph 2.2 Student Volumes: <u>AEG is permitted to recruit up to 300 students/program/campus for each calendar year for HUST programs.</u> AEG is permitted that volume between all campuses and programs at HUST. |
|   | 13. *See* Exhibit S of the Plaintiff's Declaration filed February 11, 2019, Page 10, last line <u>"interim pathway till the litigation between the parties is resolved."</u> |
|   | 14. *See* Exhibit S of the Plaintiff's Declaration filed February 11, 2019, Page 11, first line "This is because AEG gets applicants for HUST and she wants to recommend students to HUST without any reservations, hesitation, bias, or discomfort. HUST is an excellent institution and while AEG works with other partner institutions, HUST is always in |

13

demand. AEG would like to have the opportunity to place students while the matters between HMS and AEG are being litigated.

Specifically, we seek the following: [1] SEP

1.) An interim contract with the institution for 6 months.

2.) The same rate of compensation as the main vendor under the right to work and equal pay act that states that same compensation for the same work must be provided without discrimination.

15. *See* Exhibit E of the Plaintiff's Declaration filed February 11, 2019, page 14 (marked page 8 of DFEH Rights to Sue dated March 19th, 2018 and amended March 27th, 2018), lines 24-25 and paragraph 27 a. "prohibited". The Defendants lost access, could not place students, at the rate of 1,000 students/year/location for Ottawa University at $12,000/student and HUST at unknown rate per student for 300/students/year/location.  The Defendants have the right to pursue its own contracts as per paragraph 4 of the Second Agreement dated August 3rd, 2016 (*See* pleadings).

4. Representative agrees not to solicit, divert, accept

14

<table>
<tr><td></td><td>business from, perform business for or otherwise take away or interfere with any client or customer of HMS; nor solicit, divert or induce any HMS' other contractors or employees to leave HMS' employ at anytime during or after termination of this agreement irrespective of the circumstances or reason for such termination. <em>This is not applicable in certain instances where Representative develops new business opportunities and/or educational partnerships on behalf of HMS.</em><br><br>16. See Defendants' Initial Disclosures filed on July 16th, 2019 at AEG0001745 that shows the 90%-10% split between AEG and HMS discussed between the parties. HMS agreed to 90% of the commission for WestCliff University.<br><br>17. <em>See</em> Defendant's Second Supplemental Disclosures filed on 20th of July 2019, page 1, the conversion rates are noted in AEG001808. The top left and first column notes the payout per student. The columns next to that contain the conversion table for the leads. On the same side, there is 'Lost Revenue on</td></tr>
</table>

15

|  | AEG leads. In the third column, the Defendants note the losses on the 140 students they could not place. |
|  | 18. See Second Disclosure filed on 20th of July, 2019 page 1, 1, table 'Compensation Breakdown as per 4/24/2017 Contract Section 1.3. in the row in sky blue "Campbellsville" and in the same row is the 90% payout. |
|  | 19. *See* Second Disclosure filed on 20th of July, 2019 page 1, 1, table 'Compensation Breakdown as per 4/24/2017 Contract Section 1.3. in the row in sky blue "Campbellsville" and in the same row is the 90% payout. The row is compressed and it reads "A. HMS offered AEG 90% of the commission for all WestCliff students. As OU and LU were also developed by me, HMS did not offer me the same for LU and OU even though they came through Hernandez. I lost that. A. Loss as for WU, HMS offered 90% of HMS' commission or $8,000. |
|  | 20. *See* Defendants' Initial Disclosures filed on July 16[th], |

16

2019 at AEG0001745 that shows the 90%-10% split between AEG and HMS discussed between the parties. HMS agreed to 90% of the commission for WestCliff University.

21. *See* HMS_PROD05637 email on March 27th, 2017, Chris Howell also wrote the Defendants with the contract where he mentions "WestCliff Addendum" to close the discussions.

22. *See* Deposition of Aparna Vashisht-Rota dated July 23, 2019, page 332, line 19. The commission for OU is <u>$12,000</u>.

23. *See* Defendant's Second Supplemental Disclosures filed on 20th of July 2019 on page 2 with program formats. Please see right below Potomac that notes "I could not place all CU leads, I could not process them all. The next row over notes "This is impt because the students are working full time and attending class. They prefer the cheapest, easiest, and least $ options. Camp and OU were similar. Had I not been blocked, I'd have sent all the apps to

17

|  | HMS. That is 257 apps. Those would have easily been an additional 100. The Defendants note a loss on 257+100 students or 357 students. The column over notes "Regional is preferred. I could not place all WU due to accreditation." AEG001809. |
|  | 24. *See* Second Disclosure filed on 20th of July 2019 page 2, row in blue "Other CPT business I gave up in developing Lindenwood and Ottawa University." Right next to it, it notes "USU contract at $3,000/student for CPT students. I did not develop any other CPT location to my grave detriment as I'd have earned revenue on most of my leads had I focused on WestCliff. They got regional accreditation." In the same row, the Defendants note "This is not to be underscored. I gave up WestCliff to promote LU and OU based on Hernandez's and HMS' contracts. He interfered in my relationship and did not behave properly and pay me on time. I lost a lot." Right next to that, the Defendants note "I could have easily got the exclusive for WU due to my relationship but HMS decided to focus on LU and OU. This was to my grave |

18

|  | detriment because had I spent all my time focused on WestCliff, I'd have made a lot more money. $9,000/student. They pay on time. They wire the funds."

25. *See* Defendants' Fifth Supplemental Disclosures filed on August 23rd, 2019. As per Rota002576-ROTA002578 HMS allegedly has recruited 889 students at LU and OU. 416 out of 889 students is a referral rate of 46%. HMS' own data corroborates the referral calculations as per 17 and 18 above.

26. *See* Declaration of Aparna Vashisht-Rota filed June 6, 2019 paragraph 63 and capacity to produce 225 students/year.

27. *See* the Deposition of Aparna Vashisht-Rota dated July 23, 2019, page 328, line 20 that states that "You provided it in some meet and confer where we were told "Is this the best you can get at trial" or something like this ridiculous statement. So I believe those were the unclassified students. That's how I got the 416 from your meet and confer". |

19

28. *See* Deposition of Aparna Vashisht-Rota Page 332, lines 13-23, "A. 1.3.2 d, HMS_PROD01054. So because Michael Hernandez brought HMS, Lindenwood and Ottawa and they did not tell me, but that does not preclude the fact that those were my efforts. That was my new business development work that brought HMS amazing commissions. I think it's $12,000, if I remember correctly, from the—what whatever documentation that I have seen so far. HMS's regular compensation structure as provided in 124 is 21 to 25%. I believe that entitles me to negotiate a better structure with HMS."

29. *See* Plaintiff's Declaration filed February 11, 2019. Exhibit Z dated September 14, 2018, page 3, lines 5-11 "The Plaintiff opines that *contract* damages on an *independent contractor* agreement for student referrals are over Three Million Three Hundred Thousand dollars ($3,300,000). The underlying assumptions of the contract claims in the last paragraph on Page 2 of Exhibit A are not provable,

20

| | |
|---|---|
| | yet, because Defendants have the documents and other discovery that would prove the value of the contract damages. Accordingly, $3,300,000 is probably greatly exaggerated." *See* Initial Disclosures AEG001180 that notes 20-30 leads per day for Harrisburg. [Using match and logic, that translates into 10,950 leads (30 leads per day) or 5,475 students * $500 = $2,737,000. The conversion number is 50% as HMS is a more established company. *See* HMS_PROD05257. The Defendants estimated $3 million based on that data provided by HMS using math and logic. The Defendants had a conversion rate of 45% (*See* AEG001808)]. |
| | 30. *See* Opposition to Plaintiff's Statement of Discovery Issue Regarding Defendants' Third Set of Discovery Requests, page 4, specifically, "Plaintiff should answer Request for Production No. 16 ("RFP 16"). RFP 16 asks HMS to produce all contracts or agreements between HMS and each person or |

21

identity on Exhibit B. Exhibit B contains more than 2,135 persons and entities[2]. It is AEG's right to know if these efforts lead to the enrollment of students so that AEG may calculate its damages. Running a list of 2,125 names through a computer database may take a days work at the most for HMS's employee but this is proportional and reasonable given the extensive damages sought. Further, the AEG Parties seek that HMS permanently tag these entities as AEG Agents as the contracts allow perpetual royalty rights (1.3.3 f) for any present or future HMS partners. HMS has not provided all discovery and Statement of Discovery Issues are pending."

31. *See* Exhibit J of the Plaintiff's Declaration filed February 11, 2019, page 2, line 6, "I now understand that it is cheaper for Chris to spend $500K to get out of the millions he owes me if he honored the contract." In the same page, see line 22, "$500,000 in legal fees is no money for him to spend to get out of paying millions he owes me if he were to honor

---

[2] [FOOTNOTE 2 in the filing] If only 2 enrollments/agent occurred via AEG's efforts with these 2,135 persons and entities, AEG would be entitled to roughly 2 million dollars in royalty payments. The request is proportional to AEG's damages.

| | the contracts. He refuses to pay even a dime. |
|---|---|
| | 32. *See* Defendants' Opposition to Motion for Summary Judgment filed June 7th, 2019, Exhibit D, paragraphs 71 "Howell does owe me millions if HMS actually honored their contracts." and 74 "I now understand that it is cheaper for Chris to spend $500K to get out of the millions he owes me if he honored the contract. I mean he set it up for me to lose in every way and to be a burden on our family. It is better for him to do that and prove that I didn't do anything even though he clearly benefitted from the work I did so honestly." |
| | 33. *See* Defendants' Motion: Verified Motion to Amend March 21 Order, et al, page 5, paragraph 4, lines 1-5. " AEG Parties and HMS are engaged in the same area of work. Since the Order was entered, it has prohibited Defendants from having virtually any contact with any of the Affected Universities. This has had the effect of unjustly and unfairly harming Defendants because, among other things, they have students they would like to place, but are unable to |

do so because of the Order."

34. *See* Defendants' Motion: Verified Motion to Amend March 21 Order, et al, page 7 "III. THE ORDER IS A COURT ORDERED NON-COMPETE. In effect, the Order in its present form essentially grants Plaintiff a court-ordered non-compete against Defendants. Defendants submit the scope of the Order goes beyond what was necessary and appropriate in the circumstances and limits the Defendants' rights and contractual provisions under various contracts for the universities it developed. AEG should be allowed to continue its business relationship with these Universities."

35. *See* Defendants' Motion: Verified Motion to Amend March 21 Order, et al, page 7, paragraph 4, lines 1-6. "This harms Defendants as it allows HMS to communicate with such persons/entities, while prohibiting Defendants from any communications with them—all based solely on HMS's simple assertion that they are 'theirs' without regard to any basis in fact, contract, or reality. In short, the Order

24

| | is unfairly prejudicial towards Defendants and is overbroad without justification. The order, as drafted, essentially precludes Defendants from earning a meaningful income. This is patently unfair. |
|---|---|
| | 36. *See* Responses to Plaintiff's Third Set of Discovery Requests to Defendants filed on August 28th, 2019, page 5, the last two lines and page 6, lines 11, "Subject to and without waiving these objections, the responding party asserts as follows: Interrogatory No. 19 cannot be answered in full due to the fact that Plaintiff filed a Statement of Discovery Issue in response to Defendants Third Set of Discovery Requests which had an attachment of Agents that are believed to have been referred to Plaintiff by Defendants. In the Third Set of Discovery Requests Interrogatory No. 13 Defendants request information regarding how many students were enrolled through Plaintiff through or with the assistance of any of the names attached to the list identified as Exhibit A. <u>Without information requested Defendants cannot accurately give Plaintiff a "precise calculation."</u> In addition, |

|  | Defendants are unable to obtain this information directly from the agents as Defendants do not wish to violate the Court order that does not allow them to speak with agents of the Plaintiff. <u>Discovery is on-going and the responding party will provide this information to the best of their ability after the court rules on the SODI, after the court revises the TRO</u> current in place and after the information sought is received." |
|  | 37. *See* Second disclosure filed on July 20th, 2019, page 1, table 'Compensation Breakdown as per 4/24/2017 Contract Section 1.3. The third row notes "HMS for Hernandez Introduction (10% of first semester introduction) and that is $450 as noted in the next column. In the next row or the fourth row, there are damages for Hernandez ($100/semester/student) to capture the damages. AEG001808. |
|  | 38. *See* Declaration of Aparna filed on June 6th, 2019 in paragraph 46, lines 1-8. "Around January 2017, Chris and I talked about moving the compensation from Mr. Hernandez to HMS to make it easier for me to collect my funds. I had not been paid for a year and |

26

a half at this point. In parallel, as Mr. Hernandez had been late on his contract to pay me, he offered to increase my compensation from $75/student/semester to $100/student/semester for all programs thereby expanding the scope of the agreement. I wanted this moved up to HMS so it was easier for me to collect my funds and I told Chris this when he came down to San Diego in early 2017. I told him that I was not in the payment collection business. He said he would talk to Mr. Hernandez and that he was fine with the arrangement."

39. *See* Exhibit M of the Plaintiff's Declaration filed February 11, 2019, Page 2, lines 27-31 "The second matter is my contract with Hernandez. I was wondering if OU can take that over so that I can abandon it with him. This way, I can just be paid from the university directly without any weird dynamics".

Lines 40-42 "The main vendor is denying paying me saying that is all the money that I was due (from Hernandez) but the whole reason I got this contract was because I was told by the main vendor that

|  | since both sides benefitted, both should pay and the amounts are the exact same in another deal. I was also told that all universities through Mike would be compensable but now they are changing the tune on that too." |
|  | 40. *See* Third Supplemental Disclosures filed on July 21, 2019 at AEG001838-39. WestCliff agreed to pay AEG 12% of the second semester for the introduction to HMS. The referral contract between AEG and WestCliff was signed on May 3rd, 2016. |
|  | 41. *See* Declaration of Aparna Vashisht-Rota filed on June 6th, 2019 paragraphs 29-33. Upon discovering that Mr. Hernandez was responsible for Lindenwood and Ottawa University, AEG and Hernandez entered into a referral contract for Lindenwood and Ottawa University referral to HMS. As HMS benefitted from both introductions, AEG understood that HMS would pay too as per the Second Agreement Second Agreement dated August 3rd, 2016. It does not mention any universities and HMS agreed to pay 10% of the first semester as both WU and HMS |

28

benefitted from the introduction and HMS and Hernandez benefitted from the introduction. HMS ratified the connection by email on June 2nd, 2016 and thanks AEG for her efforts "dinner and drinks, Wink. Wink." HMS_PROD05590.

42. *See* Hernandez AAA Exhibits Vashisht-Rota 21 in an email dated March 20, 2017 notifies Mr. Hernandez that she wishes to move her contract up to HMS.

43. *See* Declaration of Aparna Vashisht-Rota filed on June 19th, 2019 at paragraph 46, lines 1-8, referring to early January 2017 time frame to move the compensation from Mr. Hernandez to HMS.

44. *See* Declaration of Aparna Vashisht-Rota filed on June 19th, 2019 at paragraph 44, which notes at line 3 "We also discussed the terms of AEG running WestCliff and reached a verbal agreement in which HMS would pay AEG 90% of the commission that HMS received from WestCliff for AEG's work running WestCliff."

29

45. *See* Exhibit J, Page 1, lines 20-25: Total students: 1,500+300+200+500 = 2,500/year or $500*$2,500 or $1,250,000/year. HMS_PROD06822. [Logically, using math, May 2017-2019 is $2,500,000 in loss incurred for 2 years. From June 2019 to date, is additional 5 months or $520,833 or total loss of $3,020,833]. In addition to these main agents, discovery is still pending and the next paragraph estimates the loss.

46. *See* Initial Disclosures AEG001180 that notes 20-30 leads per day for Harrisburg. [Using match and logic, that translates into 10,950 leads (30 leads per day) or 5,475 students * $500 = $2,737,000. The conversion rate is 50% as HMS is a more established company. *See* HMS_PROD05257, specifically, "You have no idea how HMS is organized, how we function, nor do you understand the volume of business we do (I think you'd be blown away)". The Defendants estimated $3 million based on that data provided by HMS using math and logic. The Defendants had a conversion rate of 45% (*See* AEG001808)].

30

| | **The next section deals with unknown damages and those lost due to jurisdiction or pending decision.** AEG reserves the right to add these damages noted below, as the HMS's discovery is incomplete. |

**Unknown/Exemplary Damages:**

| A. Defamation | 1. *See* Defendants' Opposition to Motion for Summary Judgment filed June 7th, 2019, Exhibit B, page 1, email dated August 29, 2018. "Marylou, Thanks for keeping us in the loop. I don't think I'd waste my time responding to her if I were you, she's nuts. Chris." |
| | 2. *See* Defendants' Opposition to Motion for Summary Judgment filed June 7th, 2019Exhibit C, page 1, an email dated October 18, 2018. "Definitely a whacko." |
| | 3. *See* email dated November 1, 2018 "the weekly crier" HMS_PROD06847. |
| | 4. *See* email dated October 30th, 2017,  "Without going into too much detail, Ms. Rota wishes to be compensated for her alleged involvement in introducing the university to HMS despite the fact that you don't even know who she is, nor have you ever spoken to her…go figure". She is a bit crazy. HMS_PROD03990 |
| | 5. *See* email dated September 6th, 2018, "There are reasons why we haven't pursued this any further that lead back to Aparna which I am happy to discuss with you off the record if interested." HMS_PROD03994. |
| | 6. *See* Email dated November 30th, 2015, "not required to be in meetings". In email dated October 30th, 2017, Mr. |

31

Howell writes "Without going into too much detail, Ms. Rota wishes to be compensated for her alleged involvement in introducing the university to HMS despite the fact that you don't even know who she is, nor have you ever spoken to her...go figure". She is a bit crazy. HMS_PROD03990.

7. *See* Opposition to Plaintiff's Statement of Discovery Issue Regarding Defendants' Third Set of Discovery Requests, page 4, specifically, "In regard to Request for Production 17 ("RFP 17") most phones have search functions and we can limit to certain keywords and the AEG Parties can agree to only the scrutiny of Mr. Chris Howell's accounts for all communications between Mr. Chris Howell and each person noted in the RFP to avoid subpoenas. It is wholly relevant to see what Mr. Howell is saying about Ms. Rota given that Mr. Howell and others at HMS called Ms. Rota 'crazy' 'nuts' 'whacko' and these <u>resulted in loss of business and damages to AEG.</u> The time taken to produce this is an hour at the most as most phones now allow back ups and simple searches. The burden is an hour and the benefits are AEG's reputation control, possible defamation claims, and other damages such as interference with AEG's prospective economic relations."

8. *See* Exhibit P and page 5 of the Plaintiff's Declaration filed February 11, 2019 (marked Page 1) of the "Memorandum of Understanding for an Agency Relationship Between Ottawa University, August Education Group LLC at <u>2.3 Student Volumes: AEG is permitted to recruit up to 1,000 students per year per campus.</u>" AEG can produce 1,000 students/year for Ottawa University. [Using math and logic, the estimated damages are 2,500 students from May 2017 to October

| | |
|---|---|
| | 2019 multiplied by $12,000 is $30 million in estimated damages from defamation.] <br><br> 9. *See* More specifically, page 3 of Exhibit Q of the Plaintiff's Declaration filed February 11, 2019 (marked Page 1) of the Memorandum of Understanding for an Agency Relationship Between Harrisburg University, August Education Group LLC at 2.3 Student Volumes: AEG is permitted to recruit up to <u>300 students per year per campus per program at</u> HUST. [Logically, as the Defendants had direct contracts at the same rate as the Plaintiffs, the estimated damages for HUST are an unknown rate multiplied by 750 students from May 2017 to October 2019]. |
| B. Wages & Sexual Harassment | 1. *See* Email dated October 7th, 2015 "where are you working at these days? AEG000211. <br><br> 2. *See* Email dated December 8th, 2015 "Yes, boss I will report back." HMS_PROD05857. <br><br> 3. *See* Email dated March 24th, 2017 "I work for HMS." <br><br> 4. *See* Declaration of Aparna Vashisht-Rota filed on June 19th, 2019 at paragraph 44, which notes at line 6-7 "We also discussed that HMS would reimburse me for my travel expenses for this trip to India. Chris told me that he would prepare an agreement for these items. He never did." <br><br> 5. *See* Exhibit A attached. Specifically, line 10, "we will be seeking $150,000 per year and $40,000 on expense. Not a penny more and the attorney's fees. The Judge said we could get it." <br><br> 6. *See* the Defendants' 6th disclosures filed on September 3rd, 2019 at ROTA002585-ROTA002602. Specifically, |

allegations of 1.) Sexual harassment; 2. Unlawful gender/sex discrimination; 3. Unlawful rave discrimination; 4. Unlawful national origin discrimination 5. Retaliation [public policy] 6. Retaliation Cal. Labor Code §1102.5 7. Constructive discharge 8. Intentional infliction of emotional distress 9. Failure to prevent and remedy unlawful discrimination and harassment 10. Failure to correct and remedy unlawful discrimination and harassment 11. Violation of Equal Pay Act.

7. *See* the Defendants' 6th disclosures filed on September 3rd, 2019 at ROTA003227-Rota003344, specifically, page 11 "Executive Summary Article 3 of the United Nations Protocol to Prevent, Suppress and Punish Trafficking in Persons, especially Women and Children, supplementing the United Nations Convention against Transnational Organized Crime (Trafficking in Persons Protocol) defines trafficking in persons as constituting three elements: (i) an "action", being recruitment, transportation, transfer, harbouring or receipt of persons; (ii) a "means" by which that action is achieved(threat or use of force or other forms of coercion, abduction, fraud, deception, abuse of power or a position of vulnerability, and the giving or receiving of payments or benefits to achieve consent of a person having control over another person);and (ii ) a "purpose"(of  the intended action/means):namely, exploitation." The Plaintiffs have not paid and blocked all compensation, access to place students, and put the burden of expensive litigation.

8. *See* Exhibit E of the Plaintiff's Declaration filed February 11, 2019, page 15 (marked page 9 of DFEH Rights to Sue dated March 19th, 2018 and amended March 27th, 2018), Paragraph 27 b lines 3-11 that notes "The partner called

34

me after the "prohibition" email as b. The partner called me after the "prohibition" email as he got it first he said that it was good that I was prohibited because that means that I was not a hooker. I asked what he meant and he said that HMS is not a good company. They are vicious and just snatch things from you and if you complain about it too much, they then blame you to make you look bad. He said that one of their staff apparently sleeps with anything that moves for $500. He noted that he'd love to not work with them but there is no choice in the matter. Other words attributed to HMS were "hookers, racist, pimps, gold digger, greedy, and liars". I was shocked to learn these and confronted CH with them immediately to ask for explanation."

9. *See* Exhibit E of the Plaintiff's Declaration filed February 11, 2019, page 14 (marked page 8 of DFEH Rights to Sue dated March 19th, 2018 and amended March 27th, 2018), lines 24-25 and paragraph 27 a. "prohibited". The Defendants lost access, could not place students, at the rate of 1,000 students/year/location for Ottawa University at $12,000/student and HUST at unknown rate per student for 300/students/year/location as the Defendants have the right to pursue its own contracts as per paragraph 4 of the Second Agreement dated August 3rd, 2016 (*See* pleadings). 4. Representative agrees not to solicit, divert, accept business from, perform business for or otherwise take away or interfere with any client or customer of HMS; nor solicit, divert or induce any HMS' other contractors or employees to leave HMS' employ at anytime during or after termination of this agreement irrespective of the circumstances or reason for such termination. *This is not applicable in certain instances where Representative develops new business*

|  | *opportunities and/or educational partnerships on behalf of HMS.*<br><br>10. *See* Exhibit O of the Plaintiff's Declaration filed February 11, 2019 page 6, line 32-33 "I think I was to provide a happy ending to be paid. HMS has undue and tremendous power in this situation and by withholding the compensation due to AEG, and all the while promising things is pandering".<br><br>11. *See* the Defendants' Declaration of Aparna Vashisht-Rota filed on June 6th, 2019 at paragraph 91 lines 7-8 "Mr. Ravi Lothumalla called me and said that it is good that you are 'prohibited' because it means you are not a hooker. He said that HMS is a bad company and they have someone that sleeps with anything that moves for $500. He called them other derogatory terms. Footnote: pimps, hookers, racists, gold diggers, greedy, and liars."<br><br>12. *See* the Defendants' Declaration of Aparna Vashisht-Rota filed on June 6th, 2019 at paragraph 107, lines 1-4. "I was promised money, job, bonuses, 'have to do nothing', make a lot of money and I made none. I did all the work and HMS stole it. They tried to lure me into prostitution with fake promises and withheld compensable events to keep me desperate so I'd sleep with them for money or anything that moves for $500."<br><br>13. *See* Defendants' Sixth disclosures and California's Anti-SLAPP Statute at page 1, "Passed into law in 1992, California's anti-SLAPP statute (prohibiting strategic lawsuits against public participation, or SLAPPs) has evolved into a nuanced but powerful procedural device |

for litigants facing lawsuits arising from protected petitioning or speech activity. Found at Code of Civil Procedure sections 425.16 through 425.18, it presents a mechanism to defendants to strike potentially meritless causes of action early in litigation while obtaining a mandatory fee award. If used effectively, it can quickly transform the landscape of litigation."

14. *See* Defendants' Sixth disclosures and California's Anti-SLAPP Statute at page 2, left column last paragraph that provides "Code of civil procedure section 425.16(e) divides "protected activity" into four categories include free speech or petitioning activity that either occur in or are made "in connection with" legislative, executive, or judicial proceedings. The Third category addresses statements made in certain other public forums relating to "an issue of public interest." Finally, the Fourth category serves as The collective result of section 425.16(e)'s definition of protected activity has been the creation of an expansive realm of speech and petitioning activity that maybe susceptible to an anti-SLAPP motion to strike un-der California law. For example, California courts have found activities such as the filing of a right-to-sue notice (Equilon Enterprises, LLC v. Consumer Cause, Inc.(2002)29 Cal.4th 53, 67), statements made during grievance procedures created by state law (Vergos v. McNeal(2007)146 Cal.App.4th 1387, 1400), and statements made in peer-review proceedings established by state law (Kibler v.Northern Inyo County Local Hosp. Dist.(2006) 39 Cal.4th192, 198) fit within the types of legislative, judicial, executive, and other "official proceedings" within which conduct may constitute protected activity." ROTA002581-ROTA002584

37

| C. Discrimination | 1. *See* Exhibit O of the Plaintiff's Declaration filed February 11, 2019, Page 4 Paragraph 1 that states that "HMS overlook's AEG contribution in the Ottawa Nd Lindenwood negotiations. Mike offered $500 to AEG for the introduction to HMS for Lindenwood and Ottawa which is itself greater face value than the amount offered to AEG for similar work. As a percentage of the commission, it will be even more glaring." Further, see second bullet point "HMS has female consultants" and "male consultants". This is gender based discrimination and women are paid less by HM than men for the same work or not at all." HMS has refused to provide additional data on its independent contractor via the Statement of Discovery Issues. |
| | 2. *See* Statement of Discovery Issues. HMS has refused to provide the contract for Ms. Karla who is similar in profile and background to the Defendants. |
| | 3. *See* Contract between Mr. Hernandez and HMS. Mr. |

38

|  | Hernandez was paid $72,000/year while the Defendants were offered $36,000 after 17 months of no compensation whatsoever.

4. *See* Initial Disclosures AEG1808, specifically, "Loss M/F" column.

5. *See* AEG000392, specifically, paragraph 1 "1. In my email to you on June 11th (below) I mentioned that HMS has not received a signed recruitment agreement from US Admissions. Despite not having a formal agreement, HMS paid you in good faith for the students you recruited. If you would like our relationship to continue, please send a signed agreement to me without further delay." [The Defendants in contrast have not been paid for three students and had to spend attorney's fees to obtain the prohibitively expensive and meaningless compensation. |

## ARGUMENT

**I.   DEFENDANTS TIMELY DISCLOSED THEIR DAMAGE CALCULATIONS.**

HMS asserts that Defendants failed to timely provide its damage calculation per Rule 26(a). Defendants, however, have timely provided HMS with its damage calculation in documents entitled "initial disclosure" and by the production of documents, pleadings, declarations, and deposition testimony. For example, in its July 21, 2019, July 22, 2019, and September 2019 disclosures attached as Exhibit A to HMS's motion. In those disclosures, AEG provided detailed disclosure of its damages. *See, e.g.*, AEG001808 – AEG001833 (attached to the Second Supplemental Disclosure), AEG002345-AEG002356 (attached to the Third Supplemental Disclosure), ROTA002581-ROTA002584, ROTA002650-ROTA002665, ROTA002896-ROTA002906 (attached to the Sixth Supplemental Disclosure). Those disclosures mention the damages in the 7th and 8th disclosures.

The Defendants would like to note that the calculations in those disclosures are incomplete. HMS has failed and refused to provide documentation and information concerning AEG's damages including information about students, agents, universities, HMS' income, and placements at universities for which AEG should be compensated. HMS has refused to tag universities that AEG developed for HMS. The information that will allow AEG to confirm its

calculations is the subject of its Third Set of Discovery objected to by HMS in its Statement of Discovery Issues. Once AEG obtains the information sought in that discovery, it will again supplement its disclosures; update its calculations, and metrics for precise damages.

AEG has taken great effort to include evidence that had been provided to HMS and distill it into easily understood spreadsheets. Nearly all of the evidence has been repeated to HMS multiple times and AEG has identified the location in the records supporting the damages, where available, and herein where all evidence included in this opposition can be found. As always, AEG reserves all rights to update its calculations as and when more data becomes available from the Statement of Discovery Issues or any other means. AEG does not have access to the data from HMS. Moreover, even if HMS were to provide the information AEG has sought, the Court entered an order that prevents AEG from obtaining data from the agents, universities, and others to ratify such numbers.

Absent timely disclosures by HMS, it is AEG that is being deprived of data to fully tabulate its damages. Nonetheless, contrary to HMS's assertion, all damages noted have been timely entered into evidence.

## II. DEFENDANTS' SUPPLEMENTAL DISCLOSURES AFTER THE CLOSE OF DISCOVERY INTRODUCE NOTHING NEW, ONLY SIMPLIFIED INFORMATION.

41

HMS asserts that Defendants' Seventh and Eighth disclosures were untimely and prejudicial to HMS. Not so. The Seventh and Eighth disclosures presented the same information previously disclosed to HMS is a simplified manner and is neither new nor prejudicial.  The seventh disclosure provides ongoing losses that AEG faces due to wrongful prohibition and has provided the damages on numerous occasions as noted the table. The damages in the 7th disclosure are noted in ROTA002902 as a part of the sixth disclosure prior to the fact discovery deadline. The eighth disclosure narrows the damages based on a recent court decision ruled in October 2019 that AEG noted prior in its damages in AEG1808. Finally, AEG still can't calculate its contractual damages as HMS has refused to perform on its obligations to provide data. Indeed, once Defendants obtain the information HMS has struggled to hide from the Court and Defendants, Defendants will again supplement its calculations to incorporate that information. Alleged 'prejudice' at this point is meaningless and impossible based on the current position of this case, discovery disputes, and unresolved motions pending between the parties.

### III.   DEFENDANTS' DAMAGES DO NOT REQUIRE EXPERT TESTIMONY.

Defendants' damages in this case are based on a simple formula set forth by contract and losses on students the Defendants could not place based on a simple formula directly due to HMS' 'wrongful prohibition'. It does not require expert testimony to prove or for the Court to award. To the extent any industry-specific information is required, Dr. Rota is certainly qualified

42

and will be present at trial to present such information. Furthermore, as HMS has not yet

provided information needed to precisely calculate damages, AEG reserves its rights to

supplement with expert opinions as needed based on what is revealed. Thus far, the damages

are straightforward and based on contracts between AEG and HMS.

**IV.    UNKNOWN DAMAGES: DEFENDANTS' DAMAGES RELATED TO WAGES, HARASSMENT, DISCRIMINATION, AND DEFAMATION MUST EITHER BE PERMITTED AS A PART OF THIS TRIAL OR THE DEFENDANTS SHOULD BE GRANTED AN EXEMPTION TO PURSUE ITS CLAIMS IN CALIFORNIA**

Defendants are residents of California. The harassment and all the work under all the

contracts occurred in California. AEG is incorporated in California. Recent changes in the

California harassment law extended the deadline to report harassment from one to three years.

HMS has played procedural games to deny AEG the stay it needed to establish the liability as

per California laws. Denying these claims would be injustice to AEG who is not only new to Utah

law but also new to litigation of any kind. For those reasons and the fact that HMS has still not

fulfilled its own contractual and post contractual obligations or litigation obligations all the

while rushing the Utah litigation deadlines to prevent AEG from pursuing its claims or allowing

time to add it to the Utah action. Therefore, AEG must be granted the permission to add these

damages or given an exemption to pursue its claims in the harassment suit (pending a decision).

The Court is requested to note that AEG requested and spent money on a motion to request a

43

stay as it needed more time to collect damages, await pending decisions to add to Utah action, and complete discovery but was denied that right to gain more time. HMS on the other hand, has not provided discovery wholly relevant to precise damages calculations and still has the audacity to again attempt to limit AEG's damages to grant it more injustice.

HMS is holding the information Defendants need to precisely calculate their damages. It is beyond bad faith to enforce a deadline when the Plaintiffs are the cause of any failure to meet that deadline. The Defendants affirmatively reiterate that they reserve all their rights to add damages as information is provided and becomes available to them as the Defendants have done consistently throughout the disclosures, responses to interrogatories, and request for documents. In the alternative, the Defendants humbly seek an exemption for the harassment suit pending in California to pursue its damages.

## CONCLUSION

For the reasons set forth herein, Defendants request that the Court deny HMS's motion.

DATED this 4th day of November, 2019.

/s/ Kenneth L. Reich

Kenneth L. Reich

Lewis | Hansen

*Attorneys for Defendants*

44

45

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of November, 2019, I e-filed the foregoing via the Utah State District Court electronic filing system, which caused to be delivered an electronic copy of same to the following:

Jefferey W. Shields
Nathan D. Thomas
Elizabeth Butler
JONES, WALDO, HOLBROOK
& McDONOUGH, P.C.
Attorneys for plaintiffs
jshields@joneswaldo.com
nthomas@joneswaldo.com
ebutler@joneswaldo.com


/s/ Kenneth L. Reich

46

EXHIBIT 13

Pro-Se Litigant
Dr. Aparna Vashisht-Rota
12396 Dormouse Road,
San Diego, CA 92129, USA
Email: aps.rota@gmail.com
TELEPHONE: 858-348-7068

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| APARNA VASHISHT-ROTA, an individual,<br><br>Plaintiff,<br><br>v.<br><br>HOWELL MANAGEMENT SERVICES, a Utah limited liability company; CHRIS HOWELL, an individual; TARA HOWELL, an individual, JUSTIN HOWELL, an individual, KATHLEEN HOWELL, an individual; VERLO HOWELL;<br><br>HMS Defendants,<br><br>JUSTIN SPENCER, an individual,<br><br>Defendant,<br>FRANCK TROCKI, an individual,<br><br>Defendant,<br><br>MICHAEL HERNANDEZ, an individual,<br>Defendant. | Case No. 3-20-0321<br><br>**FOURTH AMENDED COMPLAINT FOR:**<br><br>1. EQUITABLE REMEDY: BREACH OF CONTRACT SECOND AGREEMENT<br>2. EQUITABLE REMEDY: INJUNCTIVE RELIEF<br>3. BREACH OF THIRD EMPLOYMENT AGREEMENT<br>4. UNFAIR COMPETITION<br>5. TVPRA $1595 (A)<br>6. SEXUAL HARASSMENT IN VIOLATION OF §51.9 (A)(1)(I)<br>7. VIOLATION OF CIVIL CODE §51.5:<br>8. FAILURE TO PREVENT DISCRIMINATION IN VIOLATION OF CIVIL CODE §51;<br>9. VIOLATION OF EQUAL PAY |

---

## THE FIRST JUDICIAL DISTRICT COURT
## IN AND FOR CACHE COUNTY, STATE OF UTAH

| | |
|---|---|
| HOWELL MANAGEMENT SERVICES, LLC <br><br> Plaintiff, <br><br> vs. <br><br> AUGUST EDUCATION GROUP, LLC, and APARNA VASHISHT ROTA, <br><br> Defendants. | SCHEDULING ORDER <br><br> Case No. 170100325 <br><br> Judge Angela F. Fonnesbeck |

THIS MATTER IS BEFORE THE COURT pursuant to the following:

- Defendants' Verified Motion to Amend March 21 Order and, in the Alternative Motion for Exemption to Existing Order Request for Hearing [D.E. 273], filed August 22, 2019;
- Plaintiff's Statement of Discovery Issues on Request for Extraordinary Discovery [D.E. 289], filed on September 3, 2019;
- Plaintiff's Motion to Exclude Damages Evidence [D.E. 347], filed on October 21, 2019;
- Plaintiff's Motion for Summary Judgment on Counterclaim [D.E. 348], filed October 21, 2019;
- Plaintiff's Motion for Contempt of March 21, 2019, Order [D.E. 384], filed December 9, 2019; and
- Plaintiff's Motion to Exclude Damages Evidence [D.E. 409], filed January 6, 2020.

The Court held numerous hearings on these matters, including on November 13, 2019, January 23, 2020, and March 23, 2020. After those hearings, the Parties submitted several additional motions for decision. The Court then stayed the proceeding and required the Parties to participate in mediation. Since then, a global health pandemic arose, the Parties mediation was unsuccessful, and the Parties submitted a request to submit for the aforementioned issues.

Under Utah law, the Court has a duty to manage the cases before it, including researching and preparing decisions it has taken under advisement. The Parties raised a wide range of legal

issues that require detailed analysis, and they have presented a significant amount of evidence on the various claims and issues. Currently, the Court is addressing the challenges imposed on it by the global health pandemic while also managing a particularly demanding docket. In an effort to ensure that it has thoroughly and adequately addressed all the details and issues presented within the action, the Court hereby notifies the Parties that it will be taking an additional thirty (30) days to issue its memorandum decision.

DATED this ⎍⎍ day of June, 2020.

BY THE COURT:

Judge Angela F. Fonnesbeck

EXHIBIT 2

Dr. Aparna Vashisht-Rota
Pro Se Litigant
12396 Dormouse Road,
San Diego, CA 92129
Aps.Rota@gmail.com
858-348-7068

## IN THE FIRST JUDICIAL DISTRICT COURT
## CACHE COUNTY, STATE OF UTAH

| | |
|---|---|
| APARNA VASHISHT-ROTA, an individual,<br><br>          Plaintiff,<br>vs.<br><br>HMS, LLC, a Utah limited liability company; and CHRIS HOWELL, an individual<br><br>          Defendants. | **NOTICE OF SUPPLEMENTAL AUTHORITY IN SUPPORT OF PLAINTIFF'S MOTION TO REQUEST JUDGE MORGAN'S OPINION ON THIS MOTION**<br><br>Civil No. 200100119<br>Honorable Judge Fonnesbeck |

Plaintiff would like to supplement with a few documents pursuant to Rule 7(i), U.R.C.P. Plaintiff respectfully submits significant evidence that came to her attention as she was reviewing the appellate docket. Plaintiff wanted to submit evidence that opposing counsel filed the so-called "ADR" motion in bad faith in 170100325 to mislead the Court on purpose. Opposition has refused all efforts to settle or cooperate so Plaintiff as surprised by the ADR motion. The parties tried to mediate see attached (Exhibit A) but opposing counsel refused and the claim was released from mediation, which Plaintiff believes is free.

Instead, to cost Plaintiff money and to coerce a settlement far

1

removed from the money owed, that Court ordered a *sua sponte* mediation without Plaintiff's input to aid the opposition in causing more money damages and an opportunity to add confidential things to the trial briefings "I am not a child of a lesser God" (Exhibit B). In addition, even Ms. Polich remarked that the contract dispute should be in arbitration as the duty to pay has already arisen and as nothing happened in Utah.

1.) The exhibits show that opposition put forth the mediation motion in bad faith to coerce ridiculous money far removed from the money and access rights due.

2.) The second purpose of that motion was to try to get something to add to the trial briefings against Plaintiff

3.) The third purpose is to cause more money expenditure.

Mediator Polich can attest to that fact that Plaintiff, despite reservations, Plaintiff came prepared to resolve the matter and opposition did not. Had the Court asked for Plaintiff's response to the bad faith mediation motion, she'd have put forth this evidence of a failed mediation because opposing counsel refuses to cooperate. Take the SODI for instance, that motion is only possible because opposition refuses to tag the agents Plaintiff brought citing confidentiality but it is the agents that Plaintiff brought. How can the opposition put forth a motion for mediation when it has refused to cooperate in other forums? The Utah Court has the motion with respect to the discovery issues so on what basis did the opposition think that the Court should consider a motion for mediation? It acted to fool a busy, new, and a lady Judge. If there are discovery issues that have not been fulfilled by the opposition, how can it ask for mediation in "GOOD FAITH"? It cannot and it is sad that opposition misused a busy new

2

Judge's trust to jeopardize her career and ruling fidelity.

## CONCLUSION

Opposition put forth the motion for ADR in the old Utah matter in bad faith. Pursuant to Rule 60 (D), Plaintiff brings this to the Court's attention as she was reviewing the case paperwork for the appellate court, which is going really well. Plaintiff is happy with her work and it will most likely get reversed and remanded.

## VERIFICATION

I, Aparna Vashisht-Rota, hereby attest and affirm that the facts set forth herein are true and accurate to the best of my ability.

/s/ Aparna Vashisht-Rota
Dr. Aparna Vashisht-Rota

## CERTIFICATE OF SERVICE

I hereby certify that on January 16, 2021, I filed the foregoing with the Clerk of the First District Court of Utah. Participants in the case who are registered CM/ECF users will be served by the court's CM/ECF system.

Date: January 16, 2021

*/s/ Aparna Vashisht-Rota*
Dr. Aparna Vashisht-Rota
*Pro-se litigant*

EXHIBIT A

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

AUG 08 2019

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

---

APARNA VASHISHT-ROTA, an
individual,

          Plaintiff - Appellant,

  v.

HOWELL MANAGEMENT
SERVICES, LLC, a Utah limited
liability company; et al.,

          Defendants - Appellees.

No. 19-55748

D.C. No. 3:18-cv-02010-L-AGS
U.S. District Court for Southern
California, San Diego

**ORDER**

---

This case is RELEASED from the Mediation Program.

Counsel are requested to contact the Circuit Mediator should circumstances

develop that warrant further settlement discussions.

FOR THE COURT:

Jonathan Westen
bs/mediation                         Circuit Mediator

Exhibit B

 Gmail

Aparna Vashisht Rota <avrota@augusteducationgroup.com>

---

## HMS/Rota

---

**Aparna Vashisht Rota** <avrota@augusteducationgroup.com>      Fri, Mar 13, 2020 at 10:53 AM
To: Barbara Polich <bpolich@antczaklaw.com>
Cc: JEFF SHIELDS <JShields@joneswaldo.com>, Liz Butler <lbutler@joneswaldo.com>, Heather Loveridge
<HLoveridge@joneswaldo.com>, "klr@lewishansen.com" <klr@lewishansen.com>, "gacosta@lewishansen.com"
<gacosta@lewishansen.com>

Ms. Polich:

The email contains information that should not have been sent to opposing counsel. We had begun looking for replacements as we want to keep on track for Monday and get this done and perhaps that is the best option at this point or to submit to rulings. I will let counsel discuss this. That is a huge boundary violation for me and I will be lying to say that your email comforts me. I don't want a 'friend' of Jeff to coerce me into a bad agreement. It is best that we go to rulings.

In the meantime, as I am writing this, my kids have been asked to stay home as they did not get sick so they have no school. Air travel is ill-advised so perhaps we submit for rulings. I am not a child of a lesser God.

Ken/Grace: I will call you once I have calmed down. I want to proceed with rulings.


Best regards,


Dr. Aparna Vashisht-Rota
President & CEO
Phone: 858-348-7068

PRIVILEGED AND CONFIDENTIAL
This communication and any accompanying documents are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon this communication is strictly prohibited. You are not to use the e-mail, or the information in it, in any way.


On Fri, Mar 13, 2020 at 10:41 AM Barbara Polich <bpolich@antczaklaw.com> wrote:

Dr. Rota,


I did not view scheduling as an issue that required confidentiality as we are all trying to sort scheduling out in this unprecedented set of circumstances. I am sorry you feel it was inappropriate. As I mentioned previously scheduling is best left to counsel. I want you to feel positive about participating in the mediation. As a mediator I am a neutral party and I want to ensure all parties and counsel come to the mediation believing that to be the case. Again I am sorry that I conveyed information to counsel that you did not wish them to have.



**From:** Aparna Vashisht Rota <avrota@augusteducationgroup.com>
**Sent:** Friday, March 13, 2020 11:12 AM
**To:** Barbara Polich <bpolich@antczaklaw.com>
**Cc:** JEFF SHIELDS <JShields@joneswaldo.com>; Liz Butler <lbutler@joneswaldo.com>; Heather Loveridge
<HLoveridge@joneswaldo.com>; klr@lewishansen.com; gacosta@lewishansen.com
**Subject:** Re: FW: HMS/Rota



Ms. Polich:


Your email adding opposing counsel is a violation of my confidential and privileged information. He is not a friend of mine and I did not authorize this disclosure. It makes me profoundly uncomfortable that you did that.

Best regards,

Dr. Aparna Vashisht-Rota

President & CEO

Phone: 858-348-7068

PRIVILEGED AND CONFIDENTIAL
This communication and any accompanying documents are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon this communication is strictly prohibited.  You are not to use the e-mail, or the information in it, in any way.

On Fri, Mar 13, 2020 at 9:57 AM Barbara Polich <bpolich@antczaklaw.com> wrote:

Dr. Rota,

While I appreciate your interest in the schedule I think it will become unduly complicated if we do not allow counsel, perhaps with the assistance of the court, to sort through it.

**From:** Aparna Vashisht Rota <avrota@augusteducationgroup.com>
**Sent:** Friday, March 13, 2020 10:15 AM
**To:** Barbara Polich <bpolich@antczaklaw.com>
**Cc:** Kenneth L. Reich <klr@lewishansen.com>; Grace Acosta <gacosta@lewishansen.com>
**Subject:** Re: HMS/Rota

Dear Ms. Polich:

Here is the link to the cases worldwide. https://experience.arcgis.com/experience/685d0ace521648fa5beeeee1b9125cd. I am wondering if we should update the court on this issue. I am hesitant to take an airplane at this time for obvious reasons. We just finished our quarantine with no symptoms. In terms of meeting in person, I can still make the 16, 17, or 19/20 and perhaps you can be online in Utah. I have no idea if that would violate the order. In any event,  it may be an idea to ask the court if we can meet online to get this done by March 23, 2020. It impacts my cases and appeals in CA so keeping on schedule is important to me.

Best regards,

Dr. Aparna Vashisht-Rota

President & CEO

Phone: 858-348-7068

PRIVILEGED AND CONFIDENTIAL
This communication and any accompanying documents are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon this communication is strictly prohibited.  You are not to use the e-mail, or the information in it, in any way.

On Fri, Mar 13, 2020 at 8:13 AM Barbara Polich <bpolich@antczaklaw.com> wrote:

Dr. Rota,

Thank you for your email. I appreciate your expressed willingness to go forward online and the need to have the mediation go forward as soon as possible, but the court has ordered in person mediation and I do not have the authority to override a court order.  I am awaiting communication from all counsel about the schedule.

Sent from my iPad

On Mar 12, 2020, at 11:44 PM, Aparna Vashisht Rota <avrota@augusteducationgroup.com> wrote:

Dear Ms. Polich:

I am sorry to hear that you are under the weather. I am feeling good. In light of the virus situation, and depending on how you feel, I wondered if we can hold the session online or by phone on Monday as planned. If meeting online is an option, I am open on the 16/17 and 19/20. We have a deadline and I would like to meet it as I have not been paid for 5 years. I was a new entrant and this dispute destroyed my business, morale, and finances. Thanks,

Best regards,

Dr. Aparna Vashisht-Rota

President & CEO

Phone: 858-348-7068

PRIVILEGED AND CONFIDENTIAL
This communication and any accompanying documents are confidential and privileged. They are intended for the sole use of the addressee. If you receive this transmission in error, you are advised that any disclosure, copying, distribution, or the taking of any action in reliance upon this communication is strictly prohibited.  You are not to use the e-mail, or the information in it, in any way.

On Thu, Mar 12, 2020 at 8:14 AM Kenneth L. Reich <klr@lewishansen.com> wrote:

PRIVATE AND CONFIDENTIAL MEDIATION STATEMENT

Ms. Polich,

In advance of the mediation scheduled for Monday, please find attached three documents in terms of a broad overview of the facts in this matter. The first is a declaration prepared in opposition to HMS's motion for summary judgment, an expert report, and a brief in opposition to a motion concerning damages. Briefly, this case concerns three parties: Howell Management Group, LLC, plaintiff, and Aparna Vashisht Rota (an individual) and her company, August Education Group, LLC. There is no insurance covering or defending any of the claims. This mediation has been ordered by Second District Court Judge Angela Fonnesbeck (Logan). There are a multitude of motions pending before Judge Fonnesbeck on which she indicates she is prepared to issue a written ruling should the parties fail to resolve their differences through mediation. The

claims, contracts, and issues are fairly evident in the documents provided. There are a number of California cases that involve Dr. Rota and AEG against HMS (and its principal, Chris Howell). Although we do not represent Dr. Rota and/or AEG in the California actions, it is anticipated that the parties will discuss resolution of all claims in all jurisdictions; i.e., a global resolution. Prior settlement discussions were undertaken at various points in this litigation and all without success. All prior discussions involved HMS paying AEG some amount to resolve the cases in a 'nuisance-value' range below $50,000 or so. There are no pending or open offers or discussions.

Dr. Rota and AEG will be present, ready, and prepared to resolve this matter in good faith at the mediation. If there are other documents you would like us to send you or bring to the mediation, please let me know. I will see you on Friday at 2:00 in your offices where we can discuss the intricacies particular to these parties and this litigation that may not be apparent from the documents attached.

Ken

Kenneth L. Reich

LEWIS HANSEN PLESHE FLANDERS LLC

8 East Broadway, Suite 410

Salt Lake City, Utah 84111

Direct Dial: (801) 675-4299

Office: (801) 746-6300

Fax: (801) 746-6301

klr@lewishansen.com

website

<image001.png>

*To comply with IRS regulations, we inform you that any U.S. federal tax advice contained in this communication, including attachments, is not intended or written to be used and cannot be used for the purpose of avoiding penalties under the Internal Revenue Code or for promoting, marketing or recommending to another party any transaction or matter addressed herein.*

*This email was sent by a law firm and contains information that may be privileged and confidential. Any unauthorized use is prohibited. If you are not the intended recipient, please delete this email, any attachments and notify the sender immediately.*



## Settlement Agreement: Mediation

**Kenneth L. Reich** <klr@lewishansen.com>                                                 Mon, Apr 13, 2020 at 1:33 PM
To: Aparna Vashisht Rota <avrota@augusteducationgroup.com>

Wow. Go big or go home, right? Well, not so fast. Even assuming 1% of this half-a-billion demand were actually ordered (or even within the realm of possibility), HMS would take bankruptcy—guaranteed. Asking this big is the equivalent of asking nothing at all. It is so large that it loses its effectiveness. It does not move the needle of resolution. As you know, this case has so many unknowns that a bottom line number is nearly impossible. The best we can do is try to evaluate the risks and benefits of settlement versus not settling and moving forward. Let's plan a time for us to talk tomorrow. When would be a good time to talk?

Ken

Kenneth L. Reich

Lewis | Hansen

klr@lewishansen.com

801-675-4299

website

[Quoted text hidden]



Aparna Vashisht Rota <avrota@augusteducationgroup.com>

## In Limini motion draft

**Grace** <Grace@tagteamlaw.com>                                         Fri, Apr 17, 2020 at 9:42 AM
To: Aparna Vashisht Rota <avrota@augusteducationgroup.com>
Cc: "Kenneth L. Reich" <klr@lewishansen.com>, Grace Acosta <gacosta@lewishansen.com>

Aparna,

I looked at the settlement offer from HMS. I have a hard time understanding why you wouldn't take this money and get back to life. You've told me numerous times that you just wanted to get through this and go back to work helping students. You have repeatedly told me that you just want this over so that you can go back to make more money. This is a reasonable way out for you. You take this money and it helps you recoup some of your attorney fees----but you won. You fought the dragon and made him pay you.
What I am most concerned about is that you have all these claims for damages but if you win---they just close shop and open up a new company doing the same thing and your judgment is worthless. Trust me----I have seen this before. You getting $250k from them is a very good result. Especially now that there are no contracts keeping you from competing with them and you can get to work and make your money again. Again---you told me all along this was what you wanted to do.

This is a fools folly. You could win every thing at trial and spend another $250k to get a judgment that is worthless. The smart thing to do is to cut and run. Take this money and be done.

In contrast---you have lots to loose. You have been sue individually for your actions. You can't just change your name and move on if you loose. You will have to file bankruptcy and loose your credibility in the community because of this. Do not risk this. It is not smart.

This case is complex and convoluted and there is a real chance that the court finds that there is no contract between you and HMS and that you are entitled to NOTHING. NOTHING.

██████████████████████████████████████████████
██████████████████████████████████████████████

██████████████████████████████████████████████
██████████████████████████████████████████████

██████████████████████ | ████████████████████
██████████████████

Much love and peace,
Grace

**From:** Aparna Vashisht Rota <avrota@augusteducationgroup.com>
**Sent:** Thursday, April 16, 2020 10:41 PM
**To:** Grace <Grace@tagteamlaw.com>
**Cc:** Kenneth L. Reich <klr@lewishansen.com>; Grace Acosta <gacosta@lewishansen.com>
[Quoted text hidden]

[Quoted text hidden]

# EXHIBIT 3

The Order of the Court is stated below:
Dated:   September 11, 2019        /s/   Kevin K. Allen
          10:22:39 AM                    District Court Judge

Kenneth L. Reich (8578)
Grace Acosta (9836)
J.D. Lewis (16704)
LEWIS HANSEN
Eight East Broadway, Suite 410
Salt Lake City, Utah 84111
Telephone: (801) 746-6300
Facsimile: (801) 746-6301
klr@lewishansen.com
gacosta@lewishansen.com
jd@lewishansen.com
*Attorneys for Defendants*

### IN THE FIRST JUDICIAL DISTRICT COURT
### CACHE COUNTY, STATE OF UTAH

| | |
|---|---|
| HOWELL MANAGEMENT SERVICES, LLC, a Utah limited liability company, <br><br> Plaintiff, <br> vs. <br><br> AUGUST EDUCATION GROUP, LLC, a California limited liability company; and APARNA VASHISHT ROTA, an individual <br><br> Defendants. | **ORDER GRANTING EX PARTE MOTION FOR DR. VASHISHT-ROTA TO APPEAR BY PHONE AT ALL UPCOMING HEARINGS** <br><br> Civil No. 170100325 <br><br> Judge: Kevin K. Allen |

THIS MATTER having come before the Court upon the filing of an Ex Parte Motion by

Defendants August Education Group, LLC (AEG) and Dr. Aparna Vashisht-Rota ("Rota")

referred to collectively as ("AEG") (together, "Defendants").  After reviewing said motion, the

court has decided that Defendant will be allowed to appear at the September 23, 2019 hearing

and all subsequent pre-trial hearings by phone.

1

003313

DATED this 10th day of September 2019.

/s/S. Grace Acosta
Kenneth L. Reich
Grace Acosta
JD Lewis
Lewis Hansen
*Attorneys for Defendants*

**\*\*\* The Court's electronic signature will appear at the top right-hand corner of the first page of this document. \*\*\*\***

2

003314

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on September 10, 2019, the foregoing Motion was

delivered via electronic filing on the following:

> Jeffrey W. Shields
> Nathan D. Thomas
> Elizabeth M. Butler
> JONES, WALDO, HOLBROOK & McDONOUGH, P.C.
> 170 South Main Street, Suite 1500
> Salt Lake City, Utah 84101
> Telephone: (801) 521-3200
> Facsimile: (801) 328-0537
> jshields@joneswaldo.com
> nthomas@joneswaldo.com
> ebutler@joneswaldo.com

> ***/s/ Liane Monroe***

3

003315

# EXHIBIT 4

# SUPREME COURT OF THE UNITED STATES
## OFFICE OF THE CLERK
## WASHINGTON, DC 20543-0001

May 13, 2024

Apama Vashisht-Rota
12396 Dormhouse Road
San Diego, CA 92129

RE: Vashisht-Rota v. Howell Management Services
USDC SDCA No. 3:20-cv-00321-AGS-KSC

Dear Ms. Vashisht-Rota:

The above-entitled petition seeking unspecified relief was originally postmarked October 19, 2023, and received again on May 07, 2024. The papers are returned for the following reason(s):

If you intend to file a petition for an extraordinary writ, you must specify the type of relief being sought. Rule 20, and the must show how the writ will be in aid of the Court's appellate jurisdiction, what exceptional circumstances warrant the exercise of the Court's discretionary powers, and why adequate relief cannot be obtained in any other form or from any other comt Rule 20.1.

If you are atempting to file a petition for a writ of certiorari seeking review of an order from the United States District Court for the Southern District of California in case no. 3:20-cv-00321-AGS-KSC you are informed that your case must first be reviewed by a United States court of appeals. 28 USC 1254.

You are reminded that Rule 18 only applies to a direct appeal to this Court from the decision of a United States district court only when authorized by law.

Your petition and check in the amount of $300.00 is returned herewith.

Sincerely,
Scott S. Harris, Clerk
By:

Rashonda Garner
(202) 479-3025

Enclosures